UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. 21-CR-619-BAH |
| v. | : | |
| | : | |
| ERIK HERRERA, | : | |
| | : | |
| Defendant. | : | |

### ERIK HERRERA'S MOTION FOR TRANSFER OF VENUE

Erik Herrera, through undersigned counsel, and pursuant to Federal Rule of Criminal Procedure 21(a), hereby respectfully requests that this Court transfer the proceedings to the Central District of California, or to any district other than the District of Columbia and its immediately neighboring districts.[1]

### ARGUMENT

Both the Fifth and Sixth Amendments secure the right to trial by an impartial jury. Const. amends. V, VI; *see also Skilling v. United States*, 561 U.S. 358, 378 (2010). The importance of an impartial jury is fundamental to due process and, notwithstanding constitutional venue prescriptions, when prejudice makes it such that a defendant cannot obtain a fair and impartial trial in the indicting district, the district court must transfer the proceedings upon the defendant's motion. Fed. R. Crim. P. 21(a); *see also Skilling*, 561 U.S. at 378.

In some instances, the hostility of the venue community is so severe that it gives rise to a presumption of juror prejudice. *See Patton v. Yount*, 467 U.S. 1025, 1031 (1984). As recently as 2010, the Supreme Court reaffirmed the presumption approach articulated in *Patton* and

---

[1] This motion to transfer venue is based on the motion filed in *United States v. Sean McHugh,* 21-cr-453 (JDB). The court in that matter denied the motion.

identified three factors to guide the lower courts in determining whether a presumption should attach: (1) the size and characteristics of the jury pool; (2) the type of information included in the media coverage; and (3) the time period between the arrest and trial, as it relates to the attenuation of the media coverage.[2]  *Skilling*, 561 U.S. at 378-83.

Where it attaches, the Court has further recognized that the presumption of prejudice overrides juror declarations of impartiality during voir dire because such attestations may be insufficient to protect a defendant's rights in particularly charged cases.  *Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *see also Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father.").  Indeed, on appeal of a denial of a motion for change of venue, an appellate court need not even examine the voir dire record if it finds that the presumption attached.  *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963) ("But we do not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of law in this case required a [transfer].").  Thus, under this precedent, voir dire is simply not a cure for significant and substantiated due process concerns about the jury pool.  Each of those concerns is pressing in this case.

//

---

[2] Though not relevant to the instant motion, the Court identified a fourth factor for consideration on appeal following trial in the contested venue: (4) whether the jury convicted the defendant on all counts or only on a subset of counts.  The lack of uniformity in result after denial of a motion to transfer venue, the Court observed, indicates that the jury was impartial and capable of rendering a verdict on the facts presented, rather than preconceived notions of guilt.

A.      **The size and characteristics of the District of Columbia jury pool weigh in favor of finding a presumption of prejudice.**

The foundation for the presumption of prejudice is found in *Rideau*. 373 U.S. at 727.  In *Rideau*, the first factor that the Court weighed in favor of a finding of prejudice was that a sizeable portion of the small jury pool—about half, according to the numbers cited in the opinion—had been exposed to prejudicial televised broadcasts about the case.  *See id*. at 724.  Despite the fact that voir dire revealed that only three jurors had actually seen the broadcasts, the Court found that the share of the pool that was tainted was significant enough to render the defendant presumptively prejudiced.  *See id*.

Because measuring the reach and impact of negative media reporting is difficult, in applying *Rideau*, many courts have focused on population size and diversity as a proxy for the share of the population that was likely impacted.  For example, in *Skilling*, the Court observed that while the number of Enron victims in Houston was higher than that of other crimes, it was far from universal, and because Houston is the fourth-largest city in the United States, and is highly diverse, a significant number of prospective jurors would have had no connection to Enron. *Skilling*, 561 U.S. at 358 ("[E]xtensive screening questionnaire and followup [sic] *voir dire* yielded jurors whose links to Enron were either nonexistent or attenuated.").

In contrast to Houston, the District of Columbia is one of the United States' smaller metropolises, with a population under 700,000.[3]  And the impact of the events of January 6 on the residents of the District of Columbia were far more widespread than that of Enron in Houston, affecting a far greater share of residents than the conduct at issue in *Skilling*.

---

[3] *See 2020 Census Data Shows DC's Population Growth Nearly Tripled Compared to Previous Decade*, DC.gov (Apr. 26, 2021) (D.C. population recorded by census as 689,545), https://dc.gov/release/2020-census-data-shows-dcs-population-growth-nearly-tripled-compared-previous-decade.

First, a significant proportion of District of Columbia residents either work for the federal government themselves or have friends or family who do. Specifically, as of September 2017, the U.S. Office of Personnel Management reported that there are over 580,000 federal civil workers and annuitants in the greater Washington, D.C. area (excluding postal workers are certain other federal employees).[4] Just over 177,000 of those workers and annuitants are within the District of Columbia itself. *Id*. With a total population of around 690,000, it seems clear that any given member of the District of Columbia jury pool has a greater likelihood of being closely connected to the federal government than those in comparable metro areas. In fact, as of 2019, according to the DC Policy Center, active federal employment (including postal workers) accounted for over a quarter of all jobs in the District of Columbia.[5] And of course, for each federal worker, there are many friends and family members who are closely connected to the federal government by proxy.

In particular, thousands of individuals work for Congress directly and many more residents have friends and family who do.[6] Another large share are in, or have friends and family in, the many law enforcement groups who took part in responding to January 6.[7] This

---

[4] *Federal Civilian Employment*, OPM (Sept. 2017), https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/

[5] *Trends in Federal Employment in DC*, DC Policy Center (Mar. 28, 2019), https://www.dcpolicycenter.org/wp-content/uploads/3019/03/Fed-jobs-role-in-DC-economy.png.

[6] Statistics current as of 2015 show the size of Congressional staff at over 19,000. Brookings Institute, *Vital Statistics on Congress*, Chapter 5-1, available at https://www.brookings.edu/multi-chapter-report/vital-statistics-on-congress/.

[7] As reported in the Human Capital Strategic Plan, as of early 2021, 2,250 individuals were employed by the U.S. Capitol Police Force. U.S. Capitol Police, *Human Capital Strategic Plan 2021-2025* at 12 (2020), available at https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/USCP%20Human%20Capital%20Strategic%20Plan%20for%202021-2025.pdf. The Metropolitan Police Force employs 4,400 individuals; the D.C. National Guard consists of 2,700 active members. *See*

4

means that an enormous share of District of Columbia residents have significant and unique connections with individuals or institutions that were affected by January 6. Such connections are not likely to be present in any other comparable district outside of the Washington, D.C. area. The government has characterized the events of January 6 as an attack on our elections, government institutions generally, and democracy as a whole, suggesting that those District of Columbia residents closely connected to the government are more likely to view themselves as the direct victims of the events.

Second, even District of Columbia residents that have no direct connection to the government reported feeling deeply traumatized by the events that took place so close to where they live and work. For example, one D.C. resident shared in an interview that:

> I have not been able to digest any of the atrocities that took place last night here in Washington, D.C., you know, literally eight blocks away from my front door[.] I've been having a lot of conversations with people this morning . . . . We're all hurting. We're terrified. We're in shock. And I think it's going to take a while. This is by far the darkest moment of my 45 year existence.[8]

---

*Metropolitan Police Force Annual Report 2020*, at 32 (2020), available at https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR2020 lowres_a.pdf; *see also* D.C. National Guard, About Us (2020), https://dc.ng.mil/About-Us/. About 140 officers were allegedly injured from the events of January 6. *See* Michael Schmidt, *Officers' Injuries, Including Concussions, Show Scope of Violence at Capitol Riot*, N.Y. Times (July 12, 2021), https://www.nytimes.com/2021/02/11/us/politics/capitol-riot-police-officer-injuries.html. And while not all individuals employed by these agencies reported to the Capitol on January 6, all 9,350 individuals were directly and adversely affected by the January 6 events in the form of increased service demands in the weeks that followed, greatly affecting morale. Indeed, as reported by local media, more than 75 officers left the Capitol Police force in the few months following January 6. *More Than 75 Capitol Police Officers Have Quit Amid Low Morale Since Jan. 6*, The Hill (July 7, 2021), https://thehill.com/policy/national-security/561832-more-than-75-capitol-police-officers-have-quit-amid-low-morale-since.

[8] *D.C. Resident Who Gave BLM Protesters Refuge Condemns 'Atrocities' at U.S. Capitol*, CBC (Jan. 7, 2021), https://www.cbc.ca/radio/asithappens/as-it-happens-thursday-edition-1.5864816/d-c-resident-who-gave-blm-protesters-refuge-condemns-atrocities-at-u-s-capitol-1.5864894.

Such accounts are typical of those gathered in interviews in the days following January 6, during which the mayor declared a state of emergency, implemented a city-wide curfew, restricted access to particular roads and bridges, and requested that residents not attend the presidential inauguration.[9]  District neighborhoods became occupied by the Metropolitan Police and over 25,000 military personnel in the weeks that followed.[10]  Indeed, a local subsidiary of National Public Radio reported that:

> Residents have rescheduled medical appointments or switched up their bike and run routs to steer clear of downtown D.C. or the Capitol complex.  Others say they are avoiding speaking Spanish in public or buying items like baseball bats for personal protection.  Some are making plans to leave the city for inauguration.  And many have feelings of anger, sadness, and heightened anticipation for the near future [. . . ]  Some residents are also worried that a stepped up military and police presence in the city may only add to their unease.[11]

Moreover, the effects of these events continue to be felt in the District of Columbia. Indeed, District residents reacted with fear in anticipation of protests intended to show support for individuals detained in connection with prosecutions arising from the events of January 6,

---

[9] *Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today*, DC.gov (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today; *Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days*, DC.gov (Jan 6, 2021), https://mayor.dc.gov/release/mayor-bowser-issues-mayor%E2%80%99s-order-extending-today%E2%80%99s-public-emergency-15-days-a1; Jane Recker, *DC Mayor Says Americans Should Not Come to Washington for the Inauguration*, Washingtonian (Jan. 11, 2021) (noting the many street closures), https://www.washingtonian.com/2021/01/11/dc-mayor-says-americans-should-not-come-to-washington-for-the-inauguration/.

[10] Ellen Mitchell, *Army:  Up to 25,000 National Guard in DC for Biden Inauguration*, The Hill (Jan 15, 2021), https://thehill.com/policy/defense/534497-army-up-to-25000-national-guard-in-dc-for-biden-inauguration/.

[11] Jenniy Gathright and Rachel Jurzius, *What It Feels Like to Live Under D.C.'s State of Emergency*, National Public Radio (Jan 13, 2021), https://www.npr.org/local/305/2021/01/13/956424722/what-it-feels-like-to-live-under-d-c-s-state-of-emergency.

even though nine months had since elapsed. For example, the *New York Times* ran a piece regarding the "huge" police response to a small protest[12] and the Associated Press similarly reported, "In Edgy Washington, Police Outnumber Jan 6 Protestors," capturing the District's overall tenor and response to these ongoing demonstrations.[13]

      Third, an overwhelming number of District of Columbia residents — over 92 percent — voted for President Biden.[14]  According to the government's likely theory of the case, Mr. Herrera and the others charged in connection with January 6 did what they did in order to prevent Biden from becoming President notwithstanding his share of the electoral and popular vote. That is, the government's likely theory is that Mr. Herrera and others were seeking to nullify the votes of an overwhelming majority of District of Columbia residents—in the only national election in which District residents have any say, given their lack of representation in Congress.  *See, e.g.*, *Castanon v. United States*, 444 F. Supp. 3d 118, 139 (D.D.C. 2020) ("Article I contemplates that only 'residents of actual states' have and may exercise the House franchise") (citing *Adams v. Clinton*, 90 F. Supp. 2d 35, 47 (D.D.C.), *aff'd sub nom. Alexander v. Mineta*, 531 U.S. 940 (2000)), *reconsideration denied*, No. CV 18-2545, 2020 WL 5569943 (D.D.C. Sept. 16, 2020), *aff'd*, No. 20-1279, 2021 WL 4507556 (U.S. Oct. 4, 2021).

      Finally, the government, the media, and judicial officers speak of these prosecutions as designed to prevent "another January 6," and District of Columbia residents know that a repeat

---

[12] Jonathan Weisman and Matthew Rosenberg, <u>Sparse Right-Wing Protest of Jan. 6 Arrests Draws Huge Police Response</u>, N.Y. Times (Sept. 18, 2021; updated October 18, 2021), https://www.nytimes.com/2021/09/18/us/politics/capitol-sept-18-rally.html.

[13] Associated Press, *In Edgy Washington, Police Outnumber Jan. 6 Protesters*, US News (Sept. 18, 2021), https://www.usnews.com/news/politics/articles/2021-09-18/police-say-theyre-ready-for-rally-supporting-jan-6-rioters.

[14] *General Election 2020: Certified Results*, DC Board of Elections (Dec. 2, 2020), https://electionresults.dcboe.org/election_results/2020-General-Election.

of January 6 can only take place in their home.[15]  As such, the residents of the District sitting as jurors are highly likely to view Mr. Herrera not only as someone who victimized them, but also as someone who might victimize them again in the future, raising a concern about punishing for propensity.

Given the electoral makeup of the District, it would be impossible to empanel a jury that does not consist of people that the government charges were the targets of Mr. Herrera's alleged offenses.  Thus, though significantly more populous than the pool in *Rideau*, Mr. Herrera submits that the impact of the events of January 6 was felt by a far greater proportion of the residents and felt much more personally and viscerally.  The events of January rendered those residents—and therefore the jury pool—neither impartial nor indifferent.

**B.      The nature and volume of national and local media coverage weigh in favor of finding that there is a presumption of prejudice because of greater saturation and impact at the local level.**

Where pervasive pretrial publicity has "inflamed passions in the host community" and "permeat[es] the trial setting . . . [such] that a defendant cannot possibly receive an impartial trial," the district court must presume local prejudice and transfer the proceeding.  *United States v. Quiles-Olivo*, 684 F.3d 177, 182 (1st Cir. 2012); *see also Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due [P]rocess requires that the accused receive a trial by an impartial jury free from outside influences.").  This is especially true where publicity is both extensive and

---

[15] *See, e.g.*, Zachary B. Wolf, *These Republicans Are Worried About Trump's Attempted Coup 2.0*, CNN (Nov. 5, 2021) https://www.cnn.com/2021/11/05/politics/january-6-insurrection-trump-documentary-what-matters/index.html; *see also* Jordan Fischer et. al, *Judge Skewers DOJ at January 6 Sentencing*, WUSA9 (Oct. 28, 2021) (stating that a district court judge imposed a sentence designed to alert "others who might consider attacking the Capitol" that "their punishment would 'hurt.'"), https://www.wusa9.com/article/news/national/capitol-riots/resolving-the-crime-of-the-century-with-misdemeanors-judge-skewers-doj-at-january-6-sentencing-beryl-howell-jack-griffith-anna-morgan-lloyd/65-352274e8-7279-4792-a878-cf4cb0cc20ae.

sensational in nature. *Quiles-Olivo*, 684 F.3d at 182. That said, observing that "prominence does not necessarily produce prejudice, and juror impartiality does not require ignorance," the Supreme Court has repeatedly rejected claims of prejudice that rely exclusively on negative but dispassionate media reporting. *Skilling*, 561 U.S. at 358 (citing *Irvin*, 366 U.S. at 722). Something more, such as charged rhetoric or the reporting of gruesome details, is needed to establish prejudice. *See id.* (rejecting the argument that media coverage was prejudicial where "media coverage, on the whole, had been objective and unemotional, and the facts of the case were neither heinous nor sensational."). The Supreme Court has recognized that "something more" exists when the media coverage is particularly inflammatory, and where it pervades the court proceedings. *See Murphy*, 421 U.S. at 799 (1975) ("In those cases the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings"); *see also id.* ("[P]roceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled"). Finally, the problematic media must either be local in distribution, or must have greater local saturation or impact than in other districts; otherwise, there is no disparate prejudicial effect between different (comparable) venues.

For example, in *Skilling*, the defendant cited to hundreds of media reports about the Enron scandal in his motion for a transfer of venue. 561 U.S. at 358. He argued that as the former Chief Executive Officer, such articles necessarily implicated him by proxy, if not directly. *See id*. The Court disagreed, referencing its earlier opinions concerning the modern ubiquity of news media, and reiterating its former conclusion that volume does not, on its own, create prejudice. *See id*. at 382. Rather, it is sensationalism of the type that would be easily remembered—not an objective reporting of the facts—that was found to be prejudicial in prior

9

cases before the Court.[16] *Id*. at 381. The Court observed that the stories that *Skilling* cited about Enron contained "no confessions, no blatantly prejudicial information," and were "largely objective and unemotional." *Id*. at 370-71, 382 (observing that none of the reports "invited prejudgment of his culpability"). As such, the Court held that it was inappropriate to apply a broad presumption of prejudice.

Here, in a city still feeling the impacts of January 6, the pre-trial publicity—both national and local—has only served to enhance and sustain the effects and by extension, sentiments about the participants. The volume, depth of coverage, and duration of the reporting about January 6 has been almost entirely unprecedented, perhaps only comparable to the reporting following September 11.[17] It has also been sensational, including the repeated showing of select snippets of photographic and video footage appearing to show the destruction of the Capitol property and officers in distress. Indeed, some of these officers have testified before Congress about their experiences that may or may not have been representative of the whole—testimony that was also widely circulated in print and through video.[18]

The language used in the public realm to describe the events of January 6 and of the defendants involved in those events has been especially charged and inflammatory. For example,

---

[16] Of course, as the concurrence in part pointed out, voir dire later revealed that these "objective" media reports had indeed created a bias among many potential jurors, and that the district court failed to properly vet their assurances of impartiality after those biases were revealed. *See id*. at 427 (Sotomayor, J., concurring in part).

[17] "Nearly seven-in-ten adults (69%) say they have heard 'a lot' about the rioting at the U.S. Capitol on Jan. 6." *Views on the Rioting at the US Capitol*, Pew Research Center (Jan. 15, 2021), https://www.pewresearch.org/politics/2021/01/15/views-on-the-rioting-at-the-u-s-capitol/ *compare with The War On Terrorism*, Pew Research Center (May 23, 2002), https://www.pewresearch.org/journalism/2002/05/23/the-war-on-terrorism/ (noting increase in network news consumption of 7 to 10 percent in the weeks following the September 11 attacks).

[18] *See, e.g.*, *Police Officers Deliver Emotional Testimony About Violent Day at the Capitol*, Washington Post (July 27, 2021), https://www.washingtonpost.com/politics/2021/07/27/jan-6-commission-hearing-live-updates/.

in late January, President Biden referred to those involved in the January 6 events as "a group of thugs, insurrectionists, political extremists, and white supremacists."[19]  Similarly, representative Cori Bush called the January 6 incident "a white supremacist insurrection" and a "domestic terror attack."[20]  The coverage of the scene itself has also been sensationalist, relying on gruesome details in click-bait headlines to galvanize the public.  For example, a video released on CNN began:

> Hours after the rioters has been pushed back from the Capitol, when there was still glass on the stairs and blood on the floors, Congress tried to get back to the business of democracy . . .[21]

This is hardly comparable to the "unemotional" reporting on Enron's collapse and the white-collar crime allegations against its management as described by the Court in *Skilling*. 561 U.S. at 371-72, 382.

Additionally, much of the early reporting has since been shown to be factually inaccurate. For example, immediately following the events of January 6, President Biden, among other high-profile individuals, claimed that January 6 protestors killed Officer Brian Sicknick, and he repeated the claim months after it became clear that there was no basis for it.[22]  Even the official press release stated that:

---

[19] *Remarks by President Biden at Signing of an Executive Order on Racial Equity*, The White House (2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/01/26/remarks-by-president-biden-at-signing-of-an-executive-order-on-racial-equity/.

[20] *Rep. Cori Bush Calls Trump 'White Supremacist-in-Chief'*, NBC4 Washington (Jan. 13, 2021), https://www.nbcwashington.com/news/national-international/rep-cori-bush-calls-trump-white-supremacist-in-chief/2540892/.

[21] Zachary B. Wolf, *These Republicans Are Worried About Trump's Attempted Coup 2.0*, CNN (Nov. 5, 2021) https://www.cnn.com/2021/11/05/politics/january-6-insurrection-trump-documentary-what-matters/index.html.

[22] Christian Datoc and Jerry Dunleavy, *Biden Claims Jan. 6 Rioters Killed Capitol Police Officer Brian Sicknick*, Washington Examiner (June 17, 2021), available at https://www.yahoo.com/now/biden-claims-jan-6-rioters-161300824.html.

> Officer Brian D. Sicknick passed away due to injuries sustained while on-duty. Officer Sicknick was responding to the riots on Wednesday, January 6, 2021, at the U.S. Capitol and was injured while physically engaging with protesters.[23]

These claims were widely circulated and did reputational damage to defendants before the medical examiner quietly reported—more than four months later—that Officer Sicknick died of two strokes, and that he sustained no internal or external injuries from his exposure to chemical spray on January 6.[24]

The saturation of this charged and inflammatory reporting in the District of Columbia is so substantial that it would be surprising to identify any potential jurors who have not been exposed to the coverage. And although some in the jury pool may not have heard of Mr. Herrera specifically, his presence at the Capitol that day will necessarily cause prospective jurors to link his conduct to the January 6 reporting generally. And as the Court found in *Rideau*, "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." 373 U.S. at 726.

Finally, the media has reported comments by judicial officers in the District of Columbia regarding the events of January 6, which is particularly impactful given the deference and respect the public affords judges and the fact that those judges will preside over January 6 trials. For example, one article reported on the Court's comments that "*everyone* participating in the mob contributed to [the January 6] violence," and that "[m]embers of a mob who breach barriers and

---

[23] *Press Release: Loss of USCP Officer Brian Sicknick*, United States Capitol Police (Jan. 7, 2021), https://www.uscp.gov/media-center/press-releases/loss-uscp-colleague-brian-d-sicknick.

[24] Peter Hermann and Spencer S. Hsu, *Capitol Police Officer Died of Natural Causes, Officials Say*, Washington Post (Apr. 19, 2021), https://www.washingtonpost.com/local/public-safety/brian-sicknick-death-strokes/2021/04/19/36d2d310-617e-11eb-afbe-9a11a127d146_story.html.

12

push back officers to disrupt the joint session of Congress are not trespassers, they are criminals."[25] Given their broad framing, prospective jurors would necessarily associate the Court's comments about criminality and the promotion of violence with Mr. Herrera, even though he should be presumed innocent and has yet to be tried.

**C.   The timing of the proceedings weighs in favor of finding a presumption of prejudice.**

Finally, in determining whether any prior prejudice has been mitigated by the passage of time, the Supreme Court has considered the years between the exposure of the offense conduct and the trial. For example, in *Skilling*, the Court found that because more than four years had passed between the Enron scandal and the defendant's trial, "the decibel level of media attention diminished somewhat in the years following Enron's collapse," and any exposure to the early reporting would have become attenuated. *Skilling*, 561 U.S. at 383.

Here, in the 16 months since January 6, 2021, media reporting about the events of January 6 remains high. This has been especially true in recent weeks, given the high-profile House Select Committee hearings taking place now focused on investigating the events. The tenor of the news coverage remains sensational. Just this week, an article detailing the purported efforts to hang the former Vice President received prominent placement in the New York Times.[26] There is no reason to think that coverage will wane before Mr. Herrera's August trial, in fact it is more probable that it will continue to increase as the House Select Committee continues its work. It is a safe inference that everyone in the District of Columbia, where the

---

[25] *'Almost Schizophrenic': Judge Rips DOJ Approach to Jan. 6 Prosecutions*, Politico (Oct. 28, 2021) (emphasis added), https://www.politico.com/news/2021/10/28/almost-schizophrenic-judge-rips-doj-approach-to-jan-6-prosecutions-517442.

[26] Annie Karni and Maggie Haberman, "Jan. 6 Was More Harrowing Than Mike Pence Ever Imagined," N.Y. Times (June 16, 2022), https://www.nytimes.com/2022/06/16/us/politics/pence-trump-jan-6.html

hearings are taking place, is exposed to the coverage and re-living the experiences they underwent on January 6, 2021.

Interest in the events of January 6 has been high since that day, and it has not waned in the District of Columbia. As such, the timing of the proceedings weighs in favor of a finding of presumed prejudice.

## CONCLUSION

Because each of the *Skilling* factors weighs in favor of finding a presumption of prejudice, Mr. Herrera requests that the Court transfer the case to the Central District of California or to any district other than the District of Columbia and its immediately neighboring districts.

Respectfully submitted,

DATED: June 17, 2022      */s/ Jonathan K. Ogata & Cuauhtemoc Ortega*
CUAUHTEMOC ORTEGA
Federal Public Defender
(Cal. Bar No. 257443)
(E-Mail: Cuauhtemoc_Ortega@fd.org)
JONATHAN K. OGATA
Deputy Federal Public Defender
(Cal. Bar No. 325914)
(E-Mail: Jonathan_Ogata@fd.org)
Office of the Federal Public Defender
321 East 2nd Street
Los Angeles, CA 90012
Telephone: (213) 894-2854
Facsimile: (213) 894-0081