UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>ERIK HERRERA<br>        Defendant. | Case No. 1:21-CR-00619-BAH |

### ERIK HERERRA'S MOTION TO DISMISS COUNTS ONE, TWO, AND THREE OF THE INDICTMENT

#### I.    INTRODUCTION

Defendant Erik Herrera hereby moves to dismiss counts one, two and three of the Indictment pursuant to Fed. R. Crim. P. 12(b). This motion is based on the legal authority outlined below including the district court's recent opinion in *United States v. Garret Miller*, 1:21-CR-119 (CJN), ECF No. 72.

#### II.    LEGAL AUTHROITY

An Indictment must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). It "must provide the defendant sufficient detail to allow him to prepare a defense, to defend against a subsequent prosecution for the same offense, and to ensure that he be prosecuted upon facts presented to the grand jury." *United States v. Apodaca*, 275 F. Supp. 3d 123, 153 (D.C. Cir. 2017) (citing *Russell v. United States*, 369 U.S. 749 (1962), and *Stirone v. United States*, 361 U.S. 212 (1960)). A criminal defendant "may raise by pretrial motion any defense, objection, or request that the Court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(3). Rule 12 provides that a defendant may also move to dismiss the Indictment for "failure to state an offense" and "lack of specificity." Fed. R. Crim. P. 12(b)(3)(B)(iii)(v).

1

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement." *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)). "The touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259 (1997). The "void-for-vagueness doctrine" protects against arbitrary or discriminatory law enforcement. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

The rule of lenity applies if the terms of the statute are ambiguous. Once it is determined that a statute is ambiguous, the rule of lenity "requires that the more lenient interpretation prevail." *United States v. R.L.C.*, 503 U.S. 291, 293 (1992). This rule is rooted in "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Id*. at 305 (quoting *United States v. Bass*, 404 U.S. 348, 336 (1971)). The Courts have "[r]eserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *Id*. (citing *Moskal v. United States*, 498 U.S. 103, 108 (1990)). "Whether a statutory term is unambiguous … does not turn solely on dictionary definitions of its component words. Rather, 'the plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole." *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997)).

/ / /

/ / /

/ / /

/ / /

/ / /

### III.     ARGUMENT

1.  **Count One's Alleged Violation of 18 U.S.C. § 1512(c)(2) Fails to State an Offense.**

    a.  **Congressional Intent and Statutory Construction of 18 U.S.C. § 1512(c)(2)**

Analyzing the congressional intent and plain meaning of the statute evidences that 18 U.S.C. § 1512(c)(2)'s purpose is to protect the integrity of hearings before tribunals by preventing witness tampering and destruction of evidence. *See* 18 U.S.C. § 1512(c)(2).

18 U.S.C. §1512(c) was enacted as part of the Sarbanes-Oxley Act of 2002, which is titled "Corporate Fraud Accountability," and which targets "corporate malfeasance." Pub.L. No. 107-204, 116 Stat. 745. Sarbanes-Oxley was designed to "protect investors and restore trust in financial markets following the collapse of the Enron Corporation" after revelations that Enron's outside auditor had "systematically destroyed potentially incriminating documents." *Yates v. U.S.* 574 U.S. 528, 532 (2015). In Yates, the Supreme Court narrowly interpreted the term "tangible object" in § 1519 in keeping with the specific context and purpose of Sarbanes-Oxley.[1] Recognizing that, in the Sarbanes-Oxley legislation, "Congress trained its attention on corporate and accounting deception and cover-ups." *Id*. at 532. The Supreme Court held that the Act did not contemplate penalizing the act of tossing undersized fish overboard to avoid the consequences of an inspection by federal authorities. Rather, in the context of the statute's purpose, a "tangible object' must be one used to record or preserve information." *Id*. So while fish are tangible objects in the ordinary sense of that phrase, they do not qualify as tangible objects for purposes of § 1519.

In an amendment to §1512, the Sarbanes-Oxley Act added the current subsection (c)(2), which penalizes corruptly obstructing, influencing, or impeding "any official proceeding." The

---

[1] 18 U.S.C. § 1519 provides: [w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States…..

3

term "official proceeding" is defined in §1515 to include a proceeding "before a judge or court of the United States" and a proceeding "before the Congress."  Like the phrase "tangible objects" in § 1519, the phrase "official proceeding" in §1512 requires interpretation.

"Dictionary definitions of the term 'proceeding' alone…cannot conclusively resolve" whether a proceeding is an "official proceeding" under § 1512. *United States v. Ermoian*, 752 F.3d 1165, 1170 (9th Cir. 2013).  Further, courts have interpreted "official proceeding" to imply something formal. *See e.g.*, *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106 (2020); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) ) (investigation conducted by Bureau of Alcohol, Tobacco, and Firearms not an "official proceeding" because the term encompasses "events that are best thought of as hearings (or something akin to hearings").  As with the phrase "tangible object" in § 1519, the phrase "official proceeding" must be interpreted in light of the statute's express purpose, which is "to enhance and protect the necessary role of crime victims and witnesses in the criminal justice process." *United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008).

In the context of this "witness tampering" statute, an "official proceeding before the Congress" is logically limited to the same type of "adversarial nature" as court proceedings where there is a potential for witnesses to be influenced or documents destroyed.  *See* S.Rep. No. 107-146, at *6 (2002). Not only must "the charged conduct have some reasonable nexus to a record, document or tangible object," *United States v. Singleton*, 2006 WL 1984467 *3 (S.D. Tex. 2006), or to witness testimony, *United States v. Kumar*, 617 F.3d 612, 619-20 (2nd Cir. 2010), but the obstruction must concern a proceeding involving adjudicative or at least "quasi-adjudicative responsibilities." *United States v. Perez*, 575 F.3d 164, 169 (2nd Cir. 2009).

In *Ermoian*, for example, the Ninth Circuit held that an "official proceeding" suggests a "formal appearance before a tribunal;" an FBI field investigation did not qualify.  752 F.3d at 1170-71.  "[W]hen examining the term 'proceeding' within the grammatical structure of the definition at issue, it becomes clear that the term connotes some type of formal hearing." *Id*.

The court focused on the contextual language that § 1512 uses when referring to "official proceeding" explaining that § 1512 refers to "preventing the attendance or testimony of any person;" "preventing the production of a record, document, or other object, in an official proceeding; and being absent from an official proceeding to which that person has been summoned by legal process." *Id*. at 1171-1172.  It was important to the court that the statute used the words, "testimony," "attendance," "production," and "summons," all of which "strongly implies a hearing before a formal tribunal." *Id*. at 1172.  *Accord United States v. McDaniel*, 2014 WL 2084891 (N.D. Georgia 2014) ("official proceeding" for purposes of § 1512(c) did not include an FBI investigation); Sutherland at 921 F.3d at 426 (the term "proceeding" implies 'some formal convocation….in which parties are directed to appear") (quoting *United States v. Young*, 916 F.3d 368, 384 (4th Cir. 2019)).[2]

### b.     The Electoral Count on January 6, 2021, was not an "Official Proceeding" as contemplated by § 1512(c).

When considering the legislative history of 18 U.S.C. § 1512 and Congress's role in counting electoral votes pursuant to the 12th Amendment and the Electoral Count Act of 1887, later codified in 3 U.S.C. § 15, the electoral count is clearly a ceremonial and administrative event that does not qualify as an "official proceeding."  The Twelfth Amendment and the Electoral Count Act of 1887 place the responsibility on Congress to count electoral votes after the states have already heard any disputes and certified the vote. *Bush v. Gore*, 531 U.S. 98, 154 (2000) (Breyer, J., dissenting).  Members of Congress may make an objection, in writing, and without argument.  3 U.S.C. § 15.  According to the statute, there is no testimony, no witnesses, no argument, and no evidence. *Id*.  Given this, an electoral count is simply not an adjudicative

---

[2] The D.C. Circuit has not addressed the question, except in a pre-Sarbanes-Oxley version of § 1512, one that did not include the current subsection (c)(2), where the Court held that by entering into a plan to encourage others to falsify documents and to testify falsely before the Inspector General in a matter that was to be passed to the grand jury, the defendant obstructed an official proceeding. *United States v. Kelley*, 36 F.3d 1118, 1123 (D.C. Cir. 1994).

proceeding of the type that falls within the ambit of a witness tampering statute such as 18 U.S.C. § 1512(c)(2).

The purpose of the Electoral Count Act of 1887 was to resolve years of confusion as to what exactly Congress's role was in counting the electoral votes—settling the issue by minimizing congressional involvement, allowing them to resolve procedural issues, and engage is ceremonial duties surrounding the count. *Id*. The sponsors of the Electoral Count Act hoped that "if the disputes touching the Constitution of the Electoral Colleges in the States could be disposed of in advance of their action, the counting of the electoral votes at the seat of government…would be usually a little more than a formal ceremony." 4 Section 5 of the Act provides that the "State's selection of electors "shall be conclusive, and shall govern in the counting of the electoral votes" if the procedural rules have been followed. *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, J., concurrence) (emphasis added). Thus, the legislative history of the Act demonstrates that Congress's Electoral Count is intended to be a "ceremonial" finalization and recording of the votes that have already been certified by the states. Thus, while Congress is in session on January 6, it is not an "official proceeding" for purposes of 18 U.S.C. § 1512(c) and § 1515(b).

As outlined by the legislative history and purpose of the Electoral Act of 1887, "obstruction of an official proceeding before Congress" was never intended to apply to an event, like the vote count, that involves no witness testimony, documentary or tangible evidence, or meaningful adjudication. Many congressional hearings do involve witness testimony and documentary evidence and allow Congress to exercise their investigatory power. In those instances, Section 1512(c) protects the integrity of witness testimony and evidence. *See generally United States v. Poindexter*, 951 F.2d 369, 382 (D.C. Cir. 1991) (discussing how the Victim and Witness Protection Act of 1982 created a new provision, §1512, which prohibits various forms of witness tampering). By contrast, Congress's counting of the Electoral College votes is not an adjudicative proceeding; Congress was merely tasked the ceremonial and

6

administrative task of confirming the requirements for certification have been followed after the states previously determined that the votes were lawfully certified.

This administrative and ceremonial proceeding is not the target of § 1512(c) and the government cannot conveniently group the unique tradition of the Electoral Count with every other Congressional hearing as they are manifestly different—possessing different functions and characteristics. The government also cannot ignore years of precedent and legislative history plainly demonstrating that 18 U.S.C. § 1512(c)(2) is limited to adjudicative hearings where there is a potential for destruction of documents and witness tampering

Because the congressional vote on January 6, 2021, is not an official proceeding as contemplated by the drafters of § 1512(c), this Court should dismiss count one of the indictment.

### c.     18 U.S.C. is Unconstitutionally Vague on Its Face and As Applied in this Case.

Under the same principles of *United States v. Johnson*, 576 U.S. 591 (2015) and its progeny, 18 U.S.C. § 1512(c)(2) violates due process as it is vague and does not provide fair notice to Mr. Herrera.  Section 1512(c)(2) uses words throughout both sections that require courts – and anyone reading the statute - to speculate as to their meaning in the context of a defendant's particular actions.  Courts must speculate as to the meaning of the word "corruptly" acted and the phrase "official proceeding."  Even more problematic is that subsection (c)(2) is a "residual clause," one that is ambiguous and requires courts to determine exactly what line must be drawn in determining if a defendant is otherwise obstructing, impeding, or influencing an official proceeding before Congress.

In *Johnson*, the Supreme Court explained that "the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges."  576 U.S. at 597.  There, the Court found a due process violation where a defendant's sentence was enhanced by the residual clause in the Armed Career Criminal Act if the prior felony "involved conduct that presented a serious potential risk of physical injury to another."  *Id*. at 591.  The residual clause violated due process because it required speculation in

each case as to what could potentially cause injury in each set of circumstances. *Id*. at 598. The resulting ambiguity caused a wide range of interpretation and disparity among courts over the course of nine years and the Court acknowledged that the "failure of persistent efforts to establish a standard can provide evidence of vagueness." *Id*.

Similarly, as discussed above, what constitutes an "official proceeding" under § 1512(c) lacks cohesiveness in interpretation, creating disparities and confusion—evidencing its vagueness. While courts have interpreted "official proceeding" to mean something more than an investigation and something more formal, there is no established standard, leaving ambiguity among the courts. *See United States v. Perez*, 575 F.3d 164, 169 (2nd Cir. 2009); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006); *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019); *United States v. McDaniel*, 2014 WL 2084891 (N.D. Georgia 2014). Such ambiguity runs afoul of constitutional principles and renders the statute impermissibly vague. *See United States v. Poindexter*, 951 F.2d 369, 398 (D.C. Cir. 1991); *see also United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996); *Ricks v. District of Columbia*, 414 F.2d 1097 (D.C. Cir. 1968).

The vague nature of this statute is demonstrated by the large breadth with which the government seeks to apply it, resulting in vast inconsistencies—charging some individuals who reached the Senate floor, *United States v. Dale Jeremiah Shalvey*, 21-CR-334, others who did not even enter the Capitol building, *United States v. Isaac Sturgeon*, 21-CR-91, and others, like Mr. Herrera, who entered offices, but not others who entered offices, *United States v. Felipe Marquez*, 1:21-CR-136, or others who entered the speaker's conference room*, United States v. Andrew Ericson*, 1:21-CR-506. The inconsistent charging decisions along with the inherently vague words in the statute, as well as the vague "residual clause" that is the basis for charging these defendants all show that 18 U.S.C. § 1512(c)(2) is unconstitutionally vague and does not provide fair notice to Mr. Herrera.

### d. The District Court's Decision in *Miller* Support's Dismissal of Count One.

In *Miller*, the court found the word "otherwise" in §1512(c)(2) "critical to determining what §1512(c)(2) covers." *Id*. at 11. The court rejected the government's suggestion that "otherwise" "serve[d] as a clean break between subsections (c)(1) and (2)." *Id*. at 11-12. It explained that the government's proffered reading failed to "give meaning to the word 'otherwise,'" and rendered the word "pure surplusage." *Id*. at 12. The court further reasoned that the government's reading was inconsistent with *Begay v. United States*, 553 U.S. 137 (2008), in which the United States Supreme Court concluded that the Armed Career Criminal Act's ("ACCA") use of the word "otherwise" tied together the preceding and following words. *Id*. at 12-13. Specifically, the Supreme Court in *Begay* concluded that "the text preceding 'otherwise' influenced the meaning of the text that followed: it 'limited the scope of the clause to crimes that are *similar to the examples themselves*.'" *Id*. at 13 (quoting *Begay*, 553 U.S. at 143). The court went on to explain why cases that adopted the "clean break reading of 'otherwise' in § 1512(c)(2)" were incorrect. *Id*. at 14-15.

In dismissing the 1512 count the court also rejected the government's alternative reading of the statute— "that subsection (c)(1) contains specific examples of conduct that is unlawful under subsection (c)(2)" such that that the "link between" the two subsections "is that the unlawful conduct must relate to an 'official proceeding.'" *Id*. at 15 (citing *United States v. Montgomery*, 2021 WL 6134591, at *12). As the court explained, the problem with this alternative reading is that it renders the word "otherwise" superfluous because both subsections contain the phrase "official proceeding." *Id*. at 15-16.

The court concluded that "[s]ubsection (c)(2) is a residual clause for subsection (c)(1)," operating as a "catchall for the prohibition contained in subsection (c)(1)." *Id*. at 17. Under this interpretation, consistent with the Supreme Court's holding in *Begay*, the link between the two subsections is the conduct prescribed in subsection (c)(1), and "subsection (c)(2) operates to ensure that by delineating only certain specific unlawful acts in (c)(1) . . .—Congress was not 'underinclusive'" by allowing other ways to violate the statute that are similar to the conduct prohibited in (c)(1). *Id*. at 17-18.

Delving deeper, the court reasoned that the structure and scope of § 1512 suggests that subsection (c)(2) has a narrow focus, because the other subsections criminalize specific conduct in narrow contexts. *Id*. at 20. The court reasoned that while subsections (c)(2) and (c)(1) are different than the other subsections, because they prohibit an individual from taking certain actions directly rather than towards another person, the language in subsection (c)(1) still "homes in on a narrow, focused range of conduct." *Id*. at 21. The court explained that, by contrast, if § 1512(c)(2) "signals a clean break" from subsection (c)(1), it would be inconsistent with the statute as a whole because it would be the only provision to not contain a narrow focus. *Id*. The court reiterated that any different reading would improperly render subsection (c)(2) unnecessary. *Id*. at 21-22.

The court also discussed how the historical development of §1512 supports the conclusion that § 1512(c)(2) operates as a catchall to (c)(1). *Id*. at 23-25. Per the court, the revisions to § 1512(c) in 2002 filled a gap that existed because §1512(b) made it unlawful to cause "another person" to take certain actions but not for a person to take such action directly. The 2002 enactment of 1512(c) fixed that problem and took much of its language directly from 1512(b). *Id*. 23-24. The fact that Congress took much of the language from a provision already

10

contained in subsection (b), shows Congress's intent for subsection (c) to have a narrow, limited focus—just like subsection (b)(2)(B). *Id*. at 25.

Lastly, the court found that the legislative history also supports a narrow reading of subsection (c)(2). *Id*. at 26-28. The court explained the evolution of § 1512(c) resulted in a statute that ensured that individuals acting alone would be liable for the same acts that were prohibited in other parts of § 1512. *Id.* at. 27-28.

For all those reasons, the court in Miller held that § 1512(c)(1) limits the scope of (c)(2) and "requires that the defendant have taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding."[3] Because the government did not allege that Mr. Miller took any action with respect to records or documents or "other objects," the court held that the indictment failed to state an offense against him. *Id*. at 29.

Here, just as in *Miller*, the indictment does not allege or imply that Mr. Herrera took any action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence Congress's certification of the electoral vote. *See* Indictment, ECF No. 8. Therefore, it fails to allege a violation of § 1512(c)(2).

Mr. Herrera respectfully urges this Court to adopt the analysis and reasoning set forth in *Miller* and find that count one fails to state an offense against him because there is no allegation that he took any action with respect to records or documents.

---

[3] The *Miller* court also explained that, even assuming arguendo its interpretation was incorrect, at the very least the Court would be left with "serious ambiguity in a criminal statute" requiring lenity

11

> **2.    18 U.S.C. § 1752 Fails to State an Offense and Thus Counts Two and Three Should be Dismissed.**
>
> > **a.    The United States Secret Service is the Entity That May Designate Restricted Areas Under § 1752, Not the Capitol Police.**

Mr. Herrera is charged with two counts of violating 18 U.S.C. § 1752 for "entering and remaining in a Restricted Building or Grounds," and engaging in "disorderly and disruptive conduct in a Restricted Building or Grounds." When this statute was enacted, the purpose was to designate the United States Secret Service ("USSS") to restrict areas for temporary visits by the President. *See* S. Rep. No. 91-1252 (1970). At the time of enactment, the USSS was part of the Treasury. Section 1752 grants the Treasury Secretary the authority to "designate by regulations the buildings and grounds which constitute the temporary residences of the President." 18 U.S.C. § 1752(d)(1). It also allows the Secretary to "to prescribe regulations governing ingress or egress to such buildings and grounds to be posted, cordoned off, or otherwise restricted areas where the President may be visiting." § 1752(d)(2). There is nothing in the legislative history (or the statutory language) to suggest that anyone other than the USSS has the authority to so restrict the areas surrounding the Capitol building.

In *United States v. Griffen*, the government conceded that it was the United States Capitol Police that attempted to designate the area as restricted that day and not the USSS. 21-CR-92 (TNM) at Dkt. No. 33. The court in *Griffen* denied a motion to dismiss a § 1752 charge on the ground that the statute (Congress) did not specifically state who must designate the "restricted areas." *Id*. at Dkt. No. 41. However, the plain language of 18 U.S.C. § 1752(c)(B), defines "restricted building or grounds" as a "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." Since it is the Secret Service who protects the President or "other person," it is the Secret Service who must designate the area

12

"restricted." The legislative history bolsters this interpretation.[4] Because the USSS did not designate the area a restricted space, Mr. Herrera's alleged conduct cannot fall under § 1752(c) and thus this Court should dismiss counts two and three.

### IV. CONCLUSION

For the foregoing reason, the Court should (i) grant this motion; (ii) dismiss counts one, two, and three of the Indictment; and (iii) grant Mr. Herrera such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED: June 17, 2022                /s/ *Jonathan K. Ogata & Cuauhtemoc Ortega*
CUAUHTEMOC ORTEGA
Federal Public Defender
(Cal. Bar No. 257443)
(E-Mail: Cuauhtemoc_Ortega@fd.org)
JONATHAN K. OGATA
Deputy Federal Public Defender
(Cal. Bar No. 325914)
(E-Mail: Jonathan_Ogata@fd.org)
Office of the Federal Public Defender
321 East 2nd Street
Los Angeles, CA 90012
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

---

[4] Congress enacted 18 U.S.C. § 1752 as part of the Omnibus Crime Control Act of 1970. Public Law 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan 2. 1971). At that time, the USSS was a part of the Treasury Department. The Senate Judiciary Committee report accompanying the current version of §1752 noted that there was no federal statute that specifically authorized the Secret Service to restrict areas where the President maintains temporary residences and the senators explained that the key purpose of the bill was to provide that authority to the Secret Service. S. Rep. No. 91-1252 (1970)