**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-cr-619 (BAH)** |
| | : | |
| **ERIK HERRERA,** | : | |
| | : | |
| **Defendant** | : | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**
**COUNTS ONE, TWO, AND THREE OF THE INDICTMENT**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, hereby respectfully submits this opposition to the Defendant's Motion

to Dismiss Counts One, Two, and Three of the indictment.

## **INTRODUCTION**

The Defendant, Erik Herrera, has moved to dismiss ("MTD") Counts One, Two, and

Three of the Indictment pursuant to Fed. Crim. P. 12(b).  ECF No. 38.  The Defendant claims

that Count One's alleged violation of 18 U.S.C. § 1512(c)(2) fails to state an offense.  Pursuant

to this claim, the Defendant asserts that Congress' certification of the electoral count on January

6, 2021, was not an "Official Proceeding" as contemplated by § 1512(c).   The Defendant also

argues that 18 U.S.C. § 1512(c)(2) is unconstitutionally vague on its face and as applied in this

case.  The Defendant similarly asserts that the Congressional intent and statutory construction of

Title 18 U.S.C. § 1512(c)(2) prohibit the defendant from being charged in Count One, as the

Defendant asserts that Congress intended the statute to only apply to obstruction tied to

documentary or tangible evidence, which Defendant claims does not cover his conduct. The

Defendant also urges the Court to adopt Judge Nichols's decision in *United States v. Garret*

*Miller*,  21-cr-119, 2022 WL 823070 (Nichols, J.) in finding that that Section 1512(c)(2) does not cover the Defendant's conduct in the instant offense.

Pertaining to Counts Two and Three, the Defendant asserts that 18 U.S.C. § 1752 fails to state an offense, and therefore argues that those counts should be dismissed as well.  In support of this argument, the Defendant asserts that the United States Secret Service ("USSS") is the only entity that can designate a restricted area under § 1752, not the Capitol Police.  The Defendant argues that because the USSS did not designate the Capitol building or grounds a restricted space on January 6, 2021, the Defendant's conduct cannot fall under § 1752(c).

As will be explained in further detail below, the Defendant's arguments are without merit.  Specifically, as to Count One, most judges in this district have rejected many, if not all, of the challenges that Defendant raises in his motion. *United States v. Fitzsimons*, 21-cr-158, 2022 WL 1698063, at *6-*12 (D.D.C. May 26, 2022) (Contreras, J.); *United States v. Bingert*, 21-cr-91, 2022 WL 1659163, at *7-*11 (D.D.C. May 25, 2022) (Lamberth, J.); *United States v. Hale-Cusanelli*, No. 21-cr-37 (D.D.C. May 6, 2022) (McFadden, J.) (motion to dismiss hearing at pp. 4-8); *United States v. McHugh* (McHugh II), No. 21-cr-453, 2022 WL 1302880, at *2-*13 (D.D.C. May 2, 2022) (Bates, J.); *United States v. Puma*, 21-cr-454, 2022 WL 823079, at *12 n.4 (D.D.C. Mar. 19, 2022) (Friedman, J.); *United States v. Bozell*, 21-cr-216, 2022 WL 474144, at *5 (D.D.C. Feb. 16, 2022) (Bates, J.); *United States v. Grider*, 21-cr-22, 2022 WL 392307, at *5-*6 (D.D.C. Feb. 9, 2022) (Kollar-Kotelly, J.); *United States v. Nordean*, 21-cr-175, 2021 WL 6134595, at *6-*8 (D.D.C. Dec. 28, 2021) (Kelly, J.); *United States v. Montgomery*, 21-cr-46, 2021 WL 6134591, at *10-18 (D.D.C. Dec. 28, 2021) (Moss, J.); *United States v. Mostofsky*, No. 21-cr-138, 2021 WL 6049891, at *11 (Dec. 21, 2021) (Boasberg, J.); *United States v. Caldwell*, No. 21-cr-28, 2021 WL 6062718, at *11-*21 (D.D.C. Dec. 20, 2021) (Mehta, J.); *United States*

*v. Sandlin*, No. 21-cr-88, 2021 WL 5865006, at \*5-\*9 (D.D.C. Dec. 10, 2021) (Friedrich, J.).

See also, *United States V. Williams*, No. 21-cr-377 (Howell, J.).  This Court should adhere to its

well-reasoned view and that of the overwhelming majority of district judges to have considered

the Defendant's issues and deny his motion to dismiss.

As to the Defendant's argument at Counts Two and Three, the Defendant's argument on

this issue is without merit.  As explained further below, Section 1752's plain text does not

require the United States Secret Service to designate the restricted area.  The Defendant's motion

must be denied.

## **BACKGROUND**

The Defendant, Erik Herrera is charged in a five count Indictment that was

returned on October 6, 2021.  The Defendant is charged with violating Title 18, United States

Code, Sections 1512(c)(2) and 2 (Obstruction of an Official Proceeding and Aiding and

Abetting) (Count 1); Title 18, United States Code, Section 1752(a)(1)) (Entering and Remaining

in a Restricted Building or Grounds) (Count 2); Title 18, United States Code, Section 1752(a)(2)

(Disorderly and Disruptive Conduct in a Restricted Building or Grounds) (Count Three); Title

40, United States Code, Section 5104(e)(2)(D) (Disorderly and Disruptive Conduct in the Capitol

Building) (Count Four); and Title 40, United States Code, Section 5104(e)(2)(G) (Parading,

Demonstrating, or Picketing in a Capitol Building) (Count Five).

These charges stem from Erik Herrera's unlawful conduct at the U.S. Capitol on January

6, 2021.  On that date, a Joint Session of the United States House of Representatives and the

United States Senate convened to certify the vote of the Electoral College of the 2020 U.S.

Presidential Election.  Vice President Pence, who was under USSS protection, was present at the

United States Capitol building that day.  The U.S. Capitol Police ("USCP"), with sole authority over security on the Capitol grounds, set up security barriers on the Capitol Grounds. On the restricted Capitol grounds, USCP set up barriers that read, "Area Closed By order of the United States Capitol Police Board."  The Lower West Terrace on the West Front was closed to members of the public.  While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol building.  As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

Herrera was part of the larger mob that descended on the Capitol and the restricted grounds that day.  A little before 3:00 PM, he entered the Capitol through a fire door located on the Senate wing side of the building.  He came prepared – wearing a gas mask, googles, and tactical vest – some of which he'd ordered just a few weeks before January 6, 2021.  Herrera entered the building and immediately went into the Parliamentarian's Office.  Once inside, he picked up a stack of papers and held them out; this is depicted in a post on his Instagram account, with the caption: "I'm reclaiming Aztlan because I love America.  Querer es poder!"  Later on, in an exchange with someone else on Instagram, he said he had picked up the papers because he "wanted a goofy 'fuck you' picture."  From the Parliamentarian's Office, Herrera and others left the building out the same door they had come in – shortly after law enforcement officers came through telling rioters to leave.  On his way out, Herrera raised what appears to be a bottle of liquor into the air in a fist-pumping motion.

Instead of leaving the building and the grounds, Herrera then went to a different door, also on the northwest side of the building.  He entered the building again.  As he entered, he walked

past shattered windows on each side of the door and spent at least five minutes setting up his camera and taking photographs.  Herrera then proceeded to the area of the building known as the Crypt, and remained inside for approximately fifteen more minutes, before he finally exited the building around 3:30 PM.  Herrera appeared to be taking photos or video the entire time.

Airline records show that he returned home to California on January 7, 2021.  Both before and after January 6, 2021, Herrera communicated about his reasons for traveling to DC that day over Instagram.  For example, in the early morning hours of January 7 – less than a day after the riot – someone sent him a message:

> I have been at the hospital all day and when people stopped in the reception area to watch what was happening on the news. . . I too found myself captivated by what was being demonstrated.  I remember you telling me you were heading to DC to cover some shit but I don't want to assume anything further.  So, to clear any confusion . . . are you there to provide journalism coverage or is there a different reason that I'm not fully aware of?

Herrera's response was brief: "I did what I had to do for both photojournalism and our people."

The other person asked:

> Could you elaborate on what you mean by you did what you had to do for our people? Obviously news coverage can be biased depending on its source, but you are there, you're in it.  Whatever was planned and executed for today, I'd like to understand what the mission was and the desired outcome?

Herrera responded:  "The first part I'll answer at another time.  It was driven by the election results but also everything else that has been affecting the country for almost a year."

Herrera later followed up: "I don't think we had an honest electoral process in 2020.  People are fed up."

## **LEGAL STANDARD**

An indictment is sufficient under the Constitution and Rule 7 of the Federal Rules of Criminal Procedure if it "contains the elements of the offense charged and fairly informs a

defendant of the charge against which he must defend," *Hamling v. United States*, 418 U.S. 87, 117 (1974), which may be accomplished, as it is here, by "echo[ing] the operative statutory text while also specifying the time and place of the offense." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). And an indictment need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976).

Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1) (emphasis added). It follows that Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the government "has made a full proffer of evidence" or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005) (emphasis added)—neither of which has occurred here.

Indeed, "[i]f contested facts surrounding the commission of the offense would be of any assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.). Criminal cases have no mechanism equivalent to the civil rule for summary judgment. *United States v. Bailey*, 444 U.S. 394, 413, n.9 (1980) (motions for summary judgment are creatures of civil, not criminal trials); *Yakou*, 428 F.2d at 246-47 ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context"); *United States v. Oseguera Gonzalez*, No. 20-cr-40-BAH at *5, 2020 WL 6342940 (D.D.C. Oct. 29, 2020) (collecting cases explaining that there is no summary judgment procedure in criminal cases or one that permits

pretrial determination of the sufficiency of the evidence). Accordingly, dismissal of a charge does not depend on forecasts of what the government can prove. Instead, a criminal defendant may move for dismissal based on a defect in the indictment, such as a failure to state an offense. *United States v. Knowles*, 197 F. Supp. 3d 143, 148 (D.D.C. 2016). Whether an indictment fails to state an offense because an essential element is absent calls for a legal determination.

Thus, when ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and more specifically, the language used to charge the crimes. *Bingert*, 21-cr-93 (RCL) (ECF 67:5) (a motion to dismiss challenges the adequacy of an indictment on its face and the relevant inquiry is whether its allegations permit a jury to find that the crimes charged were committed); *McHugh*, 2022 WL 1302880 at *2 (a motion to dismiss involves the Court's determination of the legal sufficiency of the indictment, not the sufficiency of the evidence); *United States v. Puma*, No. 21-cr-454 (PLF), 2020 WL 823079 at *4 (D.D.C. Mar. 19, 2022) (quoting *United States v. Sunia*, 643 F.Supp. 2d 51, 60 (D.D.C. 2009)).

## ARGUMENT

### I. The Defendant's Motion to Dismiss Count One, Alleging a Violation of 18 U.S.C. § 1512(c)(2) and 2, Lacks Merit.

Count One of the Indictment charges the defendant with corruptly obstructing, influencing, or impeding an "official proceeding," – *i.e.*, Congress's certification of the Electoral College vote on January 6, 2021 – and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and 2. Count One states:

On or about January 6, 2021, within the District of Columbia and elsewhere, **ERIK HERRERA** attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.

(**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)

In 2002, Congress enacted Section 1512(c)'s prohibition on "[t]ampering with a record or otherwise impeding an official proceeding" as part of the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745, 807. Section 1512(c)'s prohibition applies to:

[w]hoever corruptly--

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) *otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so*.

18 U.S.C. § 1512(c) (emphasis added). Section 1515(a)(1), in turn, defines the phrase "official proceeding" to include "a proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B). By the statute's plain terms, then, a person violates Section 1512(c)(2) when, acting with the requisite *mens rea*, he engages in conduct that obstructs a specific congressional proceeding, including, as here, Congress's certification of the Electoral College vote.

Notwithstanding the plain terms of the offense, the defendant appears to advance three arguments for the notion that Section 1512(c)(2) does not reach the conduct alleged in the indictment: (1) that Congress's certification of the Electoral College vote is not an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2); (2) that the conduct of the Defendant cannot qualify as conduct that "otherwise obstructs, influences, or impedes" the official proceedings as Section 1512(c)(2) is limited by Section 1512(c)(1); and (3) that the statute is unconstitutionally vague as applied to the defendant.   The Defendant's claims lack merit as many judges in this District have concluded.

With respect to his statutory challenges, at least 10 district judges of this Court have considered, in other cases arising out of the events at the Capitol on January 6, 2021, one or more of the arguments the defendant raises. *See*, e.g., *Bingert*, 2022 WL 1659163 at *2 n.3. Every district judge to have reached the issue has concluded that Congress's certification of the Electoral College is an "official proceeding" within the meaning of 18 U.S.C. 1512(c)(2) and that Section 1512(c)(2) is not unconstitutionally vague. In addition, every reported court of appeals decision to have considered the scope of Section 1512(c)(2), and all but one of the judges of this Court to have considered the issue in cases involving January 6, 2021, have concluded that Section 1512(c)(2) prohibits obstruction regardless of its connection to documentary or tangible evidence. And, in any event, even if a nexus to documentary or tangible evidence were required, the allegations in the Indictment, which track the statutory language, more than adequately informed the defendant about the charge against him; nothing more was or is required.   *See, e.g.*, *United States v. Williamson*, 903 F.3d 124, 130-131 (D.C. Cir. 2018). The Defendant's claim that Section 1512(c)(2) is unconstitutionally vague is also meritless. This Court should follow its own prior

rulings and the overwhelming majority of district judges to have considered the issues raised by the defendant and deny his motion to dismiss.

**A. Congress's Joint Session to Certify the Electoral College Vote Is a "Proceeding Before the Congress" under Section 1515(a)(1)(B) And, Therefore, an "Official Proceeding" under Section 1512(c)(2)**

    **1. The plain text of the statute established that the Joint Session is an "official proceeding."**

To determine the meaning of a statute, a court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (internal quotation omitted). Section 1515(a)(1)(B), as noted, defines "official proceeding" as a "proceeding before the Congress." In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is a congressional proceeding, or "a proceeding before the Congress." Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete." *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation omitted); *Bingert*, 2022 WL 1659163 at *4.

Congress's Joint Session to certify the Electoral College vote constitutes a "proceeding" under any interpretation of that term. In its broadest and most "general sense," a "proceeding" refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013) (quoting *Proceeding*, Oxford English Dictionary, available at http://www.oed.com). The Defendant cannot meaningfully contend that Congress's Joint Session to certify the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding – and indeed an official proceeding – under that broad definition.

A narrower definition of the term "proceeding" would look to the "legal – rather than the lay – understanding" of the term. *Ermoian*, 752 F.3d at 1170. This narrower definition includes the "business conducted by a court or other official body; a hearing." Black's Law Dictionary, "Proceeding" (11th ed. 2019). Taken with its modifier "official," the term "proceeding" thus "connotes some type of formal hearing." *Ermoian*, 752 F.3d at 1170. But even under this narrower definition, Congress's Joint Session to certify the Electoral College vote – business conducted by an official body, in a formal session – would easily qualify.

The formality involved in the certification of the Electoral College vote places it well within the category of an official proceeding, even under the narrower legal definition of the term "proceeding." Few events are as solemn and formal as a Joint Session of the Congress. That is particularly true for Congress's certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute. Required by law to begin at 1:00 pm on the January 6 following a presidential election, Congress's meeting to certify the Electoral College vote is both a "hearing" and "business conducted by … [an] official body." *See* Black's Law Dictionary, "Proceeding." The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.* And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall." *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's

desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform"). Congress's certification of the Electoral College vote, moreover, must terminate with a decision: Congress may not recess until "the count of electoral votes" is "completed," and the "result declared." *Id*. Under the plain meaning of Sections 1512(c)(2) and 1515(a)(1)(B), Congress's Joint Session to certify the Electoral College vote is a "proceeding before the Congress." That alone disposes of the defendants' contentions. *See Bingert*, 2022 WL 6159163 at *4 (extensive procedural requirements of the Electoral College certification delineated in 3 U.S.C. § 15 qualify the certification as a proceeding before Congress).

### 2. Congress's certification of the Electoral College vote would qualify as an adjudicatory proceeding.

Even if the statute required the "administration of justice" gloss urged by the Defendant, Congress's certification of the Electoral College vote as set out in the Electoral Count Act of 1887 would satisfy it. The certification of the Electoral College vote involves the convening of a Joint Session of Congress, a deliberative body over which a government officer, the Vice President as President of the Senate, "presid[es]." 3 U.S.C. § 15. That Joint Session renders judgment on whether to certify the votes cast by Electors in the presidential election. Under the Constitution, the Electors create "lists" of the presidential and vice-presidential candidates, which they "sign" and "certify" before sending to Congress. U.S. Const. amend. XII. Congress then decides whether to count those certified lists, or certificates in conformity with the Electoral Count Act. 3 U.S.C. § 15. As in an adjudicative setting, parties may lodge objections to the certification, and if any such objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it. 3 U.S.C. § 15. And just as a jury does not (barring a mistrial) recess until it has a reached a verdict, the Joint Session cannot "be dissolved" until it has "declared" a "result." 3 U.S.C. § 16. Even under the defendant's theories, Congress's

certification of the Electoral College vote possesses sufficient "tribunal-like" characteristics to qualify as an "official proceeding," as several judges of this Court have already concluded. *See Caldwell*, 2021 WL 6062718, at *11 (Mehta, J.); *Nordean*, 2021 WL 6134595, at *6; *McHugh*, 2022 WL 296304, at *9.

### 3. The attempt to further restrict the term "proceeding before Congress" is unsupported and misconstrues Congress' certification of the Electoral College vote

The Defendant nevertheless argues for a narrow definition of "official proceeding" in Section 1512. But this narrow reading of the statute finds no textual support when applied to Section 1515(a)(1)(B), which speaks broadly of a proceeding "before the Congress." Had Congress wanted to impose a definition that more closely resembled a quasi-adjudicative setting (as the defendant effectively contends by demanding investigation and evidence as prerequisites for a proceeding), it needed to look only a few provisions away to 18 U.S.C. § 1505, which criminalizes, among other things, the obstruction of (i) "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency; and (ii) "the due and proper exercise of the power of inquiry under which any inquiry or investigation [that] is being had by" Congress, including by congressional committees and subcommittees. 18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020). If Congress wished to similarly limit the obstruction prohibition under § 1512(c)(2) to congressional investigations and the like, it could have enacted language similar to Section 1505. Instead, Congress chose different terms, with different meanings. See *Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship."). Congress enacted broader language ("a proceeding before

the Congress") that covers a broader range of proceedings than only the "inquir[ies] and investigation[s]" envisioned in Section 1505. That broader definition includes the Electoral College vote certification that defendants obstructed on January 6, 2021.

None of the Defendant's contrary arguments have merit. His effort to revise the definition of proceeding relies on the Ninth Circuit's decision in *Ermoian*, 752 F.3d 1165. But *Ermoian* involved a different statutory definition, 18 U.S.C. § 1515(a)(1)*(C)*, and an entirely different issue: whether an FBI investigation counts as "a proceeding before a Federal Government agency which is authorized by law" under Section 1515(a)(1)(C). In *Ermoian*, the Ninth Circuit reasoned at the outset that the term "proceeding" did not "conclusively resolve whether an FBI investigation qualifies" because narrower definitions of the term "would exclude criminal investigations in the field." 752 F.3d at 1170. This case, which involves a proceeding before Congress and implicates Section 1515(a)(1)*(B)* (and not *(C)*), presents no such question. Judge Moss, and other judges in this district citing *Montgomery*, were free to find *Ermoian*'s analysis unpersuasive or inapplicable given its different facts and interpretation of a different provision under Section 1515 that does not involve Congress. And, in any event, the Joint Session of Congress to certify the Electoral College vote would satisfy even the narrower formulations of "proceeding" cited in *Ermoian*. The Joint Session plainly constitutes "*business conducted* by a court *or other official body*; a *hearing*," or "[a] legal … process." *Id.* at 1169 (emphasis added). And there can be no serious dispute that the Joint Session is a "proceeding … authorized *by law*" or that it has the "sense of formality" that the Ninth Circuit found absent from mere criminal investigations. *Id.* at 1170 (emphasis added).

The argument that other provisions in Chapter 73 demonstrate that "proceedings before Congress" specifically relates to tribunals and the administration of justice also fails. If anything,

the neighboring provisions of Chapter 73 (such as 18 U.S.C. §§ 18 U.S.C. §§ 150 3, 1504, 1507,

1521) – which criminalize obstruction of other types of investigations and protect judges, jurors,

witnesses and the like – underscore how robustly Congress sought to penalize obstructive

conduct across a vast range of settings. That Congress wished to penalize efforts to obstruct

everything from a federal audit to a bankruptcy case to an examination by an insurance

regulatory official only crystallizes that it is more the acts of obstructing, influencing, or

impeding – than the particular type of hearing – that lie at "'the very core of criminality' under

the statute[s]." *Williamson*, 903 F.3d at 131. Moreover, the defendant's perception of what other

statutes contemplate is no basis for the Court to reject similar reasoning of other judges in this

district. Even putting aside that the "best evidence of [a statute's purpose] is the statutory text

adopted by both Houses of Congress and submitted to the President," *West Va. Univ. Hosps.,*

*Inc. v. Casey*, 499 U.S. 83, 98 (1991), the obstruction statute's legislative history confirms that

Congress intended "official proceeding" to reach broadly. Although Congress enacted Section

1512(c) as part of the Sarbanes-Oxley Act of 2002, Section 1512(c) adopted – but did not modify

– the pre-existing definition of "official proceeding" in Section 1515(a)(1), which had been in

place since 1982. See Victim and Witness Protection Act of 1982 ("VWPA"), Pub. Law 97-291,

§ 4(a), 96 Stat. 1252. And, tellingly, in considering the VWPA in 2002, the Senate Judiciary

Committee urged the inclusion of a "broad residual clause" – in a provision that was ultimately

omitted from the 1982 enactment, but that resembles the current iteration of Section 1512(c)(2) –

precisely because the "purpose of preventing an obstruction or miscarriage of justice cannot be

fully carried out by a simple enumeration of the commonly prosecuted obstruction offenses.

There must also be protection against the rare type of conduct that is the product of the inventive

criminal mind and which also thwarts justice." S. Rep. 97-532, at 18 (1982). The upshot is clear:

when it enacted the operative definition of "official proceeding," Congress intended that term to be construed broadly, not narrowly. And this case underscores Congress's foresight in doing so: the Defendant sought to thwart justice in an unprecedented and inventive manner, by literally driving Congress out of the chamber.[1]

Since the events of January 6, 2021, at least 12 judges on this Court have considered whether Congress's certification of the Electoral College vote constitutes an "official proceeding" for purposes of Section 1512(c)(2). They have all ruled that it does, largely adopting the government's rationale and rejecting the arguments that the defendant presses in this case. *See, e.g.*, *United States v. Sandlin*, 21-cr-88 (DLF), ---F.Supp.3d---, 2021 WL 5865006, at *4 (D.D.C. Dec. 10, 2021); (Friedrich, J.); *United States v. Caldwell*, No. 21-cr-28 (AHM), ---F.Supp.3d---, 2021 WL 6062718, at *7 (D.D.C. Dec. 10, 2021) (Mehta, J.); *United States v. Mostofsky*, No. 21-cr-138 (JEB), ---F.Supp.3d---2021 WL 6049891, at *10 (D.D.C. Dec. 21, 2021)(Boasberg, J.); *Montgomery*, 2021 WL 6134591, at *4-10 (Moss, J.); *United States v. Nordean*, No. 21-cr-175 (TJK), ---F.Supp.3d---, 2021 WL 6134595, at *4-6 (D.D.C. Dec. 28, 2021) (Kelly, J.); *McHugh*, 2022 WL 296304, at *5-9 (Bates, J.); *United States v. Grider*, No. 21-cr-22 (CKK), ---F.Supp.3d---, 2022 WL 392307 (D.D.C. Feb. 9, 2022) (Kollar-Kotelly, J.); *United States v. Miller*, 21-cr-119 (CJN), ---F.Supp.3d---, 2022 WL 823070, at *5 (D.D.C. Mar. 7, 2022) (Nichols, J.); *United States v. Andries*, No. 21-cr-093 (RC), 2022 WL 768684, at *3-7

---

[1] Even if the obstruction statute's application to the Electoral College vote certification proceeding was not expressly anticipated by Congress at the time of enactment, that alone "does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1749 (2020) (internal quotation and alterations omitted). A statute's application may "reach[] beyond the principal evil legislators may have intended or expected to address." *Id.* (internal quotation omitted); *cf.*, *Montgomery*, 2021 WL 6134591, at *15-17 (rejecting a narrow understanding of Section 1512(c) based on its legislative history).

(D.D.C. Mar. 14, 2022) (Contreras, J.); *Puma*, 2022 WL 823079, at *4-9 (Friedman, J.). Nothing in the Defendant's briefing warrants departing from that well-reasoned line of decisions.

### B. Section 1512(c)(2) Applies to the Conduct Alleged in the Indictment.

The Defendant's second statutory argument is no more persuasive than his attempt to revise the defining of an official proceeding. Once again, the defense seeks to avoid Section 1512(c)(2)'s application by revising its terms and redefining prohibited conduct in a way that Congress did not legislate.

### 1. Section 1512(c)(2)'s text, structure, and history demonstrate that its prohibition on obstructive conduct covers Defendant's actions on January 6, 2021.

In Section 1512(c)(2), Congress comprehensively prohibited conduct that intentionally and wrongfully obstructs official proceedings. The ordinary meaning of "obstruct[], influence[], or impede[]" encompasses a wide range of conduct designed to frustrate an official proceeding. That conduct can include lying to a grand jury or in civil proceedings, exposing the identity of an undercover agent, and burning a building to conceal the bodies of murder victims. It also includes storming into the Capitol to derail a congressional proceeding. A defendant who, acting with the necessary *mens rea*, obstructs (or attempts to obstruct) Congress's certification of the Electoral College vote, commits a crime under Section 1512(c)(2).

i. Section 1512(c)(2)'s text and structure demonstrate that it serves as a comprehensive prohibition on corrupt conduct that intentionally obstructs or impedes an official proceeding. When interpreting a statute, courts look first to the statutory language, "giving the words used their ordinary meaning." *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014) (internal quotation marks omitted). If the statutory language is plain and unambiguous, this Court's "inquiry begins with the statutory text, and ends there as well." *National Ass'n of Mfrs. v. Department of*

*Defense*, 138 S. Ct. 617, 631 (2018) (internal quotation marks omitted). Here, the meaning of

"obstruct[], influence[], or impede[]" is controlled by the ordinary meaning of those words.

The verbs Congress selected in Section 1512(c)(2) reach broadly. For example, the words

"obstruct" and "impede" can "refer to anything that 'blocks,' 'makes difficult,' or 'hinders.'"

*Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (brackets omitted) (citing dictionaries).

Similarly, "influence" includes "affect[ing] the condition of" or "hav[ing] an effect on."

*Influence*, Oxford English Dictionary, *available at* http://www.oed.com. By their plain meaning,

therefore, the string of verbs in Section 1512(c)(2) are properly viewed as "expansive" in their

coverage. *See United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013).

Section 1512(c)'s structure confirms that straightforward interpretation. Section 1512(c)

consists of two provisions, which both require the defendant to act "corruptly." First, Section

1512(c)(1) criminalizes "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record,

document, or other object . . . with the intent to impair the object's integrity or availability for

use in an official proceeding." Section 1512(c)(2), by contrast, applies more generally to any acts

that "otherwise obstruct[], influence[], or impede[]" an official proceeding. The term

"otherwise," consistent with its ordinary meaning, conveys that Section 1512(c)(2) encompasses

misconduct that threatens an official proceeding "beyond [the] simple document destruction"

that Section 1512(c)(1) proscribes. *Id.; United States v. Petruk*, 781 F.3d 438, 446-47 (8th Cir.

2015) (noting that "otherwise" in Section 1512(c)(2), understood to mean "in another manner" or

"differently," implies that the obstruction prohibition in that statute applies "without regard to

whether the action relates to documents or records") (internal quotation marks omitted); *see also*

*United States v. Ring*, 628 F. Supp. 2d 195, 224 n.17 (D.D.C. 2009) (noting that Section

1512(c)(2) is "plainly separate and independent of" Section 1512(c)(1), and declining to read

"otherwise" in Section 1512(c)(2) "as limited by § 1512(c)(1)'s separate and independent

prohibition on evidence-tampering"); *Otherwise*, Oxford English Dictionary, *available at*

http://www.oed.com (defining otherwise as "in another way" or "in any other way"); *see also*

*Gooch v. United States*, 297 U.S. 124, 127-28 (1936) (characterizing "otherwise" as a "broad

term" and holding that a statutory prohibition on kidnapping "for ransom or reward or otherwise"

is not limited by the words "ransom" and "reward" to kidnappings for pecuniary benefit);

*Collazos v. United States*, 368 F.3d 190, 200 (2d Cir. 2004) (construing "otherwise" in 28 U.S.C.

§ 2466(1)(C) to reach beyond the "specific examples" listed in prior subsections, thereby

covering the "myriad means that human ingenuity might devise to permit a person to avoid the

jurisdiction of a court").

In this way, Section 1512(c)(2) criminalizes the same *result* prohibited by Section

1512(c)(1) – obstruction of an official proceeding – when that result is accomplished by a

different *means, i.e.*, by conduct other than destruction of a document, record, or other object. *Cf.*

*United States v. Howard*, 569 F.2d 1331, 1333 (5th Cir. 1978) (explaining that 18 U.S.C. § 1503,

which criminalizes the result of obstructing the due administration of justice, provides specific

means of accomplishing that result and then a separate catch-all clause designed to capture other

means). Section 1512(c)(2), in other words, "operates as a catch-all to cover otherwise

obstructive behavior that might not constitute a more specific" obstruction offense involving

documents or records under Section 1512(c)(1). *Petruk*, 781 F.3d at 447 (quoting *United States*

*v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014)); *cf. United States v. Aguilar*, 515 U.S. 593,

598 (1995) (describing similar "[o]mnibus" clause in 18 U.S.C. § 1503 as a catchall that is "far

more general in scope than the earlier clauses of the statute").

Consistent with that interpretation, courts have upheld convictions under Section 1512(c)(2) for defendants who attempted to secure a false alibi witness while in jail for having stolen a vehicle, *Petruk*, 781 F.3d at 440, 447; disclosed the identity of an undercover federal agent to thwart a grand jury investigation, *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009); lied in written responses to civil interrogatory questions about past misconduct while a police officer, *Burge*, 711 F.3d at 808-09; testified falsely before a grand jury, *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009); solicited information about a grand jury investigation from corrupt "local police officers," *Volpendesto*, 746 F.3d at 286; and burned an apartment to conceal the bodies of two murder victims, *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021) (unpublished); *see also United States v. Martinez*, 862 F.3d 223, 238 (2d Cir. 2017) (police officer tipped off suspects before issuance or execution of search warrants), *vacated on other grounds*, 139 S. Ct. 2772 (2019); *United States v. Ahrensfield*, 698 F.3d 1310, 1324-26 (10th Cir. 2012) (law enforcement officer disclosed existence of undercover investigation to target).

Here, Section 1512(c)(2) also applies to Defendant's conduct, which involved the Defendant unlawfully entering the Capitol contemporaneously with a violent mob during the certification of the Electoral College Vote, and also entering the Senate Parliamentarian's Office, taking a selfie with stack of papers and, apparently, taking a bottle of alcohol from the office. In so doing, Defendant hindered and delayed the certification of the Electoral College vote, an "official proceeding" as that term is defined in the obstruction statute. *See* 18 U.S.C. § 1515(a)(1)(B); *supra* pp. 16-17 (listing cases). Because construing Section 1512(c)(2) to reach that conduct would neither "frustrate Congress's clear intention" nor "yield patent absurdity,"

this Court's "obligation is to apply the statute as Congress wrote it." *Hubbard v. United States*, 514 U.S. 695, 703 (1995) (internal quotation marks omitted).

      ii. In contrast, reading Section 1512(c)(2) as limited only to obstructive acts akin to the document destruction or evidence tampering captured in Section 1512(c)(1) (as Defendant suggests) suffers at least three flaws. *First*, it would give rise to unnecessarily complex questions about what sort of conduct qualifies as "similar to but different from" the proscribed conduct "described in [Section 1512](c)(1)." *United States v. Singleton*, No. 06-CR-80, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) (unpublished); *see id.* (concluding that Section 1512(c)(2) "require[s] some nexus to tangible evidence, though not necessarily tangible evidence already in existence"); *see also United States v. Hutcherson*, No. 05-CR-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (unpublished) (concluding that a violation of Section 1512(c)(2) requires proof that "an individual corruptly obstructs an official proceedings [*sic*] through his conduct in relation to a tangible object"). So construed, for example, Section 1512(c)(2) may not encompass false statements made to obstruct a proceeding – though courts have widely upheld convictions for such conduct. *See Petruk*, 781 F.3d at 447 (collecting cases).

      Limiting Section 1512(c)(2) in that way would effectively render that provision superfluous considering the comprehensive prohibitions against document and evidence destruction in both Sections 1512(c)(1) and 1519. *See Yates v. United States*, 574 U.S. 528, 541 n.4 (2015) (Section 1512(c)(1) provides a "broad ban on evidence-spoliation") (internal quotation marks omitted). By contrast, the straightforward interpretation that treats Section 1512(c)(2) as a catch-all for corrupt obstructive conduct not covered by Section 1512(c)(1) would "give effect to every clause and word" of Section 1512(c). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013); *cf. United States v. Poindexter*, 951 F.2d 369, 385 (D.C. Cir. 1991)

(explaining that limiting the catch-all provision in Section 1503's omnibus clause to obstructive

acts "directed against individuals" would render that catch-all superfluous because "earlier,

specific[] prohibitions" in Section 1503 "pretty well exhaust such possibilities") (internal

quotation marks omitted); *United States v. Watt*, 911 F. Supp. 538, 546 (D.D.C. 1995) (rejecting

interpretation of the Section 1503 omnibus clause that would "serve no other purpose than to

prohibit acts already prohibited in the first part of the statute" because that reading would

"reduce[] the omnibus clause to mere redundancy").

Contrary to Defendant's assertions, Congress' adoption of a more general catch-all in

Section 1512(c)(2) does not render superfluous other obstruction prohibitions found in Chapter

73, the criminal code's chapter on obstruction of justice. *See, e.g.*, *Montgomery*, 2021 WL

6134591, at *13 ("[T]he Court is also unpersuaded by Defendants' more general superfluity

argument, which posits that, unless Section 1512(c)(2) is narrowly construed, much of Chapter

73 would be rendered superfluous."). Instead, the catch-all in Section 1512(c)(2) serves to

capture "known unknowns." *Yates*, 574 U.S. at 551 (Alito, J., concurring) (quoting *Republic of

Iraq v. Beaty*, 556 U.S. 848, 860 (2009)). Indeed, "the whole value of a generally phrased

residual clause … is that it serves as a catchall" to ensure that the full range of conduct Congress

sought to regulate comes within the statute, including "matters not specifically contemplated" by

more specific provisions. *Beaty*, 556 U.S. at 860. In any event, "[r]edundancies across statutes

are not unusual events in drafting," *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253

(1992), and the "rule[] of thumb" that statutes should be interpreted to avoid superfluity

necessarily yields to the "cardinal canon" that Congress "says in a statute what it means and

means in a statute what it says there," *id.* at 253-54; *see also McHugh*, 2022 WL 1302880 at *10

(where § 1512 creates only explicable and indeed inevitable overlap rather than outright

redundancy, the purported superfluity in § 1512 simply does not justify displacing the provision's ordinary meaning).

Judicial treatment of the nearby omnibus clause in Section 1503, which prohibits "corruptly … influenc[ing], obstruct[ing], or imped[ing], or endeavor[ing] to influence, obstruct, or impede, the due administration of justice," 18 U.S.C. § 1503, is instructive. Drafted in "very broad language," the omnibus clause or "catchall provision," see *Aguilar*, 515 U.S. at 599, principally operates to criminalize obstructive conduct that falls outside the narrower prohibitions within Section 1503 and neighboring provisions. *See, e.g.*, *United States v. Sussman*, 709 F.3d 155, 168-170 (3d Cir. 2013) (removing gold coins from safe-deposit box); *United States v. Frank*, 354 F.3d 910, 916-919 (8th Cir. 2004) (removing car to avoid seizure); *United States v. Lefkowitz*, 125 F.3d 608, 619-620 (8th Cir. 1997) (instructing employee to remove documents from a house); *United States v. Lester*, 749 F.2d 1288, 1295 (9th Cir. 1984) (hiding a witness); *United States v. Brown*, 688 F.2d 596, 597-598 (9th Cir. 1982) (warning suspect about impending search warrant to prevent discovery of heroin); *Howard*, 569 F.2d at 1333-1334 (attempting to sell grand jury transcripts). No court has held that the omnibus clause's broad language should be given an artificially narrow scope to avoid any overlap with Section 1503's other, more specific provisions. *Cf. Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005) ("The mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either."). The same is true for the catch-all provision in Section 1512(c)(2).

Similarly, Section 1512(c)(2)'s partial overlap with other obstruction statutes does not render those other provisions superfluous. For example, the omnibus clause in 1503 and the congressional obstruction provision in 1505 both reach an "endeavor[] to influence, obstruct, or impede" the proceedings – a broader test for inchoate violations than Section 1512(c)(2)'s

"attempt" standard. *See United States v. Sampson*, 898 F.3d 287, 301 (2d Cir. 2018) ("[E]fforts to witness tamper that rise to the level of an 'endeavor' yet fall short of an 'attempt' cannot be prosecuted under § 1512."); *United States v. Leisure*, 844 F.2d 1347, 1366-1367 (8th Cir. 1988) (collecting cases recognizing the difference between "endeavor" and "attempt" standards). Section 1519, which covers destruction of documents and records in contemplation of an investigation or agency proceeding, does not require a "nexus" between the obstructive act and the investigation or proceeding – but Section 1512(c)(2) does. Again, the existence of even "substantial" overlap is not "uncommon" in criminal statutes. *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014). But given that Sections 1503, 1505, and 1519 each reach conduct that Section 1512(c)(2) does not, the overlap provides no reason to impose an artificially limited construction on the latter provision. *See, e.g.*, *Sandlin*, 2021 WL 5865006, at *8 ("[T]he fact that there is overlap between § 1512(c)(2) and the rest of § 1512, or other provisions in Chapter 73, is hardly remarkable.").

Importing into Section 1512(c)(2) a nexus-to-tangible-evidence-or-documents requirement would require inserting an extratextual gloss that would render the verbs in Section 1512(c)(2) nonsensical. *See Dean v. United States*, 556 U.S. 568, 572 (2009) (courts "ordinarily resist reading words or elements into a statute that do not appear on its face") (internal quotation marks omitted). The *actus reus* that those verbs encompass is obstructing, influencing, and impeding; a defendant cannot "obstruct" a document or "impede" a financial record. *Cf. Yates*, 574 U.S. at 551 (Alito, J., concurring) (rejecting interpretation of "tangible object" in Section 1519 that would include a fish in part because of a mismatch between that potential object and the statutory verbs: "How does one make a false entry in a fish?"); *id.* at 544 (plurality opinion)

("It would be unnatural, for example, to describe a killer's act of wiping his fingerprints from a gun as 'falsifying' the murder weapon.").

iii. Because "the statutory language provides a clear answer," the construction of Section 1512(c)(2) "ends there" and it is unnecessary to resort to legislative history. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999); *see Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 599 (2011) (same); *see also United States v. De Bruhl-Daniels*, 491 F. Supp. 3d 237, 251-52 (S.D. Tex. 2020) (declining to consider Section 1512's legislative history). Regardless, the legislative history of Section 1512(c)(2) – particularly when considered alongside the history of Section 1512 more generally – provides no support for a different conclusion, contrary to the Defendant's assertions. *See, e.g.*, *Montgomery*, 2021 WL 6134591, at *15-17.

When Congress in 1982 originally enacted Section 1512, that legislation did not include what is now Section 1512(c). *See* VWPA, Pub. L. No. 97-291, § 4(a), 96 Stat. 1248, 1249-1250. Its title then, as now, was "Tampering with a witness, victim, or an informant." *Id.*; 18 U.S.C. § 1512. As that title suggested, Section 1512 as originally enacted targeted conduct such as using intimidation, threats, or corrupt persuasion to prevent testimony or hinder, delay, or prevent communication of information to law enforcement or the courts as well as intentionally harassing another person to hinder, delay, or prevent that person from taking certain actions. *See* Pub. L. No. 97-291, § 4(a) (now codified as Section 1512(b) and Section 1512(d)).

Twenty years later, following the collapse of the Enron Corporation, Congress passed the Sarbanes-Oxley Act of 2002. Pub. L. No. 107-204, 116 Stat. 745; *see Yates*, 574 U.S. at 535 (plurality opinion). That legislation, which principally aimed to "prevent and punish corporate fraud, protect the victims of such fraud, preserve evidence of such fraud, and hold wrongdoers accountable for their actions," S. Rep. No. 107-146, at 2 (2002), included several different

provisions, *id.* at 11 (describing different components of the law); *see also* 148 Cong. Rec. H4683-84 (daily ed. July 16, 2002) (outlining new provisions). Foremost among them were two new criminal statutes, 18 U.S.C. § 1519 and 18 U.S.C. § 1520, which were intended to "clarify and close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records." S. Rep. No. 107-146, at 14. The Senate Judiciary Committee Report discussed those two provisions in detail. *See id.* at 14-16.

By contrast, the Sarbanes-Oxley Act's legislative history provides limited explanation of Congress's objective in enacting Section 1512(c). The only discussion of Section 1512 in the Senate Judiciary Committee Report, for example, noted that the pre-existing prohibition in Section 1512(b) made it a crime to induce "another person to destroy documents, but not a crime for a person to destroy the same documents personally"—a limitation that "forced" prosecutors to "proceed under the legal fiction that the defendants [in then-pending *United States v. Arthur Andersen*] are being prosecuted for telling other people to shred documents, not simply for destroying evidence themselves." S. Rep. No. 107-146, at 6-7. Similarly, Senator Hatch observed that the legislation "broaden[ed]" Section 1512 by permitting prosecution of "an individual who acts alone in destroying evidence." 148 Cong. Rec. S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch). At a minimum, nothing in these passing references casts doubt on the plain meaning of Section 1512(c)(2), which is reflected in the interpretation described above.

Section 1512(c) also differed from the newly enacted Sections 1519 and 1520 in that Congress added the former to an existing statutory section: Section 1512. *See Yates*, 574 U.S. at 541 (plurality opinion) (noting that, unlike Section 1519, Section 1512(c)(2) was placed among the "broad proscriptions" in the "pre-existing" Section 1512). Moreover, although Section 1512(c) as enacted in the Sarbanes-Oxley Act recognized two distinct prohibitions, *see* Pub. L.

No. 107-204, § 1102, 116 Stat. 807 ("Tampering with a record *or* otherwise impeding an official proceeding") (emphasis added; capitalization altered), Congress did not amend Section 1512's title. That title, "Tampering with a witness, victim, or an informant," § 1512, thus encompassed the pre-existing provisions aimed at a defendant's obstructive conduct directed toward another person,[2] but did not reflect the newly enacted prohibitions in Section 1512(c) that criminalized a defendant's own obstructive act, either through destroying documents (§ 1512(c)(1)) or otherwise impeding a proceeding (§ 1512(c)(2)). *See Yates*, 574 U.S. at 541 n.4 (plurality opinion) (noting that Congress added Section 1512(c)(1), which covered evidence-spoliation, to Section 1512 "even though § 1512's preexisting title and provisions all related to witness-tampering").

Section 1512(c)'s legislative and statutory history thus offers two reasons to interpret Section 1512(c)(2) consistently with its plain text and structure. First, Section 1512(c) aimed at closing a "loophole" in Section 1512: the existing prohibitions did not adequately criminalize a defendant's *personal* obstructive conduct *not* aimed at another person. *See* 148 Cong. Rec. S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch). Read together in this light, Section 1512(c)(1) criminalizes a defendant's firsthand destruction of evidence (without having to prove that the defendant induced another person to destroy evidence) in relation to an official proceeding, and Section 1512(c)(2) criminalizes a defendant's firsthand obstructive conduct that *otherwise* impedes or influences an official proceeding (though not necessarily through another person). *See Burge*, 711 F.3d at 809-10. Second, no substantive inference is reasonably drawn

---

[2] *See* § 1512(a) (applies to killing, attempting to kill, or using physical force or the threat of physical force against a person to prevent testimony or induce a witness to withhold information); § 1512(b) (applies to using intimidation, threats, or corrupt persuasion against a person to prevent testimony or hinder, delay, or prevent communication of information to law enforcement or the courts); § 1512(d) (applies to intentionally harassing another person to hinder, delay, or prevent that person from taking certain actions).

from the fact that the title of Section 1512 does not precisely match the "broad proscription" it in fact contains, given that the Sarbanes-Oxley Act unequivocally and broadly entitled the new provisions now codified in Section 1512(c), "Tampering with a record *or* otherwise impeding an official proceeding." Pub. L. No. 107-204, § 1102, 116 Stat. 807 (emphasis added; capitalization altered).  Section 1512's title is more limited simply because Congress did not amend the pre-existing title when it added the two prohibitions in Section 1512(c) in 2002. *Cf. Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947) (describing "the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text").

### 2. This Court should not adopt the outlier construction reflected in *United States v. Miller*

Defendant largely disregards the authorities discussed above, which are analyzed in the many decisions adopting the government's reading of the statute. *See above.*   Instead, the defense urges this Court to adopt the reasoning of *United States v. Miller*, No. 21-cr-119, 2022 WL 823070 (D.D.C. Mar. 7, 2022) (Nichols, J.), the sole decision in which a judge of this Court has construed Section 1512(c)(2) to require proof that "the defendant ha[s] taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding." *Id.* at *15. *Miller*'s outlier reasoning is unpersuasive for several reasons.

Focusing on the word "otherwise" in Section 1512(c)(2), *Miller* identified "three possible readings" of Section 1512(c)(2). 2022 WL 823070, at *6. First, Section 1512(c)(2) could serve as a "clean break" from Section 1512(c)(1), *id.* at *6, a reading that "certain courts of appeals have adopted," *id.* at *7. *Miller*, however, identified multiple "problems" with that interpretation, all rooted in the interpretation of the term "otherwise." It stated that reading "otherwise" in Section

1512(c)(2) to mean "in a different way or manner" is "inconsistent" with *Begay v. United States*, 553 U.S. 137 (2008), which considered whether driving under the influence qualified as a "violent felony" under the now-defunct residual clause of the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1). 2022 WL 823070, at *7. Second, *Miller* hypothesized that Section 1512(c)(1) could "provide[] examples of conduct that violates" Section 1512(c)(2). 2022 WL 823070, at *8.  Third, *Miller* stated that Section 1512(c)(2) could be interpreted as a "residual clause" for Section 1512(c)(1), such that both provisions are linked by the document-destruction and evidence-tampering "conduct pr[o]scribed by" Section 1512(c)(1). 2022 WL 823070, at *9. After considering Section 1512(c)'s structure, "historical development," and legislative history, *Miller* found "serious ambiguity" as to which of the two "plausible" readings – the second and third readings identified above – Congress intended. *Id.* at *15. Applying what it described as principles of "restraint," *Miller* then interpreted Section 1512(c)(2) to mean that a defendant violates the statute only when he or she "take[s] some action with respect to a document, record, or other object in order to corruptly obstruct, impede, or influence an official proceeding" (the third reading). *Id.*

Miller's reasoning is unpersuasive. *See, e.g.*, *Bingert*, 2022 WL 1659163 at *7. *Miller* ultimately turned on the court's determination that no "single obvious interpretation of the statute" controlled and that the rule of lenity was applicable and was dispositive. 2022 WL 823070, at *15. The rule of lenity, however, "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998); *Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019). Some

ambiguity is insufficient to trigger the rule of lenity; instead, a court must find "grievous ambiguity" that would otherwise compel guesswork. *See Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (internal quotation marks omitted). "Properly applied," then, "the rule of lenity therefore rarely if ever plays a role because, as in other contexts, 'hard interpretive conundrums, even relating to complex rules, can often be solved.'" *Wooden*, 142 S. Ct. at 1074 (Kavanaugh, J., concurring).

The rule of lenity is plainly "inapplicable" here. *Puma*, 2022 WL 823079, at *12 n.4. For the reasons set forth above, Congress made clear in Section 1512(c)(2) that it sought to protect the integrity of official proceedings – regardless of whether a defendant threatens such a proceeding by trying to interfere with the evidence before that tribunal or threatens the tribunal itself. Any such distinction produces the absurd result that a defendant who attempts to destroy a document being used or considered by a tribunal violates Section 1512(c) but a defendant who threatens to use force against the officers conducting that proceeding escapes criminal liability under the statute. Such an outcome would, ironically, lose sight of a core value that animates the lenity rule: that defendants should be put on notice that their conduct is criminal and not be surprised when prosecuted. *See Wooden*, 142 S. Ct. at 1082 (Gorsuch, J., concurring) ("Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails over ambiguous laws."). It would strain credulity for any defendant who was focused on stopping an official proceeding from taking place to profess surprise that his conduct could fall within a statute that makes it a crime to "obstruct[], influence[], or impede[] [any] official proceeding or attempt[] to do so." 18 U.S.C. § 1512(c)(2).

None of the grounds identified in *Miller* for finding "serious ambiguity," 2022 WL 823079, at *15 – grounds which the defendant reprises in her motion – withstand scrutiny. *Miller*

stated that the government's reading either "ignores" that the word "otherwise" is defined with reference to "something else" (namely Section 1512(c)(1)) or fails to "give meaning" to the term "otherwise." 2022 WL 823079, at *7. That is incorrect. Far from suggesting that Section 1512(c)(2) is "wholly untethered to" Section 1512(c)(1), *id.*, under the government's reading, the word "otherwise" in Section 1512(c)2) indicates that Section 1512(c)(2) targets obstructive conduct in a manner "other" than the evidence tampering or document destruction that is covered in Section 1512(c)(1). That understanding of "otherwise" is both fully consistent with the definitions of the term surveyed in *Miller*, *see* 2022 WL 823079, at *6 (noting that "otherwise" in Section 1512(c)(2) may be read as "in a different way or manner; differently"; "in different circumstances: under other conditions"; or "in other respects") (internal quotation marks omitted), and ensures that the term is not rendered "pure surplusage," *id.* at *7. In other words, "otherwise" makes clear that Section 1512(c)(1)'s scope encompasses document destruction or evidence tampering that corruptly obstructs an official proceeding, while Section 1512(c)(2)'s ambit includes "other" conduct that corruptly obstructs an official proceeding.

*Miller* also stated (and the defendant repeats) that, without a nexus to a document, record, or other object, Section 1512(c)(2) "would have the same scope and effect … [as] if Congress had instead omitted the word 'otherwise.'" 2022 WL 823079, at *7. But, as already noted, overlap is "not uncommon in criminal statutes," *Loughrin,* 573 U.S. at 358 n.4, and Section 1512(c)(2)'s broader language effectuates its design as a backstop in the same way that a "generally phrased residual clause … serves as a catchall for matters not specifically contemplated." *Beaty*, 556 U.S. at 860. And, in any event, interpreting the interplay of Sections 1512(c)(1) and 1512(c)(2) in this way does not foreclose a defendant from arguing that his conduct falls outside Section 1512(c)(2)'s scope because his document destruction or evidence

concealment is prohibited and punishable only under Section 1512(c)(1). A defendant prevailing

on such a theory may be securing a Pyrrhic victory – where success leads to reindictment under

Section 1512(c)(1) – but those practical considerations provide no reason to depart from the plain

meaning of Section 1512(c). And, in any event, the "mere fact that two federal criminal statutes

criminalize similar conduct says little about the scope of either." *Pasquantino*, 544 U.S. at 358

n.4.

The *Miller* court also posits that the government's reading is inconsistent with *Begay*.

That conclusion is flawed in several respects. First, in considering whether driving under the

influence was a "violent felony" for purposes of the ACCA's residual clause – which defines a

"violent felony" as a felony that "is burglary, arson, or extortion, involves use of explosives, or

otherwise involves conduct that presents a serious potential risk of physical injury," 18 U.S.C. §

924(e)(2)(B)(ii) – the Supreme Court in *Begay* addressed a statutory provision that has an

entirely different structure from Section 1512(c)(2). *See, e.g.*, *Sandlin*, 2021 WL 5865006, at *6

(distinguishing *Begay* on the ground that, unlike the ACCA residual clause, the "otherwise" in

Section 1512(c)(2) is "set off by both a semicolon and a line break"); *United States v. Ring*, 628

F. Supp. 2d 195, 224 n.17 (D.D.C. 2009). Differently from the ACCA residual clause, the

"otherwise" phrase in Section 1512(c)(2) "stands alone, unaccompanied by any limiting

examples." *Ring*, 628 F.Supp.2d at 224 n.17. In other words, the "key feature" in Section

924(e)(2)(B)(ii) at issue in *Begay* – "namely, the four example crimes," 553 U.S. at 147 – is

"absent" in Section 1512(c)(2). *Caldwell*, 2021 WL 6062718, at *14.

Second, *Miller*'s assertion that the meaning of "otherwise" was "[c]rucial" to the

Supreme Court's decision in *Begay* misapprehends *Begay*'s express analysis. The majority in

*Begay* noted first that the "listed examples" in Section 924(e)(2)(B)(ii) – burglary, arson,

extortion, or crimes involving explosives – indicated that the ACCA residual clause covered only similar crimes. *Begay*, 553 U.S. at 142. The majority next drew support from Section 924(e)(2)(B)(ii)'s history, which showed that Congress both opted for the specific examples in lieu of a "broad proposal" and described Section 924(e)(2)(B)(ii) as intending to encompass crimes "similar" to the examples. *Id.* at 143-144. Only in the final paragraph of that section of the opinion did the majority address the word "otherwise," noting that the majority "[could ]not agree" with the government's argument that "otherwise" is "sufficient to demonstrate that the examples do not limit the scope of the clause" because "the word 'otherwise' can (we do not say must, cf. post at [150-52] (Scalia, J. concurring in judgment)) refer to a crime that is similar to the listed examples in some respects but different in others." *Id.* at 144. A tertiary rationale responding to a party's argument where the majority refrains from adopting a definitive view of "otherwise" cannot plausibly be described as "crucial." Rather, the majority's "remarkably agnostic" discussion of "otherwise" in *Begay* explicitly noted that the word may carry a different meaning where (as here) the statutory text and context suggests otherwise. *Montgomery*, 2021 WL 6134591, at *11; *see also Caldwell*, 2021 WL 6062718, at *14 (declining to depart from the "natural reading" of "otherwise" as "'in a different way or manner'" based on the discussion in *Begay*); *Fitzsimons*, 21-cr-158 (ECF 77:18)(finding differences between use of the word otherwise in § 924(e)(2)(B)(ii) and § 1512 were simply too great for *Begay* to provide much instruction). In short, the majority in *Begay* actually "placed little or no weight on the word 'otherwise' in resolving the case." *Montgomery*, 2021 WL 6134591, at *11.

Third, whatever the significance of the majority's interpretation of "otherwise" in *Begay*, *Begay*'s ultimate holding demonstrates why this Court should not embark on imposing an extra-textual requirement within Section 1512(c)(2). The Supreme Court held in *Begay* that Section

924(e)(2)(B)(ii) encompassed only crimes that, similar to the listed examples, involve "purposeful, violent, and aggressive conduct." 553 U.S. at 144-145. But "*Begay* did not succeed in bringing clarity to the meaning of the [ACCA's] residual clause." *Johnson v. United States*, 576 U.S. 591, 600 (2015). Whatever the merits of grafting an atextual (and ultimately unsuccessful) requirement in the context of the ACCA, that approach is unwarranted in the context of Section 1512(c)(2). In the nearly 20 years between Congress's enactment of Section 1512(c)(2) and *Miller*, no reported cases adopted the document-only requirement urged by defendants.

Finally, Defendant suggests that the government's position is inconsistent with the Supreme Court's decision in *Yates*. He is incorrect. In *Yates*, five Justices concluded, in a fractured decision, that a fisherman who ordered his crew to throw his catch back into the sea to prevent federal authorities from determining whether he had harvested undersized fish did not violate Section 1519's prohibition on "knowingly alter[], destroy[], mutilate[], conceal[], cover[] up, falsif[y], or make[] a false entry in any record, document, *or tangible object* with the intent to impede, obstruct, or influence" a federal investigation. *Yates*, 574 U.S. at 531 (plurality opinion). Accordingly, five Justices in *Yates* concluded that "tangible object" as used in Section 1519 did not include a fish.

Neither the *Yates* plurality nor Justice Alito's controlling concurrence support the Defendant's position in this case. For one thing, the two textual canons that the majority and Justice Alito found significant in interpreting Section 1519 in *Yates* – *i.e.*, that "a word is known by the company it keeps" (*noscitur a sociis*) and that general words that follow specific ones should be construed as limited to the "same kind" as the specific ones (*ejusdem generis*) – "have little bearing on the interpretative question" of Section 1512(c)(2), which involves entirely

different statutory text. *See Montgomery*, 2021 WL 6134591, at *14. For another, whereas, in *Yates*, the statutory title of Section 1519 ("Destruction, alterative, or falsification of records in Federal investigations and bankruptcy") weighed against interpreting "tangible object" to include fish, *see* 574 U.S. at 552 (Alito, J., concurring in the judgment), no comparable inference can be drawn with respect to Section 1512(c)(2). (See above).  (Congress did not amend Section 1512's preexisting title in the U.S. Code when it added Section 1512(c), but Section 1512(c)'s title in the Sarbanes-Oxley Act of 2002 ("Tampering with a record *or* otherwise impeding an official proceeding" (emphasis added)) supports a broad reading of the prohibition); *see Montgomery*, 2021 WL 6134591, at *15. Finally, while the *Yates* plurality (but not Justice Alito) found Section 1519's origin in the Sarbanes-Oxley Act probative that the provision was not intended to prohibit the destruction of a fish, *see* 574 U.S. at 546 (plurality), "the inclusion of [Section 1512(c)(2)] in the Sarbanes-Oxley Act and the placement of that provision in an existing section of Chapter 73, make sense." *Montgomery*, 2021 WL 6134591, at *15.

### 3. Even under *Miller*, this Court should not dismiss Count One of the Indictment, which merely tracks Section 1512(c)(2)'s operative statutory text.

In any event, even under Defendant's theory, Count One sufficiently alleges a violation of Section 1512(c)(2) by tracking the provision's "operative statutory text." *Williamson*, 903 F.3d at 130. It is well-settled that it is "'generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *Id.* (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). The indictment in this case therefore did not need to more specifically allege that the obstruction took the form of taking some action with respect to a document. *Id.*; *see also United States v. Resendiz-Ponce*, 549 U.S. 102, 108-109 (2007). In other words, the indictment's

allegations, by charging the operative statutory text, permissibly embrace two theories: (1) that the defendant obstructed an official proceeding by taking some action with respect to a document; and (2) that the defendant obstructed an official proceeding without taking some action with respect to a document. Even a ruling finding the second theory invalid would leave the first theory intact. For that reason alone, at this stage in the proceedings, dismissal of Count One would be unwarranted.

### C. Section 1512(c)(2) Is Not Unconstitutionally Vague.

Finally, Defendant contends that Section 1512(c)(2) is unconstitutionally vague. As every judge on this Court to have considered the issue has concluded, Defendant is incorrect.

1. The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV. An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)). To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'" *Bronstein*, 849 F.3d at 1107 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)). A provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

a. Defendant fails to overcome the "strong presumpti[on]" that Section 1512(c)(2) is constitutional. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963). Section 1512(c)(2) does not tie criminal culpability to "wholly subjective" terms such as "annoying" or "indecent" that are bereft of "narrowing context" or "settled legal meanings," *Williams*, 553 U.S. at 306, nor does it require application of a legal standard to an "idealized ordinary case of the crime," *Johnson*, 576 U.S. at 604. Section 1512(c)(2)'s prohibition on "corruptly … obstruct[ing], influenc[ing], or imped[ing]" an "official proceeding" gives rise to "no such indeterminacy." *Williams*, 553 U.S. at 306. The statute requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily defined official proceeding. While "it may be difficult in some cases to determine whether these clear requirements have been met," "'courts and juries every day pass

upon knowledge, belief and intent – the state of men's minds – having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'" *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).

Defendant's suggestion that the word "corruptly" in Section 1512(c)(2) is unconstitutionally vague is incorrect. As Judge Friedman recently observed, "[j]udges in this district have construed 'corruptly' to require 'a showing of "dishonesty" or an 'improper purpose'[;], 'consciousness of wrongdoing'[;] or conduct that is 'independently criminal,' 'inherently malign, and committed with the intent to obstruct an official proceeding.'" *Puma*, 2022 WL 823079, at *10 (quoting *Montgomery*, 2021 WL 6134591, at *19; *Bozell*, 2022 WL 474144, at *6; *Caldwell*, 2021 WL 6062718, at *11; and *Sandlin*, 2021 WL 5865006, at *13) (alterations omitted). Under any of these common-sense constructions, the term "corruptly" "not only clearly identifies the conduct it punishes; it also 'acts to shield those who engage in lawful, innocent conduct – even when done with the intent to obstruct, impede, or influence the official proceeding.'" *Id.* (quoting *Sandlin*, 2021 WL 5865006, at *13). It presents no vagueness concern.

Nor does *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), support Defendant's attacks on the word "corruptly," for at least three reasons. First, the D.C. Circuit narrowly confined *Poindexter*'s analysis to Section 1505's use of "corruptly," and expressly declined to hold "that term unconstitutionally vague as applied to all conduct." 951 F.2d at 385. Five years later, in *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the D.C. Circuit rejected a *Poindexter*-based vagueness challenge to 18 U.S.C. § 1512(b) and affirmed the conviction of a defendant for "corruptly" influencing the testimony of a potential witness at trial.

*Id*. at 629-30. Other courts have similarly recognized "the narrow reasoning used in *Poindexter*" and "cabined that vagueness holding to its unusual circumstances." *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017); *see also, e.g.*, *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (rejecting vagueness challenge to "corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (same for 18 U.S.C. § 1512(b)); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) (same for 18 U.S.C. § 1503). The defendant's invocation of *Poindexter* accordingly fails to establish that Section 1512(c) suffers the same constitutional indeterminacy.

Second, *Poindexter* predated the Supreme Court's decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). There, the Court explained the terms "'[c]orrupt" and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil." *Id*. at 705 (citation omitted). In doing so, the Court "did not imply that the term was too vague." *Edwards*, 869 F.3d at 502. Third, and as noted above, courts have encountered little difficulty when addressing "corruptly" in Section 1512(c)(2) following *Arthur Andersen*. *See Puma*, 2022 WL 823079, at *10 (quoting *Montgomery*, 2021 WL 6134591, at *19; *Bozell*, 2022 WL 474144, at *6; *Caldwell*, 2021 WL 6062718, at *11; and *Sandlin*, 2021 WL 5865006, at *13) (alterations omitted). Such efforts demonstrate that the statute's "corruptly" element does not invite arbitrary or wholly subjective application by either courts or juries.

Rather than showing that the term corruptly is vague, Defendant lifts comments out of context from various opinions in what is actually not an argument for vagueness, but instead, another effort to redefine the meaning of a statutory provision. The defense's desire to adopt a different definition, however, is not a demonstration of vagueness, and absent such a demonstration, any vagueness challenge fails.

**II.  18 U.S.C. § 1752 does not require the government to prove that the restricted area was restricted at the Secret Service's direction.**

Defendant's next argument is that Counts Two and Three of the Indictment should be dismissed for failure to state an offense because the USSS did not designate the "restricted area" under 18 U.S.C. § 1752.  This argument misunderstands Section 1752's text.

Starting with the statutory language, Section 1752 provides in relevant part:

(a)  Whoever—

(1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

(c) In this section—

(1) [T]he term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

(B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting;

18 U.S.C. § 1752.  In short, Section 1752 "prohibits persons from knowingly entering without lawful authority to do so in any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd*, 831 F. App'x 513 (D.C. Cir. 2020).

To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)); *see Public Investors*

*Arbitration Bar Association v. U.S. S.E.C.*, 930 F. Supp. 2d 55 (D.D.C., 2013) (Howell, J.) ("a reviewing court must accord first priority in statutory interpretation to the plain meaning of the provision in question."). Where, as here, the statute in question's words "are unambiguous, the judicial inquiry is complete." *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation marks omitted).

Section 1752's text is clear. It proscribes certain conduct in and around "any restricted building or grounds." *See* 18 U.S.C. § 1752(a). The statute provides three definitions for the term "restricted buildings and grounds," *see* § 1752(c)(1), including "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visting," § 1752(c)(1)(B). Through a cross-reference, Section 1752 makes clear that "person[s] protected by the Secret Service" include the Vice President and the Vice President-elect. § 1752(c)(2); *see* § 3056(a)(1). The proscribed conduct within a "restricted building or grounds" includes, as relevant here, knowingly and unlawfully entering or remaining, § 1752(a)(1), and knowingly and with intent to impede or disrupt government business, engaging in "disorderly or disruptive conduct" that "in fact, impedes or disrupts" government business," § 1752(a)(2).

That straightforward analysis has a straightforward application to the facts alleged in Defendant's case. The Indictment alleges that, on January 6, 2021, a protected person was present inside the Capitol building or on the Capitol grounds, and that some portion of the Capitol building and grounds was posted, cordoned off, or otherwise restricted— making it a "restricted building or grounds" under § 1752(c)(1). The Indictment further alleges that the Defendant knowingly and without lawful authority entered and remained

in that restricted buildings and grounds.  It also alleges that the Defendant, knowingly and

with the intent to impede or disrupt government business, engaged in disorderly conduct

that resulted in a disruption to government business.  In short, the allegations closely

track the statutory language.

Looking outside Section 1752's language, the Defendant urges the Court to

import an extra-textual requirement that the USSS be required to designate the restricted

area.  That argument fails on the merits.  Section 1752 is directed not at the USSS, but at

ensuring the protection of the President and the office of the Presidency.  *See* S. Rep. 91-

1252 (1970); *see also* Elizabeth Craig, *Protecting the President from Protest: Using the*

*Secret Service's Zone of Protection to Prosecute Protesters*, 9 J. Gender Race & Just.

665, 668-69 (2006)*.*  Second, the legislative history in fact undercuts the Defendant's

argument.  An earlier version of the statute explicitly incorporated regulations

promulgated by the Department of the Treasury (which at the time housed the USSS)

governing restricted areas.  *See United States v. Bursey*, 416 F.3d 301, 306-07 (4th Cir.

2005) (noting that definition of restricted area required interpreting Treasury regulations).

But Congress's decision in 2006 to "eliminate reference to regulations," indicates that the

statute no longer depends on whether the USSS has defined an area as "restricted."

Defendant's reliance on statutory purpose and legislative history suffers a bigger

flaw: it focuses outside the text when the text itself is clear.  Such an inquiry is

permissible only where literal application of statutory language either results in an

outcome that can truly be characterized as absurd or produces an outcome that is

demonstrably at odds with clearly expressed Congressional intent.  *See United States v.*

*American Trucking Associations*, 310 U.S. 534, 543 (1940).  The plain meaning of the

statute does not result in an outcome that can be characterized as absurd.

The statute sets clear limitations on where restricted areas may be established. The statute only criminalizes entry into a restricted area "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting…" The statute does not criminalize an individual who enters an area in a building or grounds separate from where a Secret Service protectee is present, regardless of restrictions placed by law enforcement. Therefore, reading the plain meaning of the statute does not result in the "absurd" outcome suggested by the Defendant.

Nor does Defendant muster support for the claim that the literal application of the statute would be at odds with Congressional intent. The language of the statute is the best evidence of Congressional intent. *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 84 (1991). This statute was intended to ensure the safety of USSS protectees. If Congress intended to give USSS sole authority to designate a restricted area, it could have written that into the statute or amended the statute to reflect that intent. In 1970, Congress enacted 18 U.S.C. § 1752 to include subsection (d), which gave authority to the Department of Treasury, which then oversaw USSS, to "prescribe regulations governing ingress or egress to such buildings and grounds and to posted, cordoned off, or otherwise restricted areas where the President is or will be temporarily visiting." Pub. L. 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan. 2, 1971). Congress subsequently struck subsection (d) and did not replace it with language limiting the law enforcement agencies allowed to designate a restricted area. Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 192 (Mar. 9, 2006).  Congress was clearly aware that the prohibitions in 18 U.S.C. § 1752 could turn on decisions made by USSS but chose not to include that in the revised statute.

Defendant cites to *United States v. Griffen* 21-cr-92, 2022 11 (D.D.C. 2022) (McFadden) to make his case, but as Defendant admits, the court in *Griffen* denied a motion to dismiss a § 1752 charge on the ground that that the statute (Congress) did not specifically state who must designate the "restricted areas." *Id.* at Dkt. No. 41. Defendant simply raises substantially the same argument in the hope that this Court will rule differently. For the reasons stated above, it should not. The language of the statute is abundantly clear. Section 1752's plain language includes no such requirement that the USSS designate the restricted area – the statute further encompasses the precise conduct that Defendant is alleged to have committed. His Motion to Dismiss Counts Two and Three should be denied.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court deny the Defendant's Motion to Dismiss Counts One, Two, and Three.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

*/s/ Christopher M. Cook*
CHRISTOPHER M. COOK
Kansas Bar No. 23860
Assistant U.S. Attorney - Detailee
United States Attorney's Office for
the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
christopher.cook5@usdoj.gov