UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ERIK HERRERA,<br><br>                    Defendant. | Criminal Action No. 21-619 (BAH)<br><br>Chief Judge Beryl A. Howell |

**MEMORANDUM AND ORDER**

Defendant Erik Herrera faces trial on August 15, 2022, on a five-count indictment and has moved pre-trial to transfer venue to the Central District of California, or alternatively, to "any district other than the District of Columbia and its immediately neighboring districts." Def.'s Mot. Transfer Venue ("Def.'s Mot."), ECF No. 36. According to defendant, he cannot obtain a fair and impartial trial related to the events of January 6, 2021 in the District of Columbia. For the reasons discussed below, and consistent with this Court's previous disposition of virtually identical arguments by other January 6th defendants, the motion is denied.

**I.    DISCUSSION**

The right to an impartial jury is constitutionally enshrined by the Fifth and Sixth Amendments, but its primary safeguard is in the *voir dire* process. *See United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc). In this Circuit, it is "well-established procedure" to deny pre-*voir dire* requests for a change of venue; only once the *voir dire* process reveals that an impartial jury cannot be selected should a change of venue occur. *Id.* at 60-64. In extreme cases of "extraordinary local prejudice," however, juror prejudice should be presumed. *United States v. Skilling*, 561 U.S. 358, 378-81 (2010). *Skilling* guides courts to consider three

1

factors in determining whether this presumption should attach: (1) "the size and characteristics of the community in which the crime occurred," (2) the presence of "blatantly prejudicial information" in news stories available to jurors, and (3) the time elapsed between the alleged crime and trial.  Contrary to the defendant's arguments, and much like in *Skilling* itself, none of these factors weighs in favor of transferring venue.

As to the first *Skilling* factor—the size and characteristics of the District of Columbia—defendant's arguments about the nature of D.C. residents fail to establish that a fair jury cannot be found in the District. Further, they reveal the defendant's caricatured assumptions about a diverse city that comprises far more than Capitol Hill.  Defendant primarily argues that too many D.C. residents are "closely connected to the government" because they work for the federal government or law enforcement groups, or because they know someone who does.  Def.'s Mot. at 5.  Federal employees, the motion contends, were uniquely affected by the attack on the Capitol because "their duties and priorities flow from law and policy implemented and administered by those who prevail in elections." Def.'s Reply Mot. at 2.  Under this logic, there cannot be any district that would satisfy the defendant: the effort to disrupt the election is significant to anyone affected by the "law and policy implemented" by elected officials—namely, the entire American polity. Many federal employees in the District of Columbia, who in any event comprise a minority share of the population, hold non-political positions.[1]  That the events of January 6, 2021 have been characterized as an "attack on our elections, government institutions generally, and democracy as a whole," as defendant argues, Def.'s Mot. at 5, does not render District of Columbia residents any more biased than the residents of the Central District of California, who are also invested in these institutions.  *See United States v. Haldeman*,

---

[1] Defendant's argument that D.C. residents who know federal employees or law enforcement officers cannot be impartial is merely a more attenuated branch of this argument, and even less convincing.

2

559 F.2d 31, 64 n. 43 ("Scandal at the highest levels of federal government is simply not a local crime of peculiar interest to the residents of the District of Columbia.")

Defendant next argues that District of Columbia residents were "deeply traumatized" by the attack on the Capitol and its aftermath, including the city-wide curfew, enhanced law enforcement presence, and state of emergency. Def.'s Mot. at 5-6. To be sure, the immediate local impact on the residents of D.C. was undoubtedly substantial—but this fact alone is insufficient to necessitate transfer. Courts have declined to transfer venue in cases involving far more visceral local effects. *See, e.g., In re Tsarnaev*, 780 F.3d 14, 16 (1st Cir. 2015) (upholding district court's denial of venue transfer in prosecution of Boston Marathon bomber, whose actions killed three, injured hundreds, and resulted in a shelter-in-place order); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (upholding denial of venue transfer in prosecution of 1993 World Trade Center bomber, whose actions killed six and injured thousands). Moreover, only limited areas of D.C. in the immediate vicinity of the U.S. Capitol were subjected to enhanced law enforcement presence and all of the most visible security steps necessitated by the January 6, 2021 attack on the Capitol have long disappeared.

Nor do the voting patterns of D.C. residents give rise to a presumption of prejudice in this case. The D.C. Circuit, sitting *en banc*, has already rejected the argument that D.C. residents are incapable of fairness in highly politically-charged criminal prosecutions. *Haldeman*, 559 F.2d at 64, n. 43. Biden voters will constitute substantial share of any jury pool, even outside of this District—after all, President Biden prevailed in the 2020 presidential election garnering over 7 million more votes than his opponent.

As to the second *Skilling* factor—pretrial publicity—the extensive nature of local media coverage of the events of January 6, 2021 and their aftermath does not necessitate transfer.

3

Defendant portrays the District of Columbia as so saturated with "inflammatory" and "factually inaccurate" coverage of the incident that residents will be unable to be fair.  Def.'s Mot. at 10.  The mere fact of extensive and even hostile coverage is not sufficient to presume prejudice:  "In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case," and presuming these jurors' prejudice would create an "impossible standard."  *Haldeman*, 559 F.2d at 60 (quoting *Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961)).  Accord *Murphy v. Florida*, 421 U.S. 794, 800 (1975) (holding that extensive press coverage about a defendant's previous trials and convictions did not corrupt the fairness of the jurors).

      The next problem with this argument is that the defendant simultaneously concedes that this coverage has been national in nature—not just local. According to a 2021 Pew Research Center poll cited by defendant, 69 percent of U.S. adults nationwide said they had heard "a lot" about the attack on the Capitol.  Def.'s Mot. at 10.  Jurors drawn from *any* other district in the country would have exposure to the same nationwide news coverage.  *See United States v. Garcia*, 2022 WL 2904352, *14 (July 22, 2022) (Berman Jackson, J.) (noting that "ongoing media coverage of the advent of trial…both locally and nationally" would be true "wherever trial is held" (quoting *Tsarnaev*, 780 F.3d at 22)).

      More importantly, defendant has failed to demonstrate that he, in particular, has been the subject of *any* local or national publicity.  There is no indication that jurors would recognize the defendant from coverage of January 6, 2021, and *voir dire* will draw out whether jurors have seen any media reports about the defendant.  Defendant's absence from recent publicity stands in stark contrast with the "foundation precedent" for this question, *Rideau v. Louisiana*, 373 U.S.

723 (1963), which involved news stories with "blatantly prejudicial information," namely, a televised in-custody confession by the defendant to the crimes for which he would be tried. *Skilling*, 561 U.S. at 379, 382.  The Supreme Court held that the broadcast "in a very real sense was Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726.  Here, by contrast, the public is unlikely to even recognize the defendant.  Indeed, recent media coverage of the attack on the Capitol may even be *helpful* to the defendant.  The U.S. House of Representatives' Select Committee to Investigate the January 6th Attack on the United States Capitol has held several summer hearings. These hearings and ensuing media coverage have shifted media focus from the rioters to the actions of high-level officials.  Rather than containing a "confession or other blatantly prejudicial information" about the defendant, *Skilling*, 561 U.S. at 382, recent local and national news coverage about the attack on the Capitol has concerned the responsibility of persons other than this defendant.

The final *Skilling* factor—the elapsed time between the charged conduct and the trial—also weighs against the defendant.  Nearly two years after the attack on the Capitol, the curfew and state of emergency have long since lifted; residents have resumed their daily lives, if they ever paused them; the National Mall has returned to its role as the host of kickball league competitions rather than barricades and police.  The First Circuit held that two years after the Boston Marathon Bombings was sufficient for the "decibel level of publicity about the crimes themselves to drop and community passions to diminish." *Tsarnaev*, 780 F.3d at 22.  So too here: any jurors who carry the memory of January 6 particularly heavily such that he or she cannot be fair to the defendant can be ferreted out in *voir dire*.

Judges on this Court have consistently rejected arguments similar to that of defendant. *See, e.g., United States v. Bledsoe,* 21-cr-204-1, Min. Order (July 15, 2022) (denying Def.'s Mot.

5

to Change Venue, ECF No. 190) (Howell, C.J.); *United States v. Bochene,* 2022 WL 123893 (D.D.C. Jan. 12, 2022) (Moss, J.); *United States v. Garcia*, 2022 WL 2904352 (D.D.C. July 22, 2022) (Berman Jackson, J.); *United States v. Rhodes*, 2022 WL 2315554 (D.D.C. June 28, 2022) (Mehta, J.); *United States v. Williams,* 21-cr-377, Min. Order (June 10, 2022) (denying Def.'s Mot. to Change Venue, ECF No. 40) (Howell, C.J.). Defendant ignores these cases, stating only in passing that "the fact that courts in other January 6 cases have used the voir dire process to address juror fairness and impartiality issues does not control the outcome of this motion." Def.'s Reply at 7, ECF No. 46. In fact, several jury trials in this Court have disposed of January 6th cases and *voir dire* has successfully resulted in an unbiased jury. Defendant has not established that the task of choosing a fair jury for his case will be any more difficult nor explained in any way why his situation is so special that use of the voir dire process "to address juror fairness and impartiality," *id*., would not work in his case as it has in other January 6 cases. Significantly also, defendant makes no effort whatsoever to address or show any deficiency in the reasoning in any of the other decisions issued by this Judge and every other Judge on this Court denying venue transfer motions, and this Court finds those decisions to remain persuasive.

**II.   ORDER**

For the foregoing reasons, it is hereby

**ORDERED** that defendant's Motion to Change Venue, ECF No. 36, is **DENIED.**

**SO ORDERED.**

Date: August 4, 2022

_____
BERYL A. HOWELL
Chief Judge