**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-619-BAH** |
| **ERIK HERRERA,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Erik Herrera to 78 months' incarceration, which is within the 70 to 87 month guideline range calculated by the Probation Office and the government, three years of supervised release, $2,000 in restitution, and the mandatory special assessment for each count of conviction, totaling $170.

I. **INTRODUCTION**

The defendant, Erik Herrera, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ 2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

As the government's evidence established at trial, Erik Herrera, a self-proclaimed photojournalist, joined the storming of the Capitol on January 6.   Herrera entered the Capitol through a fire door, located near the Senate Parliamentarian's Office on the Senate wing side of the building.   He came prepared –   wearing a gas mask, goggles, and a bulletproof vest – some of which he had ordered just a few weeks before January 6.   Herrera also carried a tent and backpack.   He approached the building through the west side of the Capitol, where he had witnessed other rioters physically battling police who were trying to prevent rioters like himself from entering.   Herrera eventually made his way past the police and climbed through the scaffolding in and around the inauguration stage and found his way to the aforementioned fire door near the Senate Parliamentarian's Office at approximately 3:00 p.m.   Once inside the Capitol, Herrera immediately entered the Senate Parliamentarian's Office, which had been trashed by other rioters.   Herrera further contributed to the ruin in that office by picking up a stack of papers and throwing them in the air.   Herrera captured this event through an Instagram photo that he posted online, along with the caption:   "I'm reclaiming Aztlan because I love America.   Querer es poder!"[2]   Later on, in an exchange with someone else on Instagram, Herrera said he had picked up the papers and had someone photograph him because he wanted a "fuck you" picture.    Herrera also made a number of incriminating statements on Instagram before and after the riot.

The Senate Parliamentarian and her staff, along with members of Congress, would have been presiding over the certification of the Electoral College Vote that day had Herrera and other

---

[2] As explained in further detail below, testimony at trial revealed that the term "Aztlan" can refer to lands purportedly stolen from Mexico by the United States, and that the term "querer es poder" can be roughly translated into English as "Where there's a will, there's a way" or "If you can dream it, you can achieve it."

rioters not stopped the proceedings.   From the Senate Parliamentarian's Office, Herrera left the building the same way he had come in – shortly after law enforcement officers came through ordering rioters to leave and using crowd control tools such as pepper ball launchers.   On his way out, Herrera stole from the Senate Parliamentarian's office a bottle of liquor, which he later drank, and raised triumphantly as he exited the Capitol the first time.

Instead of leaving the building and the grounds, Herrera then went to a different door, also on the northwest side of the building.   He entered the Capitol a second time through the nearby Senate Wing Doors.   As he entered, he walked past shattered windows on each side of the door and spent a few minutes setting up his camera and taking photographs.   Herrera then proceeded to the nearby "hideaway" office of a United States Senator.[3]   In this Senator's office, Herrera smoked a marijuana cigarette that was passed around by fellow rioters.   After he left the Senator's hideaway office, Herrera proceeded to the Crypt, and remained inside for approximately fifteen more minutes, taking more photos, before finally exiting the building around 3:30 p.m.

Herrera testified at trial. He claimed that his only purpose for entering the Capitol that day was to take pictures, and further claimed that he did not intend to participate in a riot, or to stop the official proceeding of Congress.   Herrera suggested that all of his incriminating statements on social media were just "banter."   In the days after January 6, Herrera made several statements on social media.   For example, Herrera stated that "he did what he had to do for both photojournalism and our people" and also said, with regard to his trashing the Senate Parliamentarian's Office, "all I did was throw some paper in the air, lol."

---

[3] Testimony at trial revealed that U.S. Senators have these "hideaway" offices at the Capitol. These offices are places where Senators and/or their staff can work while at the Capitol building.

The United States recommends that the Court sentence Herrera to 78 months' incarceration. The advisory Guidelines' range is 70-87 months, the range calculated by the government and the United States Probation Office. A sentence of 78 months' incarceration will reflect the seriousness of Herrera's conduct, and will also serve to deter Herrera and, most importantly, other individuals from engaging in such conduct.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Herrera among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the Pre-Sentence Report ("PSR"), a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate

adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* PSR ¶ 1-14.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).

Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol,

J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

**B.     Defendant's Role in the January 6, 2021 Attack on the Capitol**

*Approach to the Capitol*

Erik Herrera, a freelance photographer, participated in the January 6 attack on the Capitol. His crimes are documented through a series of videos and photos provided to the FBI by concerned citizens, body worn camera from the Metropolitan Police Department, open-source video, and surveillance footage from inside of the Capitol, along with recordings from the defendant's own devices, and social media postings from the defendant's Instagram account.

7

Herrera traveled to Washington, D.C. from his home in San Diego, California, arriving in the early hours of January 6. Herrera had told local California media outlets, including the *San Diego-Union Tribune* that he would be going to Washington, D.C. to "cover the third MAGA rally and reporting inside any plausible right-wing autonomous zones."   However, Herrera testified that he did not attend the "Stop the Steal" rally that was taking place at the Ellipse on January 6. Instead, Herrera arrived in Washington, D.C. and very quickly thereafter went directly to the Capitol to participate in the riot.   Herrera, as noted above, came prepared – he was wearing a pink respirator mask, ski goggles, and a bulletproof vest.   Herrera had purchased some of these items only days before the riot on January 6th.   Herrera made his way to the Capitol from the west front, where he took a photo near the Peace Circle of an "Area Closed" sign, which marked the restricted perimeter around the Capitol.   Herrera posted this photo, included as an attachment to this sentencing memo as *Exhibit 1*, to his Instagram account.



*Exhibit 1*

***Herrera Witnessed Violence on the West Front and Ascended the Scaffolding***

Herrera then approached the Capitol and personally witnessed violence taking place between police officers, who were defending the Capitol that day, and other members of the mob. A video recording, taken by Herrera near the west stairs, shows multiple rioters battling police officers in hand-to-hand combat.  That video is attached to this sentencing memo as *Exhibit 2*. Seeing this violence did not deter Herrera, as he continued toward the building. Herrera then scaled the northwest scaffolding on Capitol grounds. A screenshot of Herrera scaling this wall is included below as *Exhibit 3*. The scaffolding was located at the western face of the Capitol building.

9



*Exhibit 3*

**Breach of the Senate Parliamentarian's Office**

Later, video footage captures a large group of rioters moving to the top of the Northwest stairway on the Capitol's Upper West Terrace. Herrera moved among this mob, and eventually found an entrance into the building at the Senate Parliamentarian's Door, also known as the Senate Fire Door, which is near the Upper West Terrace.   A screenshot from a video showing Herrera at this location right before he entered the Capitol is included below as *Exhibit 4*.



*Exhibit 4*

Once he entered the Capitol, which was just before 3:00 p.m., Herrera took a number of photos and videos with his phone, surrounded by a mob of other individuals, and then entered into the office of the Senate Parliamentarian.   Before Herrera entered the Senate Parliamentarian's Office, multiple police officers were attempting to push the mob of rioters out of the Capitol building.   Fire alarms were blaring at this location, and police officers used a number of tools, including verbal commands and pepper balls, to try to get the rioters out of the Capitol.   Herrera saw what police officers were doing at this location as well as in the Senate Parliamentarian's Office, and he heard their verbal commands to get out of the building.   CCTV video of Herrera's conduct at this precise location and time is attached as *Exhibit 5*.

Herrera spent a few moments inside the Senate Parliamentarian's Office, where he viewed the papers strewn about the floor, broken windows, damaged personal items belonging to the Senate Parliamentarian and/or her staff, scattered office equipment, ransacked furniture, and other

11

property damage.   A video showing the damage that was done to this office is attached here as *Exhibit 6*.   Herrera saw other rioters who were engaged in the destruction that was taking place in the Senate Parliamentarian's Office and decided to participate in the chaos himself.   Herrera picked up a stack of papers inside this office, had someone take a picture of him holding those papers, and then posted that picture to Instagram with the following caption (discussed above): "I'm reclaiming Aztlan because I love America, Querer es poder!"   A screenshot of this Instagram post is included below and attached as *Exhibit 7*.



*Exhibit 7*

After taking this picture, Herrera then threw these papers in the air, and proceeded to exit the office.   Before leaving, however, Herrera stole a bottle of alcohol that belonged to that office.

Herrera took this bottle of alcohol that was not his, carried it with him as police officers ordered everyone in that location to leave, and hoisted it up in triumph while making a fist-pumping motion as he was kicked out of the Capitol building.   A screenshot of Herrera raising this stolen bottle of alcohol is included below and attached as *Exhibit 8*.



*Exhibit 8*

### *Herrera's Second Breach at the Senate Wing Door and his Entry into a Senate Hideaway Office*

Having been kicked out of the Senate Parliamentarian's Office, and out of the building at this point, Herrera chose to enter the building a second time.   Specifically, after spending a few moments on the Upper West Terrace, showing off his stolen bottle of alcohol and interacting with fellow rioters, Herrera then proceeded to re-enter the building at the nearby Senate Wing Door. Herrera's entry at this location was at approximately 3:07 p.m.   A screenshot from Herrera's entry at this location is included below and attached as *Exhibit 9*.



*Exhibit 9*

Once Herrera was back inside the Capitol, he spent a few minutes taking pictures and calibrating his camera equipment, before venturing to a nearby Senator's "hideaway" office. While in this office, the second one that Herrera unlawfully entered that day, Herrera took a few more pictures and videos, including one from his own device, which revealed him smoking marijuana inside.   A screenshot of Herrera smoking marijuana inside this Senator's hideaway office is included below and attached as *Exhibit 10.*

14



*Exhibit 10*

After spending a few minutes in the Senator's hideaway office, Herrera left, and continued onward through the Capitol, eventually making his way through the Crypt, where he took a few more pictures and videos, before finally exiting at the Memorial Doors at the direction of law enforcement officers, on the east side of the Capitol building.   In total, Herrera spent just under 35 minutes inside the Capitol.   A screenshot of Herrera finally exiting the Capitol at the Memorial Doors is included below and is attached as *Exhibit 11*.



*Exhibit 11*

### *Defendant's Statements on Instagram*

The United States obtained a search warrant for Herrera's Instagram account. A review of the material obtained from Instagram revealed that Herrera intended to obstruct Congress's vote to certify the results of the 2020 Presidential election on January 6.   The entirety of Herrera's Instagram account that was produced within the scope of this warrant was introduced as an exhibit at trial.      Herrera made a number of incriminating statements both before and after the events of January 6, indicating that he was unhappy with the results of the 2020 Presidential Election, that he believed President Biden had not been legitimately elected, and that his actions on January 6 were driven by much more than his self-proclaimed profession of "photojournalism."

Shortly after the election, Herrera had expressed frustration with the election results, and indicated he did not believe President Biden had legitimately won.   Specifically, on November

16

23, 2020, Herrera stated, "I don't believe Biden won at all.   You expect me to believe he got more votes than Obama after all the weird racist stuff he said on tv? Lol okay, son."   A screenshot of this conversation is included below.[4]

**Author** ████████████████████
    **Sent** 2020-11-23 18:06:35 UTC
    **Body** Do you think Trump won or are you just thinking Biden shouldn't be president?

**Author** duvalinpapi (Instagram: 20251440)
    **Sent** 2020-11-23 18:06:43 UTC
    **Body** I don't believe Biden won at all. You expect me to believe he got more votes than Obama after all the weird racist stuff he said on tv? Lol okay, son

Herrera also indicated clearly that he knew that Congress had to certify the results of the 2020 election on January 6th, stating in another private Instagram chat on December 11, 2020, "Biden isn't anything-elect until January 6th."   A screenshot of this statement is included below.

**Author**
    duvalinpapi (Instagram: 20251440)
    **Sent** 2020-12-11 15:05:29 UTC
    **Body** Biden isn't anything-elect until January 6th

In fact, Herrera had traveled to Washington, D.C. a few weeks prior to January 6th, attending a different "stop the steal" rally held near the United States Supreme Court in December 2020.   At this rally, Herrera recorded a number of demonstrators chanting, among other things: "The fight has just begun! The fight has just begun!"   In an Instagram chat with another individual a few days after this rally, Herrera stated that he thought if Biden becomes president, it will "…get

---

[4] Herrera's Instagram account is named "duvalinpapi."   The government has redacted the names of the individuals with whom Herrera was communicating due to the public nature of this filing.

wild in the streets."   The individual with whom Herrera was speaking noted that "To have peace we must have war."   Herrera responded, "Amen.   Last weekend we were at the beginning of the revolution I think.   It was an honor just to be there."   A screenshot of this conversation is included below.

**Author**  ███████████████████████
 **Sent**  2020-12-15 19:45:10 UTC
 **Body**  Ya but what if biden actually becomes the president. Insane :0 you
        think there will be war?

**Author**  duvalinpapi (Instagram: 20251440)
 **Sent**  2020-12-15 19:45:43 UTC
 **Body**  I think it'll get wild in the streets

**Author**  ███████████████████████
 **Sent**  2020-12-15 19:51:10 UTC
 **Body**  Ya I think if that's what this country is obviously wanting to happen
        then it needs to happen. To have peace we must have war.
        Electing biden by cheating and lying to the people is disgusting.

**Author**  duvalinpapi (Instagram: 20251440)
 **Sent**  2020-12-15 19:57:20 UTC
 **Body**  Amen. Last weekend we were at the beginning of the revolution I
        think. It was an honor to just be there

As noted above, Herrera posted a number of videos and photos to his Instagram account on the day of January 6th, including the image above (*Exhibit 7*) of himself inside the Senate Parliamentarian's Office holding a stack of papers from that office, with the incriminating caption "I'm reclaiming Aztlan because I love America.   Querer es poder!"   Testimony at trial revealed that "Aztlan" refers to lands purportedly stolen from Mexico by the United States.   Herrera is Mexican-American.   Herrera's Instagram account also includes several references to "stolen lands."   Further, testimony at trial revealed that "Querer es poder" is sometimes translated as "where there is a will, there is a way."   Herrera himself testified at trial that the phrase can be

translated to "If you can dream it, you can make it.  Go for your dreams, sort of thing."  Tr. 8/18/22, p. 58: 18-21.

The day after January 6th, Herrera was asked by a friend on Instagram about his conduct that day, and specifically his conduct inside the Senate Parliamentarian's Office.  Herrera downplayed his role in the riot, saying, on January 7, 2021, "All I did was throw some paper in the air, lol."

Herrera also stated that while he was in the Senate Parliamentarian's Office having someone photograph him, he wanted to take a "fuck you" picture.  A screenshot from this conversation is included below.

**Author** ███████████████████████████

**Sent**  2021-01-09 09:16:24 UTC

**Body**  I can only imagine how awful it must be for people to. Not only lose their livelihood, but also their health insurance, maybe a loved one, hopes, dreams…. Then to see no end in sight from the most "powerful" nation in the world but still feel like a caged animal. Those kinds of circumstances change people when it happens on a long enough time line.

What was going through your mind while holding what appeared to be a stack of government documents?

I don't suppose the Proud Boys were the only group rallying together at the capitol that day, but what do you feel draws people to groups like this?

**Author** ███████████████████████

**Sent**  2021-01-09 09:17:45 UTC

**Body**  What kind of feedback have you been receiving from your most recent posts?

**Author**  duvalinpapi (Instagram: 20251440)

**Sent**  2021-01-09 09:25:12 UTC

**Body**  I wasn't thinking much, I just wanted a goofy "fuck you" picture. I don't even know what they were. Probably can't talk about that here anymore, the post was flagged.

Herrera also stated unequivocally that his actions were motivated by more than his desire to take photographs that day.   On January 7, 2021, in explaining his conduct inside the Capitol, Herrera said:   "I did what I had to do for both photojournalism and our people."

When asked what he meant by this statement, Herrera stated in part that his actions were "driven by the election results."   A screenshot of this conversation is included below.

**Author** █████████████████████████

**Sent** 2021-01-07 01:00:41 UTC
**Body** Could you elaborate on what you mean by you did what you had to do for our people?

Obviously news coverage can be biased depending on its source, but you are there, you're in it.

Whatever was planned and executed for today, I'd like to understand what the mission was and the desired outcome?

**Author** duvalinpapi (Instagram: 20251440)
**Sent** 2021-01-09 02:39:12 UTC
**Body** The first part I'll answer at another time.

It was driven by the election results but also everything else that has been affecting the country for almost a year.

In another Instagram conversation, Herrera was confronted about his beliefs regarding "stolen lands."   In response, Herrera said that his actions were part of a "resistance" and "What happened in DC showed everyone it's absolutely possible."   A screenshot from this conversation is included below.

**Author** █████████████████████████
**Sent** 2021-01-10 18:50:10 UTC
**Body** You really think maga wants to return this land to people with slightly dark skin?

**Author** duvalinpapi (Instagram: 20251440)
**Sent** 2021-01-10 18:51:01 UTC
**Body** It's called a resistance. It'll be taken back

20

**Author** ███████████████████
**Sent** 2021-01-10 18:51:05 UTC
**Body** What do you think when you see the confederate flag?

**Author** ███████████████████
**Sent** 2021-01-10 18:51:14 UTC
**Body** Or is that also a minority thing

**Author** duvalinpapi (Instagram: 20251440)
**Sent** 2021-01-10 18:51:17 UTC
**Body** What happened in DC showed everyone it's absolutely possible

### *Herrera's Testimony at Trial*

At trial, Herrera sought to downplay his role in the riot on January 6 and insisted that his incriminating statements about his intent were not to be taken seriously.  He suggested that his only purpose for being at the Capitol was to take photographs and to try to make a name for himself as a freelance photographer, and he claimed that he did not have the intent to obstruct an official proceeding. Herrera's testimony is set forth in detail at pp. 25-31 below, in the context of addressing the U.S. Probation Office's two-level adjustment for obstruction of justice under U.S.S.G. 3C1.1, arising from Herrera's false testimony at trial.

### III.   THE CHARGES

On October 6, 2021, a federal grand jury returned an indictment charging Herrera with Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2) and § 2, Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).   On August 19, 2022, a jury returned a verdict of guilty on all five counts.

## IV.   STATUTORY PENALTIES

Herrera now faces sentencing on all five counts of the indictment upon which he was convicted.   Herrera is subject to a maximum of 23 years in custody (up to 20 years for 18 U.S.C. § 1512(c)(2), a Class C felony; up to one year for each of the two Class A misdemeanors; and up to six months for each of the two Class B misdemeanors); a term of probation of not more than five years for each of the two Class B misdemeanors pursuant to 18 U.S.C. § 3561(c); a term of supervised release of not more than three years, pursuant to 18 U.S.C. § 3583(b)(2), for the Class C felony, and one year for each of the two Class A misdemeanors); a fine of not more than $460,000 (up to $250,000 for the Class C Felony pursuant to 18 U.S.C. § 3571(b)(3) and (d), $100,000 for each of the two Class A misdemeanors pursuant to 18 U.S.C. § 3571(b)(5), and $5,000 for each of the two Class B misdemeanors pursuant to 18 U.S.C. § 3571(b)(6)); and special assessments totaling $170 ($100 for the Class C Felony, $25 for each of the two Class A misdemeanors pursuant to 18 U.S.C. § 3013(a)(1)(A)(iii), and $10 for each of the Class B misdemeanors pursuant to 18 U.S.C. § 3013(a)(1)(A)(ii).

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government concurs with the U.S. Probation Office that the Sentencing Guidelines offense level is 27 but disagrees about how that offense level is calculated.   The Guidelines set out the specific "order" of the analysis:   first, determine the offense guideline; second, determine the base offense level and apply appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3.   U.S.S.G. § 1B1.1(a)(1)-(3).   Then, repeat each step for each count.   U.S.S.G. § 1B1.1(a)(4).   Finally, perform the grouping analysis in Part D of Chapter 3.   *Id.*

In the draft pre-sentence report ("PSR"), the Probation Office did not employ this specified procedure to determine the total combined offense level.   Rather, the Probation Office started with the grouping analysis in Part D of Chapter 3, then did the Guidelines analysis in U.S.S.G. § 1B1.1(a)(1)-(3), but only for Count One.   PSR ¶¶ 41-52.   Respectfully, the appropriate offense level computations for Counts One, Two and Three, however, prior to any grouping analysis under Part D of Chapter 3 are as follows:

### Count One: 18 U.S.C. §§ 1512(c)(2) and 2 - Obstruction of an Official Proceeding Before Congress, and Aiding and Abetting

| Base offense level: | 14 | U.S.S.G. §2J1.2 (a) |
|---|---|---|
| Special Offense Characteristic | +8 | U.S.S.G. §2J1.2 (b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." |
| Special Offense Characteristic | +3 | U.S.S.G. §2J1.2 (b)(2): "the offense resulted in substantial interference with the administration of justice." |
| Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of |

| | | |
|---|---|---|
| | | conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense" |
| Total | 27 | |

### Count Two: 18 U.S.C. § 1752(a)(1) - Entering and Remaining in a Restricted Building or Grounds

| | | |
|---|---|---|
| Base Offense Level | 4 | U.S.S.G. §2B2.3(a) |
| Specific Offense Characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." |
| Cross Reference | | U.S.S.G. §2B2.3(c)(1) |
| Base Offense Level (adjusted) | 25 (from Count One) | U.S.S.G. § 2X1.1(a): "the base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." |
| Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense" |
| Total | 27 | |

### Count Three: 18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building or Grounds

| | | |
|---|---|---|
| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
| Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense" |
| Total | 12 | |

Counts One through Three group because all involve the same victim: Congress.

U.S.S.G. § 3D1.2(d).  The offense level for that Group is the level "for the most serious of the

counts comprising the Group, i.e., the highest offense level of the counts in the Group."   U.S.S.G. § 3D1.3(a).   Since Counts One and Two have the highest offense levels for any count in the group, the offense level for the group is 27.   And because there is only one group, the total adjusted offense level is the level for that group:   27.   While such calculations were not completed for each count, the Probation Office correctly concluded that the combined total offense level in this case is 27.   PSR ¶ 51.

**Counts Four and Five:   18 U.S.C. §§5014(e)(2G) and (e)(2)(D)**

The guidelines do not apply to these offenses.

Herrera has no criminal convictions and therefore not assigned criminal history points. PSR ¶¶ 52-58.   The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 54.   Accordingly, Herrera's Guidelines imprisonment range is 70 to 87 months' imprisonment.   PSR ¶ 98.

## VI.   RESPONSE TO HERRERA'S OBJECTIONS/CORRECTIONS TO PSR

### Herrera's Objections to the Guidelines' Calculation

#### a) False testimony adjustment

First, Herrera objects to the allegation that he provided "materially false testimony" during trial and to the application of a two-level upward adjustment for obstruction of justice under USSG §3C1.1.   This adjustment is warranted.

Herrera testified that he sent emails to local media outlets letting them know that he would be in Washington, D.C. on January 6 "for the MAGA rally" and that he would be offering to extend his coverage of this event.   Tr. 8/17/22 p.224: 2-24.   The defense entered into evidence a copy of this email that Herrera sent to the *San Diego Union Tribune* stating "…I will be in Washington,

D.C. to cover the third MAGA rally and reporting on any plausible right-wing autonomous zones. I'd like to work with you and extend the coverage of the events to the *San Diego Union-Tribune*." Tr. 8/17/22 p.64: 12-16.   However, Herrera testified that he never attended the "Stop the Steal" rally that was taking place at the Ellipse on January 6.   Instead, Herrera arrived in Washington D.C. later in the morning, and attended only the riot that was taking place in and around the United States Capitol.

Herrera admitted on cross-examination that he did not tell various media outlets such as the *San Diego Union-Tribune* that he personally believed the election was stolen.   Tr. 8/17/22 p.84: 18-21.   Herrera also did not tell local media outlets that he would be unlawfully entering the Capitol on January 6.   Tr. 8/17/22 p.85: 7-11.   Herrera also did not tell local media outlets that he would be unlawfully entering the Senate Parliamentarian's Office, stealing a bottle of alcohol, helping to trash the office by throwing a stack of papers in the air, or smoking a marijuana cigarette in a Senator's office on January 6.   Tr. 8/17/22 p.85: 17-86: 3.

When asked on direct examination about what the term "Aztlan" meant, Herrera stated that "Interpretations of Aztlan vary from person to person.   Two of the common ones are that Aztlan is stolen land – Mexican stolen land that the U.S. government took from them; and another interpretation that's common is that Aztlan is the mythical home place of the Aztecs."   Tr. 8/17/22 p.245: 16-20.   When asked to clarify what Aztlan meant to him, Herrera stated:   "Aztlan, to me is more representative, like, a brown unity – brown, Latino empowerment.   It's just more of like, a positive model.   That's what that definition of Aztlan serves to me." When asked about the term "Querer es poder," Herrera stated, "To me it's seemed more to come off as a, if you can dream it, you can make it or go for your dreams."   Tr. 8/18/22 p.59 2-3.   Herrera also admitted that there

26

are additional interpretations of this phrase, to include, "Where there is a will there is a way." Tr. 8/18 p.76 17-23.

Herrera sought to minimize these and other statements throughout the trial, suggesting that his incriminating words on his Instagram messages were simply "banter," and not to be taken seriously.   Tr. 8/18/22 p.72: 1-10.   But the plain meaning of his words was obvious and consistent.    When looking at Herrera's words – along with his conduct, it was clear that Herrera was upset with the state of the country, particularly the results of the election which he believed was illegitimate, and he intended to do something about it.   He was a photographer and also a rioter on January 6.

Herrera admitted it was "wrong" for him to be inside of the Capitol that day.   Tr. 8/17/22 p.256 19-25.   But he seemed to suggest initially, that he thought his local press credentials allowed him access into the Capitol.   When asked directly, "Did you think that your San Diego Police Department press pass allowed you permission to be in this building?"   Herrera responded, "Yes." Tr. 8/18/22 p.26 4-7.   Later, however he clarified that he did not have a U.S. Capitol media credential and conceded that he did not have permission to enter the building.   Tr. 8/18/22 p.26: 8-24.

Herrera was confronted about his intent in both in his Instagram messages and during trial. When asked what he meant by his admission that he "did what [he] had to do for both photojournalism and our people," Herrera gave an incredible answer, saying, "I wanted to go there to take pictures.   I wanted to be there as a photojournalist.   And the part where it says 'our people' I put that in there because I like seeing diversity and representation in the media.   So, I saw that as, you know, for Latinos or any other people of color they would have someone maybe similar to

them to have coverage of that event."   Tr. 8/18/22 p.46 14-47:3.

In an Instagram chat, the person with whom Herrera was communicating asked him, "Can you elaborate on what you mean by you did what you had to do for our people?"   At trial, Herrera quoted his response on Instagram, "The first part I'll answer at another time.   It was driven by the election results but also everything else that has been affecting the country for almost a year." Tr. 8/18/22 p.48 6-8.   On direct examination, Herrera insisted on his characterization that "What I meant was for our people part again because I like to see diversity and representation in the media." Tr. 8/18/22 p.48 23-24. This is clearly a fantastical revision of what Herrera meant when he said these plain words in the immediate aftermath of January 6.

Herrera also tried to suggest that he himself was not motivated by the results of the election, or allegations of fraud, and that it was "other people" he was referring to when he said, "electoral irregularity was like nothing ***they*** had ever seen."   Tr. 8/18/22 p.78 15-18 (emphasis added). However, it was Herrera himself who stated unequivocally, "I don't believe we had we had an honest electoral process in 2020."   Herrera acknowledged that he did not like President Biden but refused to accept responsibility that his purpose for participating in the events of January 6 was to obstruct the certification process, in addition to his desire to take a few photos.   Tr. 8/18/22 p.91 19-24. On re-direct, Herrera was asked, "Did you travel to Washington, D.C. on January 6 to stop the election – the electoral vote counts because of your political beliefs?"   Herrera answered, "I didn't travel to do any of that.   I just traveled to take pictures of the rally."   Tr. 8/18/22 p. 91: 20-24.

At trial, Herrera testified about the photo he posted on Instagram of himself inside the Senate Parliamentarian's office. When asked why he picked up a stack of papers from the Senate

Parliamentarian's office and had someone take a picture of him participating in trashing that office (which he later described in another Instagram post as a "fuck you" photo), Herrera gave the following answer:   "I can't even begin to answer that because – it's something I think about every day.   That day – everything that was even happening outside, and I was seeing outside was – it was just a lot, all of the constant screaming and chanting, and people shoving each other; and seeing police fight with the protesters kind of carried into the Capitol Building.   I just – I walked in, and the screaming and chanting just continued; people all around me.   And I just for some reason, had this moment of where I wasn't thinking, and I just acted unprofessionally, foolishly; it's just something I regret."   Tr 8/17/22 p.262: 13-23.   Herrera continued, "I don't know what led me to get to that point but, after that, I ***instantly*** saw it as a horrible mistake." Tr. 8/17/22 p.262: 23-25 (emphasis added).   Herrera also stated that after he threw those papers in the air that he was "…not sure why I did that.   I don't know what came to mind.   Shortly after that, I just wanted to leave then."   Tr. 8/18/22 p.62: 18-20.   Herrera doubled down on this statement by repeating on cross-examination that he regretted his actions in the Senate Parliamentarian's office, "immediately."   Tr. 8/18/22 p.71: 15-25.   A selection of the transcript from this portion of cross-examination is included below:

> **Q.**   Do you want to revise your answer about saying you immediately regretting what you did?
>
> **A.**    No.  I did regret what I did.
>
> **Q.**  I'm sorry?
>
> **A.**    I said I do regret what I did.
>
> **Q.**   But not immediately, though.   Right?
>
> **A.**   I did, immediately.

These statements are also incredible, given that Herrera, "instantly" after he had this photograph taken, proceeded to steal a bottle of alcohol, drink it, raise it victoriously for other rioters to see, re-enter the building a second time, enter a Senator's office, smoke a marijuana cigarette, and then continued to brag about his actions during the riot itself and for days *after* January 6.   While he was in the building Herrera stated on Instagram, "What I'm experiencing is absolutely incredible." Herrera stated in an Instagram message on January 7, 2021, "I'm still full of energy."   Also on January 7, 2021, Herrera stated, "All I did was throw some paper in the air lol" and "I did what I had to do for both photojournalism and our people," and "it was driven by the election results" and "I don't think we had an honest electoral process in 2020."   Herrera told a friend of his on Instagram that he wanted to take a "fuck you" picture inside the Senate Parliamentarian's office on January 9, 2021.   On January 10, 2021, Herrera stated on Instagram, "What happened in DC showed everyone it's absolutely possible."

These are not the words of a remorseful, contrite individual.   These words show exactly what Herrera was intending to do on January 6.   Take some pictures, yes, but also obstruct an official proceeding of Congress, and participate in a riot.   Herrera was not sorry for his actions on January 6, and certainly not immediately thereafter.   He was flippant and proud of what he had done.   "Querer es Poder."

Herrera was thus untruthful at trial with respect to material matters, and he testified untruthfully about these material matters that were designed to substantially affect the outcome of the case. *See U.S. v. Dunnigan*, 507 U.S. 87 (1993). Accordingly, USSG §3C1.1 should be applied in these circumstances.   The reality is that his minimization was an attempt to undercut various legal aspects of the charges, to include the corrupt intent required by Count One, and the

knowledge required by Counts Two and Three.   This minimization failed.

For additional reference, the application of USSG §3C1.1 has been included in a number of other January 6 cases.   *See e.g.*,   *U.S. v. Guy Reffitt*, Case No. 21-cr-32 (DLF); *U.S. v. Thomas Robertson*, Case No. 21-cr-34 (CRC); *U.S. v. Thomas Webster*, Case No. 21-cr-208 (APM); *U.S. v. Hale-Cusanelli,*, Case No. 21-cr-37 (TNM); *U.S. v. Christian Secor*, Case No. 21-cr-157 (TNM); *U.S. v. Matthew Bledsoe*, Case No. 21-cr-204 (BAH); *U.S. v. Mark Andrew Marza*, Case No. 21-cr-736 (JEB); *U.S. v. Dustin Thompson*, Case No. 21-cr-736 (JEB); *U.S. v. Mathew Wood*, Case No. 21-cr-223 (APM); *U.S. v. William Reid*, Case No. 21-cr-316 (DLF); *U.S. v. Tommy Allan Frederick*, Case No. 21-cr-64 (CKK); *U.S. v. Ronald Sandlin*, Case No. 21-cr-88 (DLF).

### b) Acceptance of Responsibility

Herrera objects that the PSR applies no reduction for acceptance of responsibility.   In support of this, Herrera argues that at trial, he conceded guilt on Counts 2 and 5 (charging violations of 18 U.S.C. §§1752(a)(1) and 5104(e)(2)(G)), and certain other elements of Counts 3 and 4 (charging violations of 18 U.S.C. §§ 1752(a)(2) and 5104(e)(2)(D)).   But the fact remains that Herrera did not plead guilty to any of the Counts, thereby compelling the United States to prepare for such a trial, on all counts, and denying the United States and the court the opportunity to allocate their resources efficiently.   At a minimum, Herrera surely could have saved the government time and resources by pleading guilty to Counts 2 and 5 *before* trial. He did not.

Further, Herrera did not go to trial to preserve a constitutional challenge to a statute, or to challenge the applicability of a statute as it relates to his conduct, as contemplated under U.S.S.G.§ 3E1.1 note 2; instead, Herrera went to trial and denied the essential factual elements of guilt. Accordingly, Herrera is not entitled to any reduction for acceptance of responsibility.

Moreover, as noted by the Commentary to U.S.S.G. § 3E1.1, "Conduct resulting in an enhancement under 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." *Id.*, Note 4. While "[t]here may, however, be extraordinary cases in which adjustments under both §§3C1.1 and 3E1.1 may apply," *id.,* this is not one of them.

### c) Specific Offense Characteristic for Interfering with the Administration of Justice

Herrera objects that the U.S. Probation Office added eight levels under U.S.S.G. §2J1.2(b)(1)(B) and three levels under USSG §2J1.2(b)(2) for enhancements related to obstructing or interfering with the administration of justice. Herrera cites to Judge McFadden's opinion in *United States v. Hunter Seefried*, No. 21-cr-287, and argues that the electoral certification on January 6, 2021, did not involve "the administration of justice" and therefore that the two enhancements do not apply.

The United States has briefed its opposition to Judge Mcfadden's ruling in *Seefried* in a number of January 6 cases. *See United States v. Tenney*, 21-cr-640 at ECF No. 73; *United States v. Thompson*, 21-cr-161 at ECF No. 119; *United States v. Jensen*, 21-cr-6 at ECF No. 107.

This Court has also rejected the defendant's argument in opposition to these enhancements multiple cases now. *See e.g. U.S. v. Matthew Bledsoe*, 21-cr-204 (BAH); *U.S. v. Nicholas DeCarlo*, 21-CR-73 (BAH); *U.S. v. Nicholas Ochs*, 21-cr-73; *U.S. v. Greg Rubenacker*, 21-cr-193 (BAH); *U.S. v. Anthony Williams*, 21-cr-377 (BAH).

Multiple other judges in this district have also applied both the +8 and the +3 in January 6 cases. *See e.g.*, *U.S. v. Marshall Neefe*, 21-cr-567 (RCL); *U.S. v. Bradford Charles Smith*, 21-cr-567 (RCL); *U.S. v. Dustin Thompson*, 21-cr-161 (RBW); *U.S. v. Joshua Hughes*, 21-cr-106

(TJK); *U.S. v. George Tenney*, 21-cr-640 (TFH); *U.S. v. Ronald Snadlin*, 21-cr-88 (DLF); *U.S. v. Douglas Jensen*, 21-cr-06 (TJK); *U.S. v. Scott Fairlamb*, 21-cr-120 (RCL); *U.S. v. Jacob Chansley*, 21-cr-03 (RCL); *U.S. v. Duke Wilson*, 21-cr-345 (RCL); *U.S. v. Matthew Miller*, 21-cr- 75 (RDM); *U.S. v. Guy Reffitt*, 21-cr-32 (DLF); *U.S. V. Thomas Robertson*, 21-cr-34 (CRC); *U.S. v. Joshua Pruitt*, 21-cr-23 (TJK).   This Court should reject these same arguments once again.   The kind of activity in which Congress was engaged on January 6, 2021, plainly covers the "administration of justice."

Further, Herrera's conduct inside the Senate Parliamentarian's office threatened to cause property damage.  By taking a stack of papers from that office and throwing them in the air, Herrera's act threatened property damage and also aided and abetted others in the office that threatened and engaged in property damage.   Herrera took the time to post a photo of this act to Instagram with the incriminating caption discussed above, thereby encouraging other rioters who were ransacking the building.   To reiterate, the term "Querer es poder" can be roughly translated to "if you can dream it, you can achieve it."   This caption was not posted to Instagram in some innocuous context.   It was a photo of Herrera with documents he had taken inside the U.S. Capitol during the certification process, thereby disrupting government business, and obstructing an official proceeding.   Other rioters were in that office causing terrible damage.   Herrera was condoning such conduct, and he was participating in it.   He was also trying to show others, "if you can dream it, you can achieve it."   His actions gave encouragement to others that this type of conduct was acceptable.

At trial, Herrera admitted that others were doing things in and around that office, and Herrera would have seen the havoc that was taking place there.   Herrera knew what was being

done to that office was "wrongful," yet he still participated.   Additionally, before trial, the United

States did not know that the defendant stole a bottle of alcohol from this office (as opposed to the

defendant having brough this bottle of alcohol himself).   Herrera admitted to taking this bottle of

alcohol from the Senate Parliamentarian's Office, and later admitted drinking from this bottle in a

moment of revelry with his fellow rioters.   Similarly, Herrera admitted to smoking marijuana in

the Senator's hideaway office at trial.

Herrera's actions aided and abetted property damage, and also threatened property damage

in these locations.   Accordingly, the eight-level enhancement should be applied.

### d) Herrera's Objections to the term "Aztlan"

Herrera objects to the PSR's definitions of Aztlan and the inferences it makes regarding

his intent based on the concept of "Aztlan."   The United States has already discussed at length the

testimony at trial that involved the interpretation of this term and will not belabor this point.

Herrera's Instagram account is rife with references to "stolen lands" and this constitutes

appropriate intent evidence as elicited throughout trial.

### e) Offense Conduct at Paragraphs 8-23 in the PSR

Herrera objects to the factual recitation in the PSR to the extent it conflicts with his

concessions regarding Counts 2-5 at trial.   The United States submits that the factual recitation in

the PSR for Herrera's offense conduct is accurate as stated.

### f) Conditions of Supervision

Herrera objects to the proposed supervision condition number 12[5] because he suggests it

---

[5] If the probation officer determines that you pose a risk to another person (including an
organization), the probation officer may require you to notify the person about the risk and you
must comply with that instruction. The probation officer may contact the person and confirm that

is vague.   Herrera argue that it is unclear what "pose a risk" means.   This is a standard condition and there is not justifiable reason to exclude it.   The Court may impose conditions of supervised release if the conditions are "reasonably related" to factors set forth in 18 U.S.C. § 3553 and involve no greater deprivation of liberty than is reasonably necessary.   *See U.S. v. Malenya*, 736 F.3d 554 (D.C. Cir. 2013).    For all the reasons stated herein, Herrera's conduct, and the conduct of the mob, posed a danger to our community and to our country.   This conditions of supervision is therefore reasonably related to the factors set forth in § 3553, and it does not involve an unreasonable deprivation of liberty.   The Court may use common sense to guide its interpretation of this supervised release condition.   *See United States v. Munoz*, 812 F.3d 809, 815 (10th Cir. 2016). The Tenth Circuit has ruled that this language regarding "posing a risk" to others is not unconstitutionally vague and that there is no ambiguity in the directive to provide notice when required to do so by probation in similar circumstances. *See U.S. v. Hull*, 893 F.3d 1221 (10th Cir. 2018).    Further, people of common intelligence can discern what "poses a risk" means in this context, and the court may construe this condition in a manner that is acceptable to both parties, or modify the language to avoid a vagueness challenge. *See U.S. v. Burroughs*, 613 F.3d 233 (D.C. Cir. 2010); *See also U.S. v. Sandidge*, 863 F.3d 755 (7th Cir. 2017).

### g) Miscellaneous Corrections

Herrera raised a number of miscellaneous corrections at page 8 of his objections to the PSR that do not substantively affect sentencing.   The United States does not object to these corrections.

## VII.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court

---

you have notified the person about the risk.

must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a term of incarceration of 78 months.

### A.    Nature and Circumstances of the Offense

The January 6, 2021, attack on the U.S. Capitol is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum.

The nature and circumstances of this defendant's crimes weigh heavily towards a

significant term of incarceration. Herrera came to Washington, D.C. because he believed President Biden's victory was illegitimate, and he wanted to demonstrate his frustration with the government - not to just take some photographs.   Herrera anticipated the violence and the chaos that was to ensue that day, having worn a respirator mask, ski goggles, and a bulletproof vest to the riot.   He personally witnessed violence taking place between police officers and rioters.   He scaled the scaffolding on the west front to access a terrace on the northwest side of the building.   He recorded pictures and videos of his ascent, and the violence and chaos around him.

Completely undeterred by views of rioters fighting police and pepper balls flying through the air, Herrera entered the Capitol at the Senate Fire Door and then quickly entered the Senate Parliamentarian's Office.   Herrera further ignored signs of a violent forced, entry – smashed windows, blaring alarms, and verbal commands from officers trying to force rioters out of the building.   Inside the Senate Parliamentarian's Office, Herrera saw the ransacking that was taking place there, and he participated in further trashing that location.   With his actions of taking a stack of papers from that office, having someone take a picture of him doing so, and then throwing those papers in the air, Herrera was encouraging further property destruction.

In fact, by posting this activity onto his Instagram account, Herrera not only wanted to brag about his accomplishments, but he also wanted to encourage and/or inspire others with his actions. By "reclaiming Aztlan" or stolen lands, and telling others effectively, "if you can dream it, you can achieve it," Herrera was seeking to inspire through his conduct.   Herrera was also boasting that he had achieved his goal of thwarting Congress and stopping the certification of the Presidential election.   These are actions that, before this day, had never happened in American history, and were previously difficult to imagine.   Indeed, Herrera later stated, "What happened

in D.C. showed everyone its absolutely possible."

Moreover, when Herrera posted this incriminating photo on Instagram, members of Congress, as well as the Senate Parliamentarian and her staff, had either been evacuated from the building or were hiding in secure locations. They would have otherwise been presiding over the certification process.   Because of Herrera and others, they could not do their jobs that day.

The same can be said for Herrera's stealing of the bottle of alcohol from the Senate Parliamentarian's Office.   By taking that bottle of alcohol, and then later by taking a drink from that bottle and pumping it in the air in a victorious manner, Herrera was encouraging a debauched atmosphere.   He was, through his actions, effectively telling others the obstruction of an official proceeding of the United States government, was a celebratory event.

Herrera entered the building a second time, again seeing police officers trying to hold back the mob, hearing blaring fire alarms, seeing shattered windows, and broken-down doors, this time at the Senate Wing Doors.   In fact, Officer Aaric Wright, who testified at trial, and who had just been involved in forcing Herrera and other rioters out of the building near the Senate Parliamentarian's Office, had to come around to the exact location where Herrera entered a second time and again had to work to eject rioters from the building.   Herrera, by coming back into the building a second time, contributed to overwhelming the police, who were responding to multiple locations that day.

Herrera then entered a second secure space – a Senator's hideaway office.   There, he smoked marijuana in that office, further celebrating his achievement of stopping the certification process and disrupting government business.   Herrera was not acting as a photographer, he was a participant in a riot.   Herrera's statements, both at trial and on his social media account, indicate

38

that he was not remorseful in the immediate aftermath or in the days after January 6.   As detailed above, Herrera was proud of what he had accomplished that day – stopping Congress from certifying the election.   It is important that this Court, and this country, not become numb to the conduct and implications of what occurred on January 6, 2021.

**B.  The History and Characteristics of the Defendant**

Herrera is 34 years old and his conduct on January 6, 2021 demonstrates a disrespect for law enforcement.   To date, he has not expressed true remorse for his criminal conduct.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Herrera's conduct of corruptly obstructing of an official proceeding, encouraging property destruction, and then bragging about it on social media, is the epitome of disrespect for the law.

When Herrera entered the Capitol grounds, the Capitol itself, it was abundantly clear to him that lawmakers and the law enforcement officers who tried to protect them, were under siege. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. Herrera took advantage of

---

[6] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                                    at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

the violence and destruction of other rioters to get into the Capitol.   He was not a passive observer. In fact, he sought to inspire others to do the same.   "What happened in D.C. showed everyone it's absolutely possible."

In sum, the rule of law was not only disrespected, it was literally under attack that day.   A lesser sentence would suggest to the public, in general, and other rioters specifically, that attempts to obstruct official proceedings are not taken seriously.   In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.      The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the

---

[7] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. First, although Herrera has a criminal history category of I, he continued making social media statements after January 6 that indicated he was not remorseful for his actions. Although Herrera admitted that his actions were "wrongful" at trial, he did not take full responsibility for his conduct, suggesting that other people (and not himself) were saying the election was stolen, and testifying that he never had the intent

to obstruct an official proceeding.

Even if the Court interprets Herrera's conduct at trial as remorseful, or even if Herrera chooses to finally apologize to the United States at sentencing, the timing of such remorse renders it problematic. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.       The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations,

42

> probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related

conduct in other cases. To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

Nonetheless, in sentencing Herrera, this Court may wish to consider *United States v. Anthony Williams,* 21-cr-377 (BAH).   Williams joined rioters on the West Front, where he stole water bottles that the United States Capitol Police ("USCP") had stored on the Upper West Terrace to be used for decontamination if USCP officers were hit with chemical irritants.   Williams then entered the Capitol through the Senate Wing Doors and overran police in the Crypt with other rioters; advanced to the Rotunda, where he celebrated with other rioters and smoked marijuana; joined with other rioters and actively resisted when police tried to force him out of the Rotunda, and later bragged on social media about his conduct on January 6.   Williams was convicted by a jury of violating 18 U.S.C. § 1512(c)(2) and other offenses.   The Probation Office did not apply a Section 3C1.1 adjustment, nor did the government seek such an adjustment, and therefore Williams' guideline range was 57 to 71 months, lower than that faced by Chansley, and also lower than that faced by Herrera.   This Court sentenced Williams to 60 months' incarceration, within the guideline range.

The government is also mindful of this Court's sentence in *United States v. Matthew Bledsoe*, 21-cr-204 (BAH). Bledsoe unlawfully entered the U.S. Capitol on January 6, after attending President Trump's "Stop the Steal" rally; scaled a wall to access the upper northwest terrace; took advantage of other rioter's breach of the Senate Wing door to enter the Capitol, yelling as he entered, "]This is our house!  We pay for this shit!  Where's those pieces of shit at?"; and walked through the Capitol Building, joining the mob in various chants, including "Nancy! Nancy! Nancy!" near Speaker Pelosi's suite.   Bledsoe also paraded around the second

floor, and eventually circled the House Chamber, all while members of Congress were trapped inside and unable to evacuate.   Bledsoe remained inside the Capitol for a total of 22 minutes. Bledsoe proceeded to trial and gave misleading testimony.   The jury convicted him on all counts, including 18 U.S.C. § 1512.   The government recommended a sentence of 70 months' incarceration, at the bottom of the 70 to 87 month guideline range.   This Court sentenced Bledsoe to 48 months' incarceration.

Unlike Herrera however, Bledsoe did not actually enter any sensitive spaces; Herrera entered both the Parliamentarian's Office and a Senator's Hideaway Office. Unlike Herrera, Bledsoe did not attempt to damage or destroy property, nor did he steal anything; Herrera tossed papers in the air in the Parliamentarian's Office and stole a bottle of liquor.   Unlike Herrera, when Bledsoe left the Capitol, he did not return; Herrera was forced out of the Capitol by police, he re-entered through a different door.

## VIII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.   Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   Two general restitution statutes provide such authority.   First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." [8]  *Papagno*, 639 F.3d at 1096.   Second, the

---

[8]  The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at

Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.  *Papagno*, 639 F.3d at 1096.   The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.   *See* 18 U. S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features.   Both require that restitution "be tied to the loss caused by the offense of conviction."  *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).   Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[9]  *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2).   Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.   *See Papagno*, 639 F.3d at 1097; § 3663(b); § 3663A(b).   Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.   *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).   The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result.   *See Emor*, 850 F. Supp. 2d at 202.   The use of a

---

18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[9] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA.  *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

"reasonable estimate" or a reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[10]   *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses ... cannot be a precise mathematical inquiry").

The statutes also differ in some respects.   As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49.   18 U.S.C. § 3663(a).   In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."   *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).   By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title

---

[10] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review."   *Fair*, 699 F.3d at 513.

18 property offenses 'in which an identifiable victim … has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[11]

Applying these principles to this case leads to the conclusion that Herrera should be required to pay $2,000 in restitution.   One of the offenses to which he was found guilty, 18 U.S.C. § 1752(a)(1), triggers mandatory restitution under the MVRA as an "offense against property" that resulted in pecuniary loss for the Architect of the Capitol, *see* 18 U.S.C. § 3663A(c)(1)(A)(ii). Moreover, Herrera's additional convictions under Title 18, *see* Count 1 (18 U.S.C. § 1512(c)(2)) and Count 3 (18 U.S.C. § 1752(a)(2)), fall within the VWPA.   As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.   That amount reflects, among other things, damage to the United States Capitol building and grounds and losses suffered by law enforcement officers deployed to protect Members of Congress, their staff, and other Capitol property.   January 6 defendants who had pled guilty to one or more felony offenses have uniformly agreed to pay $2,000 in restitution.   *E.g.*, *United States v. Cody Mattice and James Mault*, D.D.C., 1:21-cr-00657 (BAH), ECF 43 and 47 (plea agreements).   Recognizing the practical and legal difficulties in allocating loss amounts across all January 6 defendants, including many who will be charged in the future, judges of this Court have likewise imposed restitution in the amount of $2,000 on defendants convicted of one or more felonies following trial.   *E.g., United States v. Guy Reffitt*, D.D.C. 1:21-cr-00032 (DLF),

---

[11] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. § 3663(a)(1)(B)(ii); 18 U.S.C. § 3663A(c)(3)(B).

ECF 170 (judgment).   This Court should do likewise and order Herrera to pay $2,000 in restitution in this case.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 78 months, which is within the Guidelines as calculated by the Probation Officer, restitution of $2,000, and the mandatory total $170 special assessment.

Respectfully submitted,

MATTHEW D. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

BY:      */s/ Christopher M. Cook*
CHRISTOPHER M. COOK
Assistant United States Attorney
KS Bar No. 23860
601 D. Street N.W.
Washington, D.C. 20530
412-327-3487
christopher.cook5@usdoj.gov


*/s/ Jacqueline Schesnol*
JACQUELINE SCHESNOL
Assistant United States Attorney
AZ Bar No. 016742
601 D Street N.W.,
Washington, D.C. 20530
602-514-7500
jacqueline.schesnol@usdoj.gov