UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
|               v. : | CASE NO. 21-CR-619-BAH |
| ERIK HERRERA, : | |
|           Defendant. : | |

## ERIK HERRERA'S SENTENCING MEMORANDUM

Erik Herrera, through undersigned counsel, Federal Public Defender Cuauhtemoc Ortega, hereby submits his sentencing memorandum for this Honorable Court's consideration.

## I. INTRODUCTION

At trial, Mr. Herrera admitted that he entered the United States Capitol on January 6, 2021, without permission and that he engaged in inappropriate, disorderly, and disruptive conduct.[1] He acknowledged that he "behaved unprofessionally and foolishly," and stated that he knew what he did was "wrong," and that he "shouldn't have done it."[2] To those who love and understand Mr. Herrera best, his actions that day represented a shocking divergence from the person they know: a person with no criminal history, a creative and sensitive individual who

---

[1] *See* Final Jury Instructions, Defendant Erik Herrera's Theory of the Case, Dkt. 65, at 10 ("Defendant . . . admits that he committed the violations charged in Counts Two and Five, and that he engaged in disorderly or disruptive conduct—element one of Counts Three and Four. But Mr. Herrera denies that he acted with the intent to impede or disrupt the orderly conduct of Government business or Congress—element two of Counts Three and Four. Mr. Herrera further denies Count One. Specifically, he denies that he corruptly intended to obstruct, influence, and impede Congress' certification of the Electoral College vote on January 6, 2021.").

[2] Tr. 8/17/22 p. 265:14-20. Attached as Exhibit 1 is the transcript of Mr. Herrera's testimony on August 17, 2022. Attached as Exhibit 2 is the transcript of Mr. Herrera's continued testimony on August 18, 2022.

loves the arts and photography, and a family member who can be relied on for support. Because they know his true character, they continue to support him throughout this process.

Mr. Herrera has taken several steps to improve himself since his arrest. He has given up smoking marijuana, a habit he indulged in regularly since youth and throughout his adult life, including while in the Capitol building. He enjoys the clearer mind and healthy feeling that comes with sobriety and has no desire to use the substance again.  Following his conviction, Mr. Herrera, of his own accord, also asked for assistance locating counseling therapy to further help him understand how he allowed such an incredible lapse in judgment to occur on January 6 and to gain insight into what else has caused his life to arrive at this point.  For example, Mr. Herrera has been working with his therapist on understanding and coping with the feelings of anxiety and depression he began to develop in the last three years during the pandemic.  On the employment front, he has also resolved to work more so that he can be financially self-sufficient and help his family.  Last summer, he started working regularly at a family member's remodeling and construction business.  This has provided him a steadier and more reliable stream of income than freelance photography.  With all of these endeavors, Mr. Herrera's goal is to reestablish himself as a respectable, productive citizen after disgracing himself and his family with his actions at the Capitol building.[3]  But first, he stands ready to accept the consequences for his actions.

Mr. Herrera respectfully requests that the Court sentence him to a term of imprisonment of 15 months, a sentence within the correct sentencing guidelines range, three years of supervised release, $2,000 in restitution, and a total of $170 in special assessments.  For the reasons set forth below, this is a fair sentence that is sufficient but not greater than necessary to accomplish the goals of sentencing set forth in 18 U.S.C. § 3553(a).

---

[3] Attached as Exhibit 3 is Mr. Herrera's Letter to the Court.

## II. SENTENCING GUIDELINES CALCULATION AND OBJECTIONS

Mr. Herrera agrees with the Presentence Investigation Report (PSR) that the total base offense level is 14. (PSR ¶ 41). He also agrees that his Criminal History Category is I, since he has no prior convictions. (*Id.* ¶ 54). The resulting guidelines range is therefore 15-21 months. Mr. Herrera objects to the additional specific offense characteristics and adjustments that Probation and the government propose. On December 5, 2022, Mr. Herrera provided the Probation Office and the government his objections to the initial PSR.[4] In the final PSR, Probation and the government maintain that the disputed specific offense characteristics and adjustments apply.[5] Mr. Herrera submits that this is error.

### A. Objection to Application of USSG §§2J1.2(b)(1)(B) and 2J1.2(b)(2) for Enhancements Related to Obstructing or Interfering with the Administration of Justice, Which Together Add Eleven Additional Levels

The final PSR adds a +8 under USSG §2J1.2(b)(1)(B)[6] and a +2 under USSG §2J1.2(b)(2).[7] Mr. Herrera objects to the application of these enhancements. It is the Government's burden to demonstrate by a fair preponderance of the evidence that an enhancement is warranted. *See United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997).

---

[4] Though much of the arguments are re-incorporated into this memorandum, a copy of Mr. Herrera's objections to the initial PSR provided to Probation and the government are attached hereto as Exhibit 4. The exhibits referenced in the document are not included to avoid duplicative attachments, since they are already otherwise marked and included with this memorandum.

[5] Upon reviewing the government's analysis, Mr. Herrera withdraws his objection to proposed condition of supervised release number 12.

[6] This enhancement applies if "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."

[7] This enhancement applies if "the offense resulted in substantial interference with the administration of justice."

3

Though it appears courts in this circuit do not apply a "clear and convincing" evidence standard at sentencing, *United States v. Graham,* 317 F.3d 262, 269 (D.C. Cir. 2003) (stating that this circuit "has never applied the 'clear and convincing' standard and discussing different circuit approaches to the heightened evidentiary standard), Mr. Herrera submits that with respect to at least the +8 under USSG §2J1.2(b)(1)(B), the court should consider whether applying a clear and convincing evidence standard is warranted in this case given that it nearly triples the guidelines range (from a low end of 15 months to a low end of 41 months).

As legal objection, the defense incorporates herein the reasoning by the court in *United States v. Hunter Seefried*, Case No. 21-cr-287 (TNM), holding that the electoral certification on January 6, 2021, did not involve "the administration of justice" and therefore that the enhancements under USSG §§2J1.2(b)(1)(B) and 2J1.2(b)(2) do not apply.[8] Mr. Herrera asks the Court to adopt *Seefried* reasoning and not apply the two enhancements.

With respect to the +8 under USSG §2J1.2(b)(1)(B), Mr. Herrera's position is that, even if the foregoing legal objection is overruled, his conduct does not fit the requirements of the enhancement under any evidentiary standard. Both the initial and final PSR state that the enhancement applies because "the defendant contributed to the trashing of the Senate Parliamentarian's Office when he took a stack of papers and threw them in the air and the stack of papers was that office's property/work product." (PSR ¶ 42). In response Mr. Herrera's initial objections, however, the PSR subsequently expanded the theory of applicability to "encompass both the defendant's own acts or omissions and those whom the defendant aided, abetted, counseled, commanded, induced, procured . . ," as well as the harm that resulted from "jointly undertaken criminal activity," citing to the relevant conduct guideline at U.S.S.G. §1B1.3. (PSR

---

[8] Attached hereto as Exhibit 5.

at p. 24).[9] Neither the PSR or the government, however, cite to any evidence that Mr. Herrera acted in concert with any other individual, or attempted or intended to influence the actions of other individuals, present inside the Capitol. There is not a single instance of property damage caused by another person that has been traced to Mr. Herrera. Mr. Herrera was alone in Washington, D.C., that day, and the majority of the video of him inside the Capitol shows him wandering by himself. Probation and the government have pointed to no authority for the proposition that Mr. Herrera's presence in the Capitol is sufficient to meet the legal definition of a jointly undertaken criminal enterprise or aiding and abetting. The government points to Mr. Herrera's photo of himself on Instagram with the caption, "Querer es poder," in support of its argument that Mr. Herrera was trying to influence others, but there is no evidence that Mr. Herrera, by that photo and statement on a world-wide social media platform, was intending to rally people to cause property damage inside the Capitol.

The government, it should be noted, has also yet to factually establish the nature and content of the documents at issue in this enhancement; both it, and the PSR, assume they were the Senate Parliamentarian Office's "property/work product." (PSR, at p. 24). Though Mr. Herrera is not trying to minimize the seriousness of his conduct (he admitted it, after all), he must object to the absence of this foundational evidence because his interaction with these documents, and their assumed content, is practically the entire basis on which the government proposes to triple his guidelines range. But the enhancement cannot be applied based on suppositions alone. Though Mr. Herrera's actions were no doubt highly inappropriate, it has also yet to be established that the documents were actually damaged, destroyed or rendered unusable.

---

[9] The government additionally argues that the enhancement applies to the act of "condoning" property damage, though no such term is included in the guideline's language. Gov't Sentencing Memo., Dkt. 75, at 33.

In addition to picking up and throwing documents, the government also argues that "stealing" a bottle of alcohol and smoking marijuana inside the building constituted property damage. Along the same lines as with the documents, the government assumes that Mr. Herrera "stole" a bottle of alcohol from the Senate Parliamentarian's office.[10] The government has yet to factually established that the bottle belonged to that office as opposed to, for example, the more probable explanation that Mr. Herrera simply picked up a bottle that another intruder had set down on a flat surface. More importantly, it fails to explain precisely how taking the bottle caused property damage. Finally, though the argument that marijuana smoke also caused property damage is made in passing in one sentence,[11] the government has done nothing to prove property damage occurred from Mr. Herrera's brief moments of smoke exhalation, other than to simply assert the possibility that it caused property damage.

The application notes to this guideline section state that the "inclusion of 'property damage' … is designed to address cases in which property damage is caused or threatened as a means of intimidation or retaliation (e.g., to intimidate a witness from, or to retaliate against a witness for, testifying). [The subsection] is not intended to apply, for example, where the offense consisted of destroying a ledger containing an incriminating entry." U.S.S.G. § 2J1.2, App. Note 5. Probation and the government have not proved that any of the actions alleged to constitute property damage—the throwing of the papers, the picking up of an alcohol bottle, or the brief moments of smoking marijuana—were "caused or threatened as a means of intimidation or retaliation." In fact, Mr. Herrera's actions seem much more akin to the example of destroying a ledger, which the commentary excludes from the reach of the enhancement.

---

[10] *Id.* at 34.
[11] *Id.*

It should be noted that the parties stated in their Joint Pretrial Statement that the excerpt reproduced below represented the estimated offense level, and since the filing of the Joint Statement there have been no material changes to the evidence:

and (d). Counsel also explained that the estimated offense level under the United States Sentencing Guidelines was as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2 | Base Offense Level | +14 |
| U.S.S.G. § 2J1.2(b)(2) | Substantial Interference with the Administration of Justice | +3 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -3 |
| | Total | 14 |

Counsel explained that a level 14 carries a guidelines term of imprisonment of 15 to 21 months.

*See* Dkt No. 49.[12] It is a bit surprising, then, that the government is now aggressively pursuing this enhancement when the most of the bases it now advances for its applicability were known to them at the point of the filing.

Mr. Herrera respectfully urges the Court to not apply this enhancement. And if it does, Mr. Herrera suggests that the Court grant a significant downward variance since given that the harm Mr. Herrera caused is low relative to other defendants. This enhancement, for example, is equally applicable to defendants who physically injured law enforcement on the scene. Mr. Herrera's conduct is not on par with such defendants.

   **B.**  **Objection to Adjustment for Obstruction of Justice Under USSG §3C1.1**

Mr. Herrera objects to the allegation that he provided "materially false testimony" during trial and to the suggested application of a +2 adjustment for obstruction of justice under U.S.S.G. §3C1.1. In the context of USSG §3C1.1, the government must meet its burden of proof by the "clear-and-convincing" standard, and the evidence must be evaluated "in the light most favorable to the defendant." *United States v. Montague*, 40 F.3d 1251, 1253 (D.C. Cir. 1994) (holding that

---

[12] Attached hereto as Exhibit 6.

a "preponderance of the evidence" standard is insufficient). The higher standard reflects the fact that a defendant has a constitutional right to testify, *id.* at 1254, and "not every accused who testifies at trial and is convicted will incur an enhanced sentence . . . for committing perjury." *United States v. Dunnigan*, 507 U.S. 87, 95-96 (1993). Lower courts must make "independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under" the definition of perjury. *Id*. Thus, for this adjustment to apply, the government must prove by clear and convincing evidence that Mr. Herrera committed perjury, *id.*, and not merely that some aspects of his testimony might have come across as inconsistent or in conflict under the pressure of cross examination.

The government grasps at straws on this one. Prior to addressing its specific arguments, it should be emphasized that the government is seeking an obstruction of justice enhancement for a defendant who took the stand *to admit that he is guilty of most of the criminal conduct alleged against him.* Mr. Herrera ran a very narrow defense in this case; his defense was that he lacked the intent to interfere with the electoral count process. He otherwise readily admitted that he did not have permission to enter the Capitol but did anyway and that he engaged in disorderly and disruptive conduct once inside. Instead of pointing to a concrete instance of perjury, the government navigates through Mr. Herrera's testimony to find points of ambiguity, some caused by the government itself, and accuses him of lying[13]:

Communications with the Media. The government claims Mr. Herrera told media outlets he intended to cover the January 6 MAGA rally and then did not, and that he did not disclose to the media that he intended to unlawfully enter the Capitol building. These items do not

---

[13] The government's arguments for this adjustment are found at pp. 25-31 of its sentencing memorandum.

constitute testimonial perjury; even if we assume the government's claims are true, lying to a third party prior to the offense conduct is not perjury or obstruction. And again, the government here relies on suppositions. The fact that Mr. Herrera did not make it to the rally that morning does not mean he never intended to go; he did intend to go. If that was not elicited clearly, counsel, not Mr. Herrera, bears responsibility for the omission. Mr. Herrera did not tell the media outlets he was going inside the Capitol building because, like most of the world, he did not know a Capitol breach would occur. The government has pointed to no evidence suggesting that he had advanced knowledge of plans to breach the Capitol.

<u>Aztlan</u>. The government seems to claim Mr. Herrera's testimony obstructed justice because he explained that the term Aztlan has various interpretations. Even though it was a centerpiece of its theory, the government never put on testimony from a credentialed source to explain the term to the jury. Ironically, most testimony about the term came from Mr. Herrera himself, and the government used the definitions he furnished in support of their case. It is baffling, then, that the government would identify this line of testimony as obstructive.

<u>San Diego Press Pass</u>. The government cites to a moment when Mr. Herrera misspoke and said that he thought his San Diego Press Pass granted him access to the Capitol. The government in its own papers acknowledges that Mr. Herrera corrected himself, so the point intended by argument is unclear. Mr. Herrera was crystal clear that he knew he did not have permission to enter the Capitol:

```
Q.   Did you receive permission from the Capitol
building to enter the building that day as a -- with a
Capitol press credential?
A.   No, I did not.
Q.   So when you entered the building there, you knew
you could not enter that building without permission?
A.   That's correct.
```

*See* Tr., 08/18/22, at 26.

<u>Instagram Communications</u>.  The government claims Mr. Herrera obstructed justice by stating that his Instagram messages were "banter," and by allegedly trying to minimize the meaning of some of his statements.  Mr. Herrera did not try to shield his social media comments from the jury.  The Court will recall that the defense stipulated to the admission of the entirety of Mr. Herrera's Instagram account in the government's possession to provide the jury context for his statements. In fact, Mr. Herrera, through his testimony, even focused the jury in on multiple items from his social media account that the government did not highlight in its case in chief. For example, Mr. Herrera discussed the hat bearing the message, "Fuck Biden and Fuck You for Voting for Him":

//

//

10

```
BY MR. ORTEGA:
    Q.   Do you recognize this post, Mr. Herrera,
Government's Exhibit 1055?
    A.   Yes.
    Q.   And did you write that language "Love to hate
Biden" on that post?
    A.   Yes.
    Q.   And why did you do that?
    A.   Just shows my dislike for Joe Biden.  I still
don't like him.
    Q.   And when -- do you remember when you obtained this
hat?
    A.   Sometime --
    Q.   Is this your hat?
```

                                                          53

```
    A.   Yes.
```

See Tr., 08/18/22, at 52. If Mr. Herrera were trying to deceive the jury about his beliefs or the contents of his Instagram account, he would not have drawn attention to the foregoing exhibit and many others that expressed extremely negative views about President Biden and other members of government. On the contrary, Mr. Herrera drew the jury's attention to these portions of his social media because he wanted to be candid about his beliefs and to show that he had nothing to hide. The government takes issue with the characterization he gives some of his social media statements, but on balance, Mr. Herrera facilitated the jury's ability to scrutinize his social media, not inhibited it.

Purpose of Travel. The government claims Mr. Herrera perjured himself by testifying that he did not travel to Washington, D.C., to try to stop the electoral count certification. This topic matter was the heart of Mr. Herrera's defense. It would set a troubling precedent that a defendant could admit to most of the conduct he is charged with, but nonetheless be accused of

11

perjury because he shared his state of mind with the jury regarding the intent element of the charges and the jury found him guilty. If a verdict of conviction were enough to *per se* prove an intent to obstruct justice by clear and convincing evidence, higher courts would have stated that explicitly. It is not.

Immediacy of Remorse. The government states that Mr. Herrera testified inconsistently about whether he was "immediately" remorseful. It is unclear how ambiguity about the timing of a defendant's remorse is a material matter. The government has cited no authority to this effect.

Even if the government can find certain points of inconsistency in Mr. Herrera's trial testimony—a not unexpected thing in any case given that cross examination by design is a difficult exercise for lay witnesses—he is owed the benefit of the doubt because the law instructs that the evidence be viewed in the light most favorable to the defense. *Montague*, 40 F.3d at 1253. The Court should not apply this adjustment.

### C. Acceptance of Responsibility

The PSR applies no reduction for acceptance of responsibility, even though, Mr. Herrera at trial conceded guilt on two counts (2, 5) and conceded the elements of two other counts (3, 4). He did not concede guilt on Count 1, the felony count. Even if the acceptance of responsibility adjustment does not apply because Mr. Herrera contested Count 1 and portions of Counts 3 and 4, the Court should consider Mr. Herrera's concession of guilt as to Counts 2 and 5 and certain elements of Counts 3 and 4 under the 18 USC § 3553(a) factors.[14]

---

[14] In response to this argument, the government states that Mr. Herrera could have pled guilty to Counts 2 and 5 before trial and conserved government trial preparation resources. (Gov't Sentencing Memo., at 31.) Mr. Herrera understands the Court does not wade into plea negotiation waters during sentencing, but in response to the government's statement, and to provide full context, Mr. Herrera did offer to plead to misdemeanor charges several times before trial in exchange for dismissal of the felony charge, but the government was not interested in such a disposition.

## III. SENTENCING FACTORS UNDER 18 U.S.C. 3553(a)

### A. Mr. Herrera's History and Characteristics

As is clear from Mr. Herrera's letter,[15] he grew up in San Diego, California, to Mexican immigrants and is proud of his local community and of his family's roots and heritage. Although Mr. Herrera's family struggled financially during his youth, his parents' willingness to work hard, sometimes taking on many jobs at the same time, ensured that the family could make ends meet. (PSR ¶ 61). Mr. Herrera's family is very close knit—he and his sister and her children currently all live with their parents—which makes the attention his conduct has brought them all the more painful to him. His family, however, continues to support him as he navigates this case, his first encounter with the criminal justice system.[16] In turn, Mr. Herrera, who is single and has no children of his own, makes himself available to help his family however he can. For example, recently, his sister separated from the father of her three children. In his absence, Mr. Herrera has stepped up to help care for his nieces, who range in age from two to seven years old, by looking after them and helping them with their homework. He finds that being a resource to his family gives him a sense of fulfillment and self-worth. All in all, Mr. Herrera is a person who leads a fairly quiet life focused on his family, his work, and his hobbies.

Mr. Herrera's long-time dream has been to make it as a successful photographer. He obtained some local success as a result of his efforts, even earning a profile in a magazine

---

[15] Exhibit 3.

[16] Attached as Exhibits 7 through 11 are letters of support written by friends and family of Mr. Herrera for the Court's consideration.

13

regarding his work and his emphasis on the Latino perspective.[17]  At trial, the Court heard testimony from Mr. Herrera about his love for photography and saw examples of his work:[18]







Mr. Herrera's work ranges from the artistic, to commercial shots, to photojournalism.  Even though Mr. Herrera loves photography, he acknowledges that he has thus far not broken into the industry in a way that allows him financial independence and stability.  As Mr. Herrera works on figuring out the next chapter in his life following service of his sentence, he has focused on how to grow as a person so that he can rebuild the reputation he lost as a result of the instant charges and be a productive member of society.

---

[17] *See* Exhibit 12.
[18] *See* Exhibits 13 and 14 (self-published photography booklets admitted at trial).

As discussed in the introduction to this memorandum, after his conviction, Mr. Herrera, on his own, asked for help locating a therapist to help him work through feelings of anxiety and depression that he has felt internally accumulating over the last two to three years, and to understand what allowed him to have such a terrible lapse in judgement in connection with the offense conduct.[19] His motivation in doing so was to build upon efforts he started to improve his lifestyle following his arrest. He has stopped using marijuana completely, which has helped him feel healthier and more responsible. Last summer, when he could not afford to pay for plane tickets and lodging to attend court hearings, he began working with his cousins in a construction and remodeling business to repay his family for their help with the expenses and to help add to the household's income stream. Though his long term interest remains photography, he is learning that he needs a backup plan that allows him to be financially self-sufficient as he continues to pursue his career dreams and goals.

As he states in his letter, Mr. Herrera is determined to learn from this experience. While in custody, he intends to focus on improving his mental and physical health. He also intends on taking art and other creativity-oriented classes to help him "maintain a peaceful state of mind." In focusing on how he cause use this experience to become a better person and citizen, Mr. Herrera is displaying signs of growth and maturity that stand in contrast to the foolish and immature version of himself reflected in the photos and videos inside the Capitol.

---

[19] Undersigned counsel reviewed documentation from Mr. Herrera's therapist confirming he has not missed any scheduled sessions and has attended appointments on October 24, November 7, November 28, December 13, and December 19.

### B. Nature and Circumstances of the Offense, Unwarranted Sentencing Disparities, and Deterrence

Mr. Herrera understands, that notwithstanding his growth efforts, his actions have consequences. For that reason, he requests that the Court impose a sentence that includes a term of 15 months imprisonment. Probation and the government recommend 70 and 78 month sentences, respectively, based on an incorrectly calculated guidelines range. Even if the range were calculated correctly, such sentencing recommendations are astonishingly high for a defendant of Mr. Herrera's level of culpability; they would place him in the same league as the very worst January 6 actors and punish him more harshly, in some instances, than persons who clearly had a more involved role.[20] Such a result would be plainly unfair and inappropriate when considering that, unlike with many of the worst defendants, there is no evidence that Mr. Herrera:

- Played a lead or encouraging role in causing the crowds to breach into the Capitol building and other restricted grounds;
- Attempted to hurt, fight, or physically resist any law enforcement personnel[21];
- Brought a firearm, zip-ties, rope, or any other equipment intended to be used against law enforcement or members of government;
- Rallied the crowd to target specific members of government;
- Conspired with others to travel to Washington, D.C., prior to January 6, with the intent to cause disruption or violence;

---

[20] *See* https://www.pbs.org/newshour/nation/jan-6-rioter-known-as-qanon-shaman-sentenced-to-41-months
[21] *See* https://www.washingtonpost.com/dc-md-va/2022/10/27/jan-6-rioter-who-dragged-dc-officer-into-mob-is-sentenced-7-12-years/

16

- Exchanged messages with others on the Capitol grounds to help advance the mayhem;

- Exploited skills learned in the military or law enforcement to advance the riot[22];

- Headed or belonged to any radical groups that promote violence; or,

- Intimidated potential witnesses during the course of the government's investigation.[23]

The factors in Mr. Herrera's case that the government considers most aggravating pale in comparison to the foregoing examples. It is true that Mr. Herrera entered the Capitol building twice without permission and engaged in disorderly behavior after doing so; these are things he admits, not contests. It should not be overlooked, however, that on balance, Mr. Herrera did not hurt anyone, threaten anyone, cause any serious damage, or take on a leading or organizing role. On balance, a sentence of 15 months imprisonment is sufficient to punish him for his conduct and to adequately promote respect for the law when all these factors are balanced. It would not create unwarranted sentencing disparities because the recommended sentence is within the correct guidelines range.

## IV. RESTITUTION AND SPECIAL ASSESSMENTS

Mr. Herrera does not intend to contest the restitution amount and has no objection to the imposition of the mandatory special assessments.

---

[22] *See* https://www.nytimes.com/2022/09/01/us/jan-6-nypd-officer-sentenced.html; *see also* https://www.nytimes.com/2022/08/11/us/thomas-roberston-jan-6-sentenced.html

[23] *See* https://www.washingtonpost.com/dc-md-va/2022/08/01/reffitt-sentence-jan6/

## V. CONCLUSION

Mr. Herrera respectfully requests that the Court sentence him to a term of imprisonment of 15 months, a sentence within the correct sentencing guidelines range, three years of supervised release, $2,000 in restitution, and a total of $170 in special assessments.

Respectfully submitted,

DATED: December 29, 2022          */s/ Cuauhtemoc Ortega*
CUAUHTEMOC ORTEGA
Federal Public Defender
(Cal. Bar No. 257443)
(E-Mail: Cuauhtemoc_Ortega@fd.org)
321 East 2nd Street
Los Angeles, CA 90012
Telephone: (213) 894-2854
Facsimile: (213) 894-0081