# EXHIBIT 1

```
              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,        )  Criminal Action
                                 )  No. 21-619
vs.                              )
                                 )
ERIK HERRERA,                    )  August 17, 2022
                                 )  9:00 a.m.
              Defendant.         )  Washington, D.C.
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF TRIAL**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

<u>**APPEARANCES:**</u>

FOR UNITED STATES: CHRISTOPHER COOK
                   DOJ-USAO
                   700 Grant Street, Suite 4000
                   Pittsburgh, PA 15219
                   (412) 894-7566
                   Email: christopher.cook5@usdoj.gov

                   JACQUELINE N. SCHESNOL
                   DOJ-USAO
                   40 North Central Avenue, Suite 1800
                   Phoenix, AZ 85004-4449
                   (602) 514-7689
                   Email: jacqueline.schesnol@usdoj.gov

FOR DEFENDANT:  CUAUHTEMOC ORTEGA
                Office of the Federal Public Defender
                321 East 2nd Street
                Los Angeles, CA 90012
                (213) 894-2854
                Email: cuauhtemoc_ortega@fd.org

                JONATHAN KENJI OGATA
                Federal Public Defender
                411 West Fourth Street, Suite 7110
                Santa Ana, CA 92701
                (714) 338-4500
                Email: jonathan_ogata@fd.org

Court Reporter: Elizabeth Saint-Loth, RPR, FCRR
                Official Court Reporter

            Proceedings reported by machine shorthand.
         Transcript produced by computer-aided transcription.

```
 1                    (ERIK HERRERA, Defendant, sworn.)

 2              THE COURT:  Mr. Herrera, you may remove your mask

 3      while testifying.

 4              And you may proceed.

 5              MR. ORTEGA:  Thank you, Your Honor.

 6                         DIRECT EXAMINATION

 7      BY MR. ORTEGA:

 8      Q.  Good afternoon, Mr. Herrera.

 9      A.  Good afternoon.

10              MR. ORTEGA:  I would like to start by talking a

11      little bit about East County Magazine, which we were just

12      chatting about during the trial.  Okay?

13              And what I would like to do first is call up --

14      well, Your Honor, I would like to move into evidence Defense

15      Exhibits 6065, 6066, and 6067.

16              THE COURT:  Any objection?

17              MR. COOK:  No objection, Your Honor.

18              THE COURT:  All right.  Hearing no objection,

19      6065, 6066, and 6067 may be admitted.

20              MR. ORTEGA:  May I publish the exhibits,

21      Your Honor?

22              THE COURT:  Yes.

23              (Defense Exhibits 6065, 6066, and 6067 admitted,

24      and published.)

25              MR. ORTEGA:  Let's pull up 6065 first.
```

1          Maybe you could capture the top half of the page.

2    BY MR. ORTEGA:

3    Q.  Mr. Herrera, do you recognize this document?

4    A.  I do.

5    Q.  And what is it?

6    A.  This is an article in East County Magazine, a local --

7    Q.  Okay.

8    A.  -- news outlet where I live.

9    Q.  And do you see the photos that are displayed on that

10   article?

11   A.  Yes.

12   Q.  And did you take some of those photos?

13   A.  Yes.

14   Q.  And do you see a photo credit in your name towards the

15   bottom of the article?

16   A.  I do.

17          MR. ORTEGA:  If we can pull up the photo credit.

18          THE COURT:  Are you able to --

19          MR. ORTEGA:  We're working on it, Your Honor.

20   BY MR. ORTEGA:

21   Q.  Do you see where it says:  Photo, right, by Erik Herrara

22   [sic]?

23   A.  Yes, I do.

24   Q.  Is your name misspelled in that photo credit,

25   Mr. Herrera?

1    A.   Yes.   There is a typo in my last name.

2    Q.   Can you move the microphone a little closer to your

3    mouth.

4    A.   Yes.   There is a typo in my last name.

5    Q.   And how is it misspelled?

6    A.   There should be an "E" where the first "A" is.   The

7    correct spelling would be H-E-R-R-E-R-A.

8    Q.   Okay.   And you remember taking the photos that were

9    published with this article for East County Magazine,

10   correct?

11   A.   Yes.

12            MR. ORTEGA:   Now let's bring up Exhibit 6066.

13            And if we can call out the article.

14   BY MR. ORTEGA:

15   Q.   Do you recognize this article, Mr. Herrera?

16   A.   Yes.

17   Q.   And what is it?

18   A.   It's a picture I took at the waterfront in San Diego.

19   Q.   And is the picture that's reflected on the article --

20   the picture you are talking about, the picture you took?

21   A.   Yes.

22   Q.   And was it published by East County Magazine?

23   A.   Yes, it was.

24            MR. ORTEGA:   If we can call out the photo credit

25   under the "by" line.

1    BY MR. ORTEGA:

2    Q.  Does the same spelling error of your name occur in this

3    article?

4    A.  Yes.  The same typo occurs in my last name.

5              MR. ORTEGA:  Okay.  And, lastly, if we can call up

6    Exhibit 6067.

7    BY MR. ORTEGA:

8    Q.  And what is this exhibit, Mr. Herrera?

9    A.  This is another article in East County Magazine

10   featuring one of my photos.

11   Q.  Okay.  And what was this article about?

12   A.  This article, I believe, was about voter recount, if I

13   am not mistaken.

14   Q.  Okay.  And you took the photo that's displayed on this

15   article?

16   A.  That is correct.

17             MR. ORTEGA:  And if we can call out the photo

18   credit once more.

19   BY MR. ORTEGA:

20   Q.  Is that your name on the article, giving you photo

21   credit?

22   A.  Yes, and with the same typo.

23   Q.  The same typo to your last name?

24   A.  Correct.

25             MR. ORTEGA:  Okay.  Thank you.

1          I'd like to call up Defense Exhibit 6084, which I

2     believe has already been admitted into evidence.

3          THE COURT:  It has been.

4          MR. ORTEGA:  I'd like to go to page 2.

5          If we can call out the very top, the headline on

6     the contract.

7     BY MR. ORTEGA:

8     Q.  Do you remember entering into this agreement,

9     Mr. Herrera?

10    A.  I do.

11         MR. ORTEGA:  And if we can go back to the document

12    and highlight the paragraph that says "work."

13    BY MR. ORTEGA:

14    Q.  Under the terms of the agreement, can you describe how

15    your relationship with East County Magazine worked?

16    A.  I found out about East County through research online.

17    I found a local news online outlet for where I live in

18    San Diego, the eastern county.  And considering I live in

19    East County, I thought it would be a good opportunity to

20    submit some of my work there considering that I live there.

21    Q.  And is the -- I am asking specifically how you submitted

22    your work to East County Magazine under the agreement.

23         Would you send them photos?  And if they liked

24    them, they would pay you for the photos?

25    A.  Yes.

1    Q.  Would they sometimes ask you to do specific assignments?

2    A.  Yes.  At times there were assignments directed to me.

3            MR. ORTEGA:  Okay.  I would like to bring up --

4    this has not been admitted into evidence yet -- Exhibit

5    6018, 6-0-1-8.

6    BY MR. ORTEGA:

7    Q.  I am just going to show you the next six exhibits,

8    Mr. Herrera, and ask you if you recognize them.

9            Do you recognize this exhibit?

10   A.  Yes, I do.

11   Q.  And what is it?

12   A.  This was at a --

13   Q.  Well, before you describe that -- sorry -- did you -- is

14   this a photograph that you took?

15   A.  Yes.

16           MR. ORTEGA:  Let me go to 6019.

17   BY MR. ORTEGA:

18   Q.  And is this another photograph that you took?

19   A.  Yes.

20           MR. ORTEGA:  6020.

21   BY MR. ORTEGA:

22   Q.  Is this another photograph that you took?

23   A.  Yes.

24           MR. ORTEGA:  6021.

25   BY MR. ORTEGA:

1    Q.  Same question.  Is this another photograph that you

2    took?

3    A.  Yes.

4             MR. ORTEGA:  And 6022, finally.

5    BY MR. ORTEGA:

6    Q.  Is this another photograph that you took?

7    A.  Yes.

8             MR. ORTEGA:  Your Honor, I move to admit

9    Exhibits 6017 through 6022 into evidence.

10            THE COURT:  Any objection?

11            MR. COOK:  No objection, Your Honor.

12            THE COURT:  Hearing no objection, they may all be

13   admitted.

14            MR. ORTEGA:  And let's publish, with the Court's

15   permission, Defense Exhibit 6022.

16            THE COURT:  You may publish.

17            (Defense Exhibits 6017 through 6022 admitted, and

18   published.)

19   BY MR. ORTEGA:

20   Q.  Do you see the exhibit, Mr. Herrera?

21   A.  Yes.

22   Q.  Okay.  Can you tell us what the circumstances were when

23   you took this photo?

24   A.  This assignment came about because Ms. Raftery, the

25   editor for East County Magazine, contacted me and asked me

1    if I was available to cover a fire that broke out in East

2    County, specifically, the city of Santee.

3    Q.  Okay.  Do you remember when that was?

4    A.  I am not exactly sure on the date.

5              THE COURT:  And Santee, I understand, is a town;

6    is that right?

7              THE WITNESS:  Yes.  It's a city in San Diego's

8    eastern county.

9              THE COURT:  Okay.  Do you know how to spell it?

10             THE WITNESS:  S-A-N-T-E-E.

11             THE COURT:  Okay.  Thank you.

12             MR. ORTEGA:  Okay.  Let's go to Exhibit 6065.

13   BY MR. ORTEGA:

14   Q.  Do you see the photo published in that article?

15   A.  Yes.  It's the one on the bottom right.

16   Q.  And that's the same photo we were just looking at that

17   you took and submitted to East County Magazine?

18   A.  Yes, that is correct.

19   Q.  Thank you, Mr. Herrera.

20             Okay.  I want to pull back a little bit,

21   Mr. Herrera, and ask you a little bit more about yourself.

22             Where did you grow up?  Where do you live?

23   A.  I was born and raised in San Diego, California.

24   Q.  Okay.  What do you do for a living?

25   A.  I am a photographer.

1    Q.  Okay.  Do you own a professional camera?

2    A.  Yes.

3              MR. ORTEGA:  Okay.  Your Honor, may I approach the

4    witness with a physical exhibit?

5              THE COURT:  Yes, you may.

6              And what is the number?

7              MR. ORTEGA:  It's going to be a few, Your Honor;

8    but the first two are 6001 and 6002.

9              Let me also place in front of you 6004, 6005.

10             May I, Your Honor?

11             THE COURT:  Yes.  You may approach.

12   BY MR. ORTEGA:

13   Q.  Mr. Herrera, can you describe these items to us and what

14   they are?

15   A.  May I pick them up?

16   Q.  Yes.

17             MR. ORTEGA:  With the Court's permission.

18             THE COURT:  Yes.  Of course.

19   BY MR. ORTEGA:

20   Q.  And are you picking up item 6001, for the record, which

21   is a camera?

22   A.  Yes.

23   Q.  Can you describe for the jury what that camera is?

24   A.  This is my professional work camera, a Nikon camera.

25   Q.  Okay.  And can you tell us what makes that camera

1    different than just an ordinary camera I can go buy myself?

2    A.   This camera just is better suited for harsh

3    environments; it's pretty rugged.  The image and sensor

4    quality is more on the professional side.

5    Q.   Okay.  Can I ask you to pick up Exhibit 6002, which is a

6    lens.

7    A.   This one ends in "3."

8    Q.   I'm sorry.  I think that's my mistake; but go ahead and

9    pick that one up.

10              Is that a lens?

11   A.   Yes.  This is a lens.

12   Q.   Okay.  Can you describe what that is for?

13   A.   This is my Nikon 25 to 50 millimeter lens, a wide angle

14   lens, that I use together with my Nikon camera.

15   Q.   Okay.  And if you can pick up physical Exhibit 6002.

16              MR. ORTEGA:  And, Your Honor, I apologize.  I

17   labeled it a lens; it's actually a flash.

18              THE WITNESS:  There is no one that ends in "2."

19   BY MR. ORTEGA:

20   Q.   Okay.  Well, why don't you tell me what you are holding.

21   A.   This is a wireless transmitter for the flash.  So this

22   sits on top of the camera body itself, and it wirelessly

23   transmits to the flash so you can take a picture using

24   flash.

25   Q.   Okay.

1          THE COURT:  Okay.  So, Mr. Ortega, I'm sorry.  I

2    have got to be very, very careful about my record.  So 6001

3    is the Nikon body.

4          6002 is the lens or not the lens?

5          MR. ORTEGA:  It's not the lens, Your Honor.

6          THE COURT:  So the lens is 6003?

7          MR. ORTEGA:  Yes, Your Honor.

8          I will correct the tags to the extent they're

9    wrong.

10         THE COURT:  Okay.  That's all right.  I just want

11   my record to be clear.

12         MR. ORTEGA:  602 will be the flash, which I

13   have apparently forgotten in a different part of the

14   courtroom, Your Honor.

15         THE COURT:  So 6003 -- 6002 is a flash?

16         MR. ORTEGA:  Yes.  6003 is the lens.

17         THE COURT:  Okay.  Okay.  Well, so far so good.

18         MR. ORTEGA:  Thank you, Your Honor.

19         THE COURT:  Okay.

20   BY MR. ORTEGA:

21   Q.  And then 6004 will be a remote, which is what you were

22   just describing, right?

23   A.  Yes.

24   Q.  So the last one is 6005, which is a battery for your

25   camera, correct?

1    A.   This battery is actually for the flash itself.

2    Q.   Okay.  Well, you are making me -- you're making it

3    apparent that I know very little about photography,

4    Mr. Herrera.

5             Why don't you describe for us how the camera, the

6    flash, the remote, and the lens interact when you're taking

7    photographs professionally?

8    A.   May I put together some of it?

9    Q.   Yes.

10             MR. ORTEGA:  If the Court is okay with that.

11             THE COURT:  Yes, that's fine.

12             THE WITNESS:  So I will take the camera body

13    itself, and I usually -- well, most of the time I would use

14    a wide-angle lens, such as this one, and I will attach it to

15    the camera body.  And then I would take the wireless

16    transmitter and I attach it to the top of the camera body,

17    and secure it.  And minus not having the flash, this is the

18    wireless setup to take wireless pictures without -- with the

19    wireless flash.

20    BY MR. ORTEGA:

21    Q.   And is that the camera setup that you had with you on

22    January 6th?

23    A.   Yes.

24             MR. ORTEGA:  Your Honor, I would like to show the

25    witness Exhibit 6001.1.  If we can call it up.

1              If you can just take a look at your monitor,

2       6001.2.

3              6001.3 -- and 6001.3.

4       BY MR. ORTEGA:

5       Q.  Do you recognize the items depicted in these three

6       photographs?

7       A.  Yes.  Yes.  Yes.

8       Q.  And what is it?

9       A.  This is a picture of the bottom side of my Nikon camera.

10      Q.  And the three pictures describe the camera that you are

11      holding?

12      A.  Correct.

13              MR. ORTEGA:  Your Honor, I move to admit the three

14      exhibits, 6001.1 through 6001.3, into evidence.

15              THE COURT:  Any objection?

16              MR. COOK:  No objection, Your Honor.

17              THE COURT:  6001.1 through .3 will be admitted.

18              (Defense Exhibits 6001.1 through 6001.3 admitted,

19      and published.)

20              MR. ORTEGA:  If I can bring up Exhibit 6002.1.

21      BY MR. ORTEGA:

22      Q.  Do you recognize what is depicted here, Mr. Herrera?

23      A.  Yes.

24      Q.  What is it?

25      A.  This is a picture of the wireless flash unit.

1          MR. ORTEGA:  Can I bring up Defense

2   Exhibit 6002.2.

3   BY MR. ORTEGA:

4   Q.  Do you recognize what is depicted here?

5   A.  Yes.

6   Q.  What is it?

7   A.  This is the same -- this is a picture of the same flash

8   unit; it's the front side.

9          MR. ORTEGA:  Your Honor, I move Defense

10   Exhibits 6002.1 and 6002.2 into evidence.

11          THE COURT:  Any objection?

12          MR. COOK:  No objection, Your Honor.

13          THE COURT:  They may be admitted.

14          (Defense Exhibits 6002.1 and 6002.2 admitted, and

15   published.)

16          MR. ORTEGA:  Now I will bring up Defense

17   Exhibit 6003.1.

18   BY MR. ORTEGA:

19   Q.  Can you describe what we're looking at -- or what is

20   depicted by this photograph?

21   A.  This is a picture of my wide-angle Nikon lens.

22          MR. ORTEGA:  Your Honor, move to admit

23   Exhibit 6003.1 into evidence.

24          THE COURT:  Any objection?

25          MR. COOK:  No objection, Your Honor.

```
1              THE COURT:  It will be admitted.
2              (Defense Exhibit 6003.1 admitted, and published.)
3              MR. ORTEGA:  Let's bring up Exhibit 6004.1.
4     BY MR. ORTEGA:
5     Q.  What is depicted in this photo, Mr. Herrera?
6     A.  This is a picture of the wireless flash transmitter
7     remote.
8     Q.  And it's the one that you own?
9     A.  Yes.
10             MR. ORTEGA:  I move 6004.1 into evidence,
11    Your Honor.
12             MR. COOK:  No objection, Your Honor.
13             THE COURT:  It will be admitted.
14             (Defense Exhibit 6004.1 admitted, and published.)
15             MR. ORTEGA:  Lastly, Defense Exhibit 6005.1.
16    BY MR. ORTEGA:
17    Q.  Do you recognize this image?
18    A.  I do.
19    Q.  And what is it?
20    A.  This is a picture of the battery that powers the camera
21    body.
22             MR. ORTEGA:  Okay.
23             Your Honor, I move Exhibit 6005.1 into evidence.
24             MR. COOK:  No objection.
25             THE COURT:  It will be admitted.
```

1                    (Defense Exhibit 6005.1 admitted, and published.)

2    BY MR. ORTEGA:

3    Q.  So, Mr. Herrera, did you receive any training in

4    photography?

5    A.  No.

6    Q.  Did you go to journalism school?

7    A.  I did not.

8    Q.  Did you study photography in community college or

9    anything like that?

10   A.  I did not.

11   Q.  How did you learn to be a photographer?

12   A.  I am completely self-taught.

13   Q.  Okay.  How did you teach yourself to be a photographer?

14   A.  I got my first camera, I believe, in 2007 -- my first

15   camera similar to this one.  And it was just a matter of

16   trial and error, see -- playing around with settings, taking

17   pictures of various subjects; just discovering as I went

18   along.

19   Q.  Did you -- what kind of photography did you engage in?

20   A.  I did a lot of, like, abstract art photography.

21   Portraits, at times.  Landscapes.  Film photography as well.

22   Q.  Did you publish any of your photography?

23   A.  Yes.

24   Q.  And in what form did you publish it?

25   A.  I self-published three books.

 1                     MR. ORTEGA:  Okay.  I would like to bring up

 2      Defense Exhibit 6009.1.

 3      BY MR. ORTEGA:

 4      Q.  Do you recognize this exhibit, Mr. Herrera?

 5      A.  Yes.

 6      Q.  What is it?

 7      A.  This is a picture -- the last book I self-published --

 8      titled, Mírame.

 9                     MR. ORTEGA:  Okay.  Your Honor, may I approach the

10      witness with a physical exhibit?

11                     THE COURT:  Yes, you may.

12                     MR. ORTEGA:  And it's marked Exhibit 6009.

13      BY MR. ORTEGA:

14      Q.  Is that exhibit, 6009, the booklet of your photography

15      that you published?

16      A.  Yes.  It is a physical copy.

17      Q.  And is Exhibit 6009.1 -- let me just page through the

18      pages of the exhibits so you can compare it to the book.

19                     Is it a true and accurate copy of the book that

20      you are holding?

21                     MR. ORTEGA:  I think that's the last page.

22                     THE WITNESS:  Yes, it is.

23                     MR. ORTEGA:  Your Honor, I move to admit

24      Exhibit 6009 and 6009.1 into evidence.

25                     THE COURT:  Both of them.

 1              MR. COOK:  No objection, Your Honor.

 2              THE COURT:  Hearing no objection, they will both

 3     be admitted.

 4              MR. ORTEGA:  If we can go to the first page of

 5     6009.1.

 6              THE COURT:  They may be published.

 7              MR. ORTEGA:  And if we can publish, Your Honor.

 8              (Defense 6009 and 6009.1 admitted, and published.)

 9     BY MR. ORTEGA:

10     Q.  And for the benefit of the jury, Mr. Herrera, this is

11     the cover of the booklet?

12     A.  This is the cover, yes.

13     Q.  And so what type of photography did you seek to compile

14     in this booklet?

15     A.  This is a combination of both digital and film

16     photography; and it's a project -- an ongoing project of me

17     documenting the Latino and Mexican-American community in

18     Southern California.

19              MR. ORTEGA:  Okay.  If we can turn to the second

20     page of this exhibit.

21              The third page.

22              THE COURT:  If I can just interrupt here for a

23     second.

24              You've used this term now twice.  The difference

25     between digital and film photography is what?

1          THE WITNESS:  Digital photography refers to a

2     digital camera with a memory card; you can download it onto

3     a digital device.  Film photography would be 35-millimeter

4     film, taking it to, like, a one-hour developing.  That's the

5     difference.

6          THE COURT:  Okay.

7          MR. ORTEGA:  If we can go to the next page,

8     please.  And the next page.

9          If you can continue scrolling through the book.

10    BY MR. ORTEGA:

11    Q.  Can you describe to us what -- the photographs that are

12    being displayed?

13        You took these photographs, right?

14    A.  Yes.

15    Q.  And what is the artistic perspective that you're trying

16    to capture with these photographs?

17    A.  I captured some -- like, with these things specifically,

18    just things that would be commonly found in a Hispanic

19    neighborhood, like the storefront here, the street vendors,

20    the inside of a local bar; traditional Aztec dancing

21    commonly referred to as Danza; parties; low riders -- at

22    times, low-rider vehicles.

23    Q.  And why were you interested in this subject matter?

24    A.  Because I am Latino as well.  I am a Mexican-American,

25    first generation.  This project of mine is very -- means a

1    lot to me because it is me just documenting my people, my

2    community, wherever they are found.

3    Q.  Do you seek to represent all aspects of your community?

4    A.  All aspects, yes.

5    Q.  What does that mean for you?  What does that involve?

6    A.  It could be something with, like, the car shows, the

7    parties, political rallies, little objects, or, like,

8    storefronts, like a house -- the fronts of houses, details

9    like that.

10   Q.  Do you also capture diverse political perspectives in

11   the community?

12   A.  Yes.

13          MR. ORTEGA:  Your Honor, may I approach the

14   witness?

15          THE COURT:  Yes, you may.

16          What are you approaching him with?

17          MR. ORTEGA:  This is Defense 6010.

18          THE COURT:  I will ask if we can bring up Defense

19   Exhibit 6010.1.

20   BY MR. ORTEGA:

21   Q.  I am going to ask you to do the same thing, Mr. Herrera.

22   If you can compare the booklet to the pages that are being

23   displayed on the screen, and tell me if the screen version

24   is an accurate copy of the booklet.

25          THE WITNESS:  Would you mind slowing down just a

1    tad bit?

2                Thank you.

3                Okay.  Yeah.

4                MR. ORTEGA:  I think we're at the last page now.

5    BY MR. ORTEGA:

6    Q.  Mr. Herrera, is that a true and accurate copy of the

7    booklet?

8    A.  There's a couple more pages, and it's titled The

9    Language of Sun Worship.  And this particular set of photos

10   was more art driven, so it's -- I have a description that I

11   wrote, if you'd like me to read it.

12   Q.  Sure.  Is that the one that's on the screen right now?

13   A.  Yes.

14               MR. ORTEGA:  Let's call it out.

15               THE WITNESS:  The text below that.

16               A collection of photographs sourced from my

17   ongoing series and studies within organic sunlight.  This is

18   an observation explaining dynamics between color, texture,

19   natural elements, and meditations experienced with the sun.

20               MR. ORTEGA:  Thank you.

21               Now, if you can just page through the book so the

22   jury can see it.

23               Okay.  Thank you.

24   BY MR. ORTEGA:

25   Q.  Am I understanding you correctly, Mr. Herrera, that the

1    angle for these photos has to do with the sun's interaction

2    with various landscapes and items?

3    A.  Yeah, like natural sunlight.

4    Q.  Okay.  Thank you.

5         So, Mr. Herrera, did you -- what did you do with

6    these booklets once you put them together?

7    A.  I offered them for sale.

8    Q.  How would you sell them?

9    A.  I would go to local -- like, they were called -- they're

10   referred to as Zine Fest.  It's like a small art and book

11   fair that -- there's many throughout many cities; San Diego

12   happens to have one.  I would sell them there or people

13   would inquire with me about a copy.

14   Q.  Okay.  And how else did you earn a living as a

15   photography?

16        How would someone hire you to take pictures of

17   them in a nonjournalism context; for example, at a party or

18   to display a product, for example?

19   A.  Sometimes it would be word of mouth.  And also I offer

20   my services with -- through an app called Snapper,

21   S-N-A-P-P-E-R.

22   Q.  Okay.  And what is Snapper?

23   A.  Snapper is, essentially, like an Uber service but for

24   photographers.  Someone would -- for example, looking for a

25   head shot, they would be presented with a list of

1    photographers in their area.  They can view each

2    photographer's work, and then the client can pick the

3    photographer that they feel is best suited for them.

4    Q.  And did you actually get jobs through Snapper?

5    A.  Yes.

6    Q.  Okay.  And is that one of the ways you earned income as

7    a photographer?

8    A.  Yes.

9    Q.  I want to move to November 2020 and work you were doing

10   around that time.  So, as you recall, we were talking about

11   East County Magazine.

12            Your arrangement with them provided that you would

13   obtain election and election-related coverage for the

14   magazine, correct?

15   A.  Correct.

16   Q.  Okay.  Did you go out and obtain election and

17   election-related coverage for the magazine?

18   A.  I did.

19            MR. ORTEGA:  If we can bring up Defense

20   Exhibit 6078.

21   BY MR. ORTEGA:

22   Q.  Do you recognize this photo?

23   A.  Yes.

24   Q.  Did you take it?

25   A.  Yes.

1          MR. ORTEGA:  Your Honor, permission to publish

2     defense exhibit -- or move to admit Defense Exhibit 60 --

3     I'm sorry, Your Honor.  I am getting a little lost here.

4          THE COURT:  6078?

5          MR. ORTEGA:  -- 6078 into evidence.

6          MR. COOK:  No objection, Your Honor.

7          THE COURT:  It may be admitted, and it may be

8     published.

9          It's published.  What is your question?

10          MR. ORTEGA:  Thank you, Your Honor.

11          (Defense Exhibit 6078 admitted, and published.)

12     BY MR. ORTEGA:

13     Q.  Can you describe this photo, and why you took it?

14     A.  This photo was taken in an area of San Diego called

15     Hillcrest; and this was one of the many photos I took that

16     day where people were celebrating Joe Biden's winning the

17     presidency.

18     Q.  And so did you submit this photo to East County Magazine

19     for consideration?

20     A.  Yes, I believe I sent it.

21          MR. ORTEGA:  Okay.  And let's go to Defense

22     Exhibit 6079.

23     BY MR. ORTEGA:

24     Q.  Do you recognize this photo?

25     A.  Yes.

```
1    Q.  Did you take it?

2    A.  Yes.

3              MR. ORTEGA:  Defense moves to move Defense

4    Exhibit 6079 into evidence, Your Honor.

5              MR. COOK:  No objection, Your Honor.

6              THE COURT:  It may be admitted.  It may be

7    published.

8              (Defense Exhibit 6079 admitted, and published.)

9    BY MR. ORTEGA:

10   Q.  Can you describe this photo, please.

11   A.  This is -- as the last photo, this was in the same

12   intersection of Hillcrest, and there was many people walking

13   around the intersection, on the sidewalks, celebrating the

14   election results.

15             MR. ORTEGA:  Can we also bring up Defense Exhibit

16   6080?

17   BY MR. ORTEGA:

18   Q.  Do you recognize this photo?

19   A.  Yes.

20   Q.  Did you take it?

21   A.  Yes.

22             MR. ORTEGA:  Your Honor, I move Defense Exhibit

23   6080 into evidence.

24             MR. COOK:  No objection.

25             THE COURT:  Hearing no objection, it will be
```

1    admitted.

2              (Defense Exhibit 6080 admitted, and published.)

3    BY MR. ORTEGA:

4    Q.  Can you describe this photograph?

5    A.  This is the same intersection, just across the street;

6    and it's a continuation of the many people that were there

7    that day to celebrate the election results.

8    Q.  Did you also cover -- this is a celebration, but did you

9    also cover protests and demonstrations prior to January 6th?

10   A.  I did.

11   Q.  Okay.  And do you remember the first demonstration that

12   you covered?

13   A.  The first one I went to, I believe, was in 2016.

14   Q.  2016?

15   A.  Yes.

16   Q.  Can you tell us about that?

17   A.  In 2016, in the city of El Cajon, an African-American

18   man was shot by police, and it gave rise to many days of

19   protest afterwards.

20   Q.  And were you present, covering the protest?

21   A.  Yes.

22   Q.  Okay.  And did you -- what did you experience there?

23   Did you experience any issues as a photographer?

24   A.  A few instances, yes.

25   Q.  Can you explain?

```
 1      A.  There was one --
 2                  THE COURT:  Can I interrupt for just one second?
 3                  Where was this?
 4                  THE WITNESS:  El Cajon.  It's in San Diego.
 5                  THE COURT:  Oh, it's a neighborhood in San Diego.
 6                  THE WITNESS:  Yes.
 7                  THE COURT:  Thank you.
 8                  THE WITNESS:  There were a few instances where, I
 9      think, some of the protesters didn't feel comfortable with
10      my presence there.  I am not sure if they thought I was with
11      a news outlet they disagreed with.  I was just there to take
12      pictures and to possibly submit them later; and I was pretty
13      much told to leave.  I think some -- I don't know who, but
14      there was -- someone had set a vehicle on fire.  It was just
15      a very aggressive atmosphere for those few days.
16      BY MR. ORTEGA:
17      Q.  Have you covered other demonstrations since 2016?
18      A.  Yes.
19      Q.  Okay.  What is a more recent one, maybe in 2020, before
20      January 6th?
21      A.  Before 2020?
22      Q.  Well, let me phrase it this way:  Did you cover a
23      protest in November 2020?
24                  MR. ORTEGA:  Let me bring up Defense Exhibit 6076.
25      BY MR. ORTEGA:
```

1    Q.   Okay.  Do you recognize this photo?

2    A.   I do.

3    Q.   Okay.  And what is it?

4    A.   This was a protest that took place in downtown

5    San Diego.

6    Q.   And let me ask you, did you -- do you recognize this

7    photo because you took it?

8    A.   Yes.

9              MR. ORTEGA:  Your Honor, I move Defense

10   Exhibit 6076 into evidence.

11             MR. COOK:  No objection, Your Honor.

12             THE COURT:  It will be admitted.

13             (Defense Exhibit 6076 admitted, and published.)

14   BY MR. ORTEGA:

15   Q.   Now that it's published, can you tell us what was going

16   on in this photo?

17   A.   The protest was making its way throughout downtown

18   San Diego.  These protesters were preventing a police

19   vehicle from crossing so that the protest could go through;

20   and the protester on the left is giving the finger to the

21   officer inside the vehicle.

22             MR. ORTEGA:  Okay.  Let's bring up Defense

23   Exhibit 6073.

24   BY MR. ORTEGA:

25   Q.   Do you recognize this photo?

1    A.  Yes.

2    Q.  Did you take this photo?

3    A.  I did.

4         MR. ORTEGA:  We move Defense Exhibit 6073 into

5    evidence, Your Honor.

6         THE COURT:  Any objection?

7         MR. COOK:  No objection, Your Honor.

8         THE COURT:  It will be admitted.

9         (Defense Exhibit 6073 admitted, and published.)

10   BY MR. ORTEGA:

11   Q.  Is this another photo you took at that demonstration,

12   Mr. Herrera?

13   A.  Yes.

14   Q.  Thank you.

15        So I want to now move forward, Mr. Herrera, and

16   talk to you a little bit about --

17        MR. ORTEGA:  We can take the exhibit down.

18   BY MR. ORTEGA:

19   Q.  -- your coverage of the November 2020 presidential

20   election.

21        You traveled to Washington, D.C. in December 2020

22   to -- well, let me ask it this way:  Did you travel to

23   Washington, D.C. in December 2020?

24   A.  Yes.

25   Q.  And what did you come here to do?

1    A.  I traveled to D.C. because there was going to be a large

2    protest, some were calling it a MAGA rally.

3    Q.  Okay.  Did you contact any media outlets before you

4    traveled to Washington, D.C. about covering that protest?

5    A.  I believe I might have.

6    Q.  Would it refresh your recollection to see a copy of an

7    email you sent?

8    A.  Yes.

9           MR. ORTEGA:  Let's bring up Defense Exhibit 6026.

10   BY MR. ORTEGA:

11   Q.  And if you can take a look at it, and tell me if that --

12   tell me when you're done reviewing it.

13   A.  I'm finished.

14   Q.  Okay.  So does that refresh your recollection about

15   whether you contacted any news media outlets about going to

16   Washington, D.C. in December 2020?

17   A.  Yes, it does.

18   Q.  And who did you contact?

19   A.  I contacted Roger Wilson at the San Diego Union-Tribune.

20   Q.  Okay.  Why did you contact him?

21   A.  I contacted the Union-Tribune because the San Diego

22   Union-Tribune is the largest newspaper in San Diego.

23   Q.  Okay.  And what did you want from them?

24   A.  I wanted to take photos at this event in hopes of having

25   my work published and maybe even getting assignments through

1    the Union-Tribune later on.

2    Q.  And did you send this email?

3    A.  Yes.

4            MR. ORTEGA:  Okay.  Your Honor, we'd move to admit

5    Defense Exhibit 6026 into evidence.

6            MR. COOK:  Your Honor, we have made our objection

7    known previously.

8            THE COURT:  All right.  It will be admitted over

9    objection.

10           (Defense Exhibit 6026 admitted, and published.)

11           THE COURT:  It may be published.

12           MR. ORTEGA:  Thank you.

13   BY MR. ORTEGA:

14   Q.  And so this is an email you sent to the San Diego

15   Union-Tribune, correct, Mr. Herrera?

16   A.  Yes.

17   Q.  At the end of the email, you asked:  Do you have any

18   photographers out there for this?

19           Why do you ask that of the San Diego

20   Union-Tribune?

21   A.  I asked that question because in the event that they

22   didn't have a photographer they would have someone from

23   San Diego there to cover for a San Diego publication.

24   Q.  Now, you do, in fact, come to Washington, D.C. in

25   December 2020 to cover this event, right?

1    A.  Yes.

2    Q.  And then do you later learn that there is going to be

3    other events in Washington, D.C. on January 6, 2021?

4    A.  Yes, I did.

5    Q.  And when you learned that, do you contact media outlets

6    again about providing coverage for those events?

7    A.  I did, yes.

8              MR. ORTEGA:  Can I bring up Defense Exhibit 6027?

9              THE COURT:  Can we go back to that last email for

10   a second?

11             MR. ORTEGA:  Yes, Your Honor.  6026.

12             THE COURT:  Yes.  So, Mr. Herrera, you said that

13   you are going to be uploading to your Twitter account if

14   you'd like to keep posted on tomorrow.

15             So were you offering the newspaper your

16   photographs to use for free, if they wanted?

17             THE WITNESS:  No.  I mean, that's something I am

18   willing to work with as long as I have credit towards my

19   name, so it can help build my reputation.

20   BY MR. ORTEGA:

21   Q.  And, Mr. Herrera, on that note, do you sometimes refer

22   people to your Instagram or Twitter so that they can become

23   familiar with your work as you are pitching yourself as a

24   freelancer for them?

25   A.  I do.  Mostly Instagram, but Twitter as well in the

```
 1   past.
 2              MR. ORTEGA:  Okay.  So if we can bring up Defense
 3   Exhibit 6027.
 4   BY MR. ORTEGA:
 5   Q.  Do you recognize this document, Mr. Herrera?
 6   A.  Yes.
 7   Q.  Okay.  Did you write this email?
 8   A.  Yes, I did.
 9              MR. ORTEGA:  Your Honor, I move Defense
10   Exhibit 6027 into evidence.
11              MR. COOK:  Same objection, Your Honor.
12              THE COURT:  All right.  Over objection, 6027 will
13   be admitted.
14              (Defense Exhibit 6027 admitted, and published.)
15   BY MR. ORTEGA:
16   Q.  Can you describe this email to us?
17   A.  This is an email I wrote to Samuel Hodgson at the
18   San Diego News Union-Tribune.
19   Q.  Okay.  And what did you tell Mr. Hodgson?
20   A.  I told Samuel that I was going to be present here in
21   Washington, D.C. on January 6th for the MAGA rally and
22   anything that would be taking place here that day.
23   Q.  And do you make an offer to Mr. Hodgson?
24   A.  Yes.
25   Q.  What was that offer?
```

1    A.   That I would like to work with him and extend my

2    coverage of the event to the San Diego Union-Tribune.

3    Q.   Okay.  Now, there is a word in the email, "plausible."

4    Is that a typo?

5    A.   Yes.

6    Q.   What did you mean by "plausible"?

7    A.   I meant possible.

8    Q.   Okay.  And so when you say you want to report any inside

9    [sic] -- any possible right-wing autonomous zones, what are

10   you talking about?

11   A.   Before this, there was some protests in Seattle,

12   Washington, where demonstrators had taken hold of an area --

13   I am not sure what area of Seattle it was, but they got an

14   area, took it under control and, basically, barricaded

15   themselves off from everything else outside of it.

16           So when I saw that on the news and on social

17   media -- because of how big that particular event was, I was

18   thinking that maybe it would be a possibility something

19   similar like that would happen here in D.C. with the more

20   right-wing protesters and demonstrations.

21   Q.   And what you are communicating to Mr. Hodgson, if I am

22   correct, is that you were extending to him coverage of those

23   events if it were to happen?

24   A.   Yes.

25           MR. ORTEGA:  Okay.  Now I would like to bring up

1     Defense Exhibit 6028.

2               We can call up the top of the email.

3     BY MR. ORTEGA:

4     Q.  Do you recognize this email, Mr. Herrera?

5     A.  Yes.

6     Q.  Did you write this email?

7     A.  Yes, I did.

8               MR. ORTEGA:  I'd move this exhibit, Your Honor,

9     Defense Exhibit 6028, into evidence.

10              MR. COOK:  Same objection, Your Honor.

11              THE COURT:  And over objection, it will be

12    introduced and admitted, and it may be published.

13              (Defense Exhibit 6028 admitted, and published.)

14    BY MR. ORTEGA:

15    Q.  Now, Mr. Herrera, this email is directed to something

16    called scribermedia.com.

17              What is that?

18    A.  Scribermedia.com is an independent news outlet.

19    Q.  Okay.  Can you read the email, Mr. Herrera, out loud?

20    A.  Hello.  Allow me to introduce myself.  My name is

21    Erik Herrera, and I am a Mexican-American photojournalist

22    born and raised in San Diego, California.

23              I have been photographing for ten years and

24    recently have become a credentialed press photographer for

25    my local news outlet, East County Magazine.  However, my

1    independent photojournalism highlights issues and events

2    that, unfortunately, result in physical violence.

3            My photojournalism also serves as a visual archive

4    of America's history that stems from a traditional Mexican,

5    blue-collar upbringing.

6            On January 6th, I will be in Washington, D.C. to

7    cover the third MAGA rally and reporting inside any

8    plausible -- typo, meaning possible -- right-wing

9    autonomisms [sic].  I'd like to work with you for this event

10   and extend my coverage with the help of Scriber.

11   Q.  And, again, were you -- did you send this email to

12   Scriber -- why did you send this email to Scriber?

13   A.  For the same reason I sent it to the Union-Tribune.  I

14   was just trying to get my work published in various places,

15   hopefully getting more assignments through those outlets,

16   and just to get more recognition.

17   Q.  And this email is sent in December 28, 2020, correct?

18   A.  Correct.

19   Q.  And that's about a week before the travel to

20   January 6th, correct?

21   A.  Correct.

22   Q.  Okay.  So in the email you say that your independent

23   photojournalism highlights issues and events that,

24   unfortunately, result in physical violence.

25            What do you mean by that?

1    A.  I have been to some protests where if there were a

2    counterprotest to that event, there would be people fighting

3    one another outside, objects being thrown about, mace and

4    pepper spray being sprayed by demonstrators and protesters;

5    and, in some instances, I was approached and told to leave

6    pretty aggressively.

7              MR. ORTEGA:  Now I want to bring up Defense

8    Exhibit 6031.

9    BY MR. ORTEGA:

10    Q.  Do you recognize this document?

11    A.  Yes.

12    Q.  What is it?

13              Well, let me ask you first:  Did you write this

14    email?

15    A.  Yes, I wrote it.

16              MR. ORTEGA:  And, Your Honor, I would like to move

17    Defense Exhibit 6031 into evidence.

18              MR. COOK:  Same objection, Your Honor.

19              THE COURT:  Admitted over objection.  It may be

20    published.

21              (Defense Exhibit 6031 admitted, and published.)

22    BY MR. ORTEGA:

23    Q.  Okay.  Now, Mr. Herrera, what is this document?  What is

24    this email?

25    A.  This is an email I wrote to a San Diego news station

1    called KUSI.

2    Q.  When did you write that?

3    A.  I wrote this on December 28th, 2020.

4    Q.  Is that about a week before January 6th --

5    A.  Yes.

6    Q.  -- 2021?

7            And what was the purpose of this email?

8    A.  This was my first time reaching out to KUSI.  KUSI is,

9    again, a local television news outlet in San Diego.  It's

10   fairly popular; everyone recognizes the station.  And I

11   thought I would try out something that wasn't one of the

12   other companies that I had approached before, again, for the

13   same reasons, to potentially get my work published and maybe

14   get assignments later on down the road.

15   Q.  So KUSI is different than the other media outlets you

16   reached out to because it's a television station; is that

17   correct?

18   A.  Yes.

19   Q.  And you, in the email, make a similar comment, as you

20   did to Scriber, which is in the middle:  My independent

21   journalism highlights issues and events that unfortunately

22   result in physical violence.

23           And can you tell us again why you were telling

24   KUSI that your journalism covers events that might result in

25   physical violence?

1    A.  I was bringing that up to KUSI because since I was going

2    to be at January 6th, knowing that there would be a rally --

3    I have been to many rallies and other demonstrations where

4    there was just a counterprotest to that and, in some cases,

5    it would get violent; people were fighting -- again,

6    throwing things at one another; chasing off media at times.

7    Q.  When you say at the end of the email:  I'd like to

8    extend my coverage of the event to KUSI, what did you intend

9    by that?

10   A.  That I wanted them to have me -- considering they're a

11   San Diego station and I am from San Diego as well, I wanted

12   to potentially be a San Diego representative for them to

13   cover what was happening here that day.

14          MR. ORTEGA:  Okay.  Now I'd like to bring up

15   Defense Exhibit 6035.

16   BY MR. ORTEGA:

17   Q.  Did KUSI respond?

18   A.  Yes.

19   Q.  Do you recognize the document that is on the screen in

20   front of you?

21   A.  Yes.

22   Q.  Is this an email exchange between you and KUSI that

23   spans between your first contact with KUSI and January 8th?

24   A.  Yes.

25          MR. ORTEGA:  Your Honor, I move Defense

1    Exhibit 6035 into evidence.

2              MR. COOK:  Same objection, Your Honor.

3              THE COURT:  Admitted over objection.  It may be

4    published.

5              (Defense Exhibit 6035 admitted, and published.)

6              MR. ORTEGA:  Now we can go back to the main

7    document.  And go to page 3 of the document, please.

8              If we can call up the top portion, starting with

9    "Good morning, Erik," through to the contact info.

10             Now if we can redo it and capture the date above

11   it.

12   BY MR. ORTEGA:

13   Q.  Okay.  So is this KUSI's response to your email on

14   December 28, 2020?

15   A.  Yes.

16   Q.  Can you read it, please.

17   A.  Good morning, Erik.  Thanks for reaching out.  We would

18   be interested in having you on KUSI next week.  Would you be

19   open to doing a few live Zoom chats?

20   Q.  Okay.  And you responded to that email, right?

21   A.  Yes, I believe so.

22             MR. ORTEGA:  Okay.  And if we can go to page 2 of

23   that exhibit.  Highlight the bottom portion of the page,

24   starting with the date.  Yes.

25   BY MR. ORTEGA:

1  Q.  Is this your response to KUSI's email?

2  A.  Yes.

3  Q.  Can you read it, please.

4  A.  Hi, Jake.  Happy New Year.  Yes.  I can do a live Zoom

5  while in D.C.  I can let you know when I arrive after I find

6  the place that I'll be staying at.  What time are you

7  thinking about hosting the Zoom chat?

8           MR. ORTEGA:  Okay.  We can close that, and pull

9  out the middle section.

10 BY MR. ORTEGA:

11 Q.  Is this KUSI's response to you -- to that last email?

12 A.  Yes.

13 Q.  Can you read it, please.

14 A.  Great, Erik.  Happy New Year.  I'm not sure when we'd

15 like to Zoom just yet.  Can you touch base once you're in

16 D.C.?

17          MR. ORTEGA:  Okay.  And if we can zoom out of that

18 and bring up your response.

19 BY MR. ORTEGA:

20 Q.  What do you reply to Jake at KUSI -- Jacob?

21 A.  Hi, Jacob.  I'm currently in Atlanta, ATL, waiting for

22 my D.C. flight.  Would you like for me to call you at one of

23 the numbers provided in your first email?

24 Q.  When do you send that email?

25 A.  January 6, 2021, at 4 a.m.

1          MR. ORTEGA:  Now, let's zoom back out and go to

2     the first page.  At the very bottom is half of a message,

3     but I am going to pull that out first.

4     BY MR. ORTEGA:

5     Q.  Jacob Minger replies to you and says -- can you read,

6     please.

7     A.  Good morning, Erik.  I'm in the middle of our morning

8     show.  Want to call me when you reach D.C.?

9          MR. ORTEGA:  Now let's go to page 2 and get the

10    rest of that email.

11    BY MR. ORTEGA:

12    Q.  Can you read the rest of the reply.

13    A.  If I --

14    Q.  It's a little cut off.  Try your best.

15    A.  If I don't answer right away, I may be in my a.m.

16    editorial meeting.  Just shoot me a text, and I'll call you

17    back.  Safe travels.

18          MR. ORTEGA:  Okay.

19          If we can go back to page 1 and pull up the bottom

20    email, again, that we previously started with -- the very

21    bottom one.

22    BY MR. ORTEGA:

23    Q.  And what was the date of that email?

24    A.  That was January 6, 2021, at 8:05 a.m.

25    Q.  Okay.  So eventually you do arrive in Washington, D.C.

1    that day, obviously, right?

2    A.  Yes.

3    Q.  Okay.  And so do you then contact KUSI again?

4    A.  I believe I might have, yes.

5           MR. ORTEGA:  Okay.  Let me pull out the next email

6    in that chain, which...

7    BY MR. ORTEGA:

8    Q.  Okay.  So this is an email that you sent to KUSI on

9    January 6, 2021, at 9:26 a.m.

10          Can you read it.

11          THE COURT:  What's -- is this part of the same

12   chain that's already been admitted?

13          MR. ORTEGA:  Yes.

14          THE COURT:  603 --

15          MR. ORTEGA:  6035.

16          THE COURT:  All right.  Okay.

17          THE WITNESS:  Hi, Jacob.  I'll let you know when I

18   get to the location.  Right now I'm with a group walking and

19   it's with some Patriots and Proud Boys.

20   BY MR. ORTEGA:

21   Q.  Okay.  So what do you mean by that?  What are you

22   describing to KUSI?

23   A.  Like the group of people that I was with.

24   Q.  Are you viewing these people or are these people you

25   traveled with?

1    A.  No.  They were just people that I was viewing, and they

2    were just walking around D.C. when I already got there.

3    Q.  Did you go to Washington, D.C. on January 6th with

4    anyone?

5    A.  No.  I traveled alone.

6              MR. ORTEGA:  Okay.  If we can pull back out.

7              If we can pull out the top half of the page which

8    includes both emails.

9    BY MR. ORTEGA:

10   Q.  Starting with the bottom, KUSI writes back to you the

11   day after January 6, right?

12   A.  Yes.

13   Q.  What do they tell you?

14   A.  Good morning, Erik.  Hope you are safe and unharmed

15   after yesterday.  Let us know if you were able to shoot any

16   video we may be interested in airing and if you saw media

17   being attacked, et cetera.

18   Q.  Okay.  And do you reply to him on January 8th, 2021?

19   A.  Yes.

20   Q.  What do you say?

21   A.  Hi, Jake.  I will send you some photos first via

22   WeTransfer.  My return flight was 15 hours, and I was

23   exhausted by the time I got home.  I will also send video

24   through WeTransfer once I transfer them to my laptop.  I did

25   see media get kicked out, but not physically attacked.

1      There are some videos of the attacks.

2      Q.  Did you eventually send the photos and the videos to

3      KUSI after you got home?

4      A.  Yes.

5              MR. ORTEGA:  Okay.  I would like to bring up

6      Defense Exhibit 6036.

7      BY MR. ORTEGA:

8      Q.  Do you recognize this email?

9      A.  Yes.

10             MR. ORTEGA:  Your Honor, I move to admit Defense

11     Exhibit 6036 into evidence.

12             MR. COOK:  Same objection, Your Honor.

13             THE COURT:  Over objection, 6036 will be admitted.

14             MR. ORTEGA:  If we can publish the exhibit,

15     please.

16             THE COURT:  And it may be published.

17             (Defense Exhibit 6036 admitted, and published.)

18     BY MR. ORTEGA:

19     Q.  So, Mr. Herrera, what are you doing in this email?

20     A.  I believe this is a reply to me.

21     Q.  Okay.  I am going to draw your attention to page 2 of

22     the --

23             MR. ORTEGA:  Let's go to page 2.

24             Well, actually, go back to page 1.

25     BY MR. ORTEGA:

1   Q.  Do you see your email address in the middle of the page?

2   A.  Yes.

3          MR. ORTEGA:  Okay.  If we can call out that

4   section.

5   BY MR. ORTEGA:

6   Q.  Does this reflect that you sent KUSI some files?

7   A.  Yes.

8   Q.  And do you remember if that's when you sent it through

9   WeTransfer?

10  A.  Yes.

11         MR. ORTEGA:  Okay.  Now, let's go back to page 2

12  of that exhibit and highlight that portion of the text.

13  BY MR. ORTEGA:

14  Q.  And so these are the items that you are hoping are going

15  to be run on television, right?

16  A.  Correct.

17  Q.  And so you sent them two categories of photos and videos

18  that you took on January 6th, correct?

19  A.  Yes.

20  Q.  What were those two categories that you sent in?

21  A.  The first one is a photo with 15 items, and it's titled:

22  Inside Capitol Building.  The one right below that is a

23  folder with 32 items, and it's titled:  Outside Capitol

24  Building.

25         MR. ORTEGA:  Okay.  If we can go back to the first

1    page of that exhibit, to the very top.

2    BY MR. ORTEGA:

3    Q.  When do you send him the WeTransfer with those files?

4    A.  The date in the email itself says January 9th, 2021, at

5    10:31 a.m.

6              MR. ORTEGA:  Okay.  Thank you, Mr. Herrera.

7              And lastly, in this series, Defense Exhibit 6037.

8    BY MR. ORTEGA:

9    Q.  Do you recognize this email, Mr. Herrera?

10   A.  Yes.

11   Q.  Okay.  And what is this email?

12             MR. ORTEGA:  Well, I will move this email into

13   evidence, Your Honor, Defense Exhibit 6037.

14             MR. COOK:  Same objection, Your Honor.

15             THE COURT:  Over objection, it will be admitted,

16   and it may be published.

17             (Defense Exhibit 6037 admitted, and published.)

18   BY MR. ORTEGA:

19   Q.  So, Mr. Herrera, this email is from you to KUSI again,

20   right?

21   A.  Yes.

22   Q.  And what's the date on that email?

23   A.  January 16th, 2021, at 4:50 p.m.

24   Q.  And the subject line?

25   A.  January 6th.

1    Q.  Okay.  And in this email are you following up with KUSI

2    about the pictures you sent?

3    A.  Yes.

4    Q.  Okay.  And are you offering to resend them to them if

5    they need them?

6    A.  Yes.

7    Q.  KUSI, to your knowledge, didn't end up using your photos

8    and your videos, right?

9    A.  They didn't end up using it.

10   Q.  Okay.  But you were hoping that they would use them

11   because as -- well, as of January 16th, 2021, ten days after

12   January 6th, you were still hoping that they would use them,

13   correct?

14   A.  Yes.

15              MR. ORTEGA:  Thank you.

16              All right.  We can take that exhibit down.

17   BY MR. ORTEGA:

18   Q.  So, Mr. Herrera, I want to talk to you a little bit now

19   about the actual day.  You have made these preparations to

20   go.  We've heard a lot of testimony over the course of the

21   trial about you bringing a vest -- a bulletproof vest,

22   goggles, a respirator, a gas mask.

23              Why did you bring those items with you when you

24   traveled to Washington, D.C. on January 6th?

25   A.  I brought those items with me because of my prior

1    experiences at protests.

2    Q.  Did you bring those items with you because you intended

3    to use them to try to force your way into the Capitol?

4    A.  No.

5    Q.  When you were traveling to D.C. before -- on your way to

6    the -- excuse me.

7           Did you travel to Washington, D.C. on January 6th

8    because you wanted to stop the electoral count process?

9    A.  Not at all.

10   Q.  Okay.  Well, let's talk about why you engaged in some of

11   the actions that you engaged in then.

12           Before we talk about that, I want to talk to you a

13   little bit about some of the Instagram posts that the

14   government has been displaying during the course of this

15   trial.  Okay?

16   A.  Okay.

17   Q.  So, in various Instagram posts, you talk about there

18   being electoral irregularity in November 2020 with the

19   presidential election.

20           Can you tell us why you are making those comments?

21   A.  It was just -- in my history of voting, there was just

22   nothing like that I have ever seen or heard about -- about

23   an election until then, that particular election.

24   Q.  What do you mean?  What had you not seen or heard about?

25   A.  People talking about voter fraud, and that the election

1    was stolen.

2    Q.  Okay.  Do you mean that you heard, like, people in

3    power, people in authority talking about that?

4    A.  From the then-President at the time, social media, news

5    coverage of people talking about that subject.

6    Q.  It seemed like you were intrigued by it, right?

7    A.  Yes.  I was curious about it.

8    Q.  And a lot of the back and forth we see on Instagram with

9    your friends, you are talking about whether or not there

10   might have been some dishonesty, right?

11   A.  Yes.

12   Q.  Let me talk to you a little bit about your feelings

13   about Joe Biden, frankly, because that's also come up during

14   this trial, and I suspect it's going to come up again.

15            Do you dislike Joe Biden?

16   A.  I don't like him.

17   Q.  Okay.  Are you a registered -- what party are you

18   registered to vote with?

19   A.  I am a registered Democrat.

20   Q.  Okay.  Donald Trump ran for office in -- the first

21   time -- for the first time in 2016, right?

22   A.  Yes.

23            MR. ORTEGA:  Okay.

24            Can we pull up Defense Exhibit 6015, please.

25            If we can zoom into -- I believe this one has been

242

1    admitted into evidence, Your Honor.

2              THE COURT:   6015 has been admitted so it may be

3    published.

4              Yes, you may publish it.

5              Do you have a question, Mr. Ortega?

6              MR. ORTEGA:   Yes, Your Honor.

7              If we can pull up the bottom section, Number 11.

8    BY MR. ORTEGA:

9    Q.  Did you register to vote in January 2008?

10   A.  Yes.

11             MR. ORTEGA:   Okay.   If we can pull back out and go

12   to Section 9.

13   BY MR. ORTEGA:

14   Q.  What party did you register to vote with?

15   A.  I registered with the Democratic Party.

16   Q.  Are you presently a Democrat?

17   A.  Yes.

18   Q.  Okay.  Did you vote for Donald Trump when he ran in

19   2016?

20   A.  No.

21   Q.  Okay.  Who did you vote for?

22   A.  I voted for Hillary Clinton.

23   Q.  Okay.  In 2020 did you vote for Donald Trump?

24   A.  Yes.

25   Q.  Okay.  And why did you change your mind about voting for

1    a Democrat for President?

2    A.  I was just very put off at some of the things that were

3    said and came out about Joe Biden.

4    Q.  Like what?

5    A.  I didn't like that Joe Biden co-authored the '94 Crime

6    Bill which disproportionally affected blacks and Latinos in

7    the USA.  I did not like that, in a live interview, he said

8    that if African-Americans don't vote for him they are not

9    really black.  And I also don't like the fact that Joe Biden

10   refers to the entire American Latino population as Latin X.

11   Q.  So during the trial you saw an Instagram post that was

12   placed into evidence by the government where you are

13   describing Joe Biden making a racist comment.

14           Is that what you were referring to when you typed

15   that into the Instagram message?

16   A.  Which -- I am kind of --

17   Q.  You don't remember?

18   A.  -- having trouble remembering it, yes.

19   Q.  It's okay.  I will come back to that.

20           Okay.  Well, does the fact that you don't like

21   Joe Biden mean that you were interested in interfering with

22   him becoming the President?

23   A.  No.

24   Q.  Okay.  Does the fact that you were curious about, maybe

25   even believed that there was some electoral irregularities,

1    mean that you wanted to go to the Capitol on January 6th to

2    interfere with the electoral count?

3    A.  Not at all.

4    Q.  So why are you saying all of this stuff on Instagram

5    that suggests you have strong feelings about the electoral

6    count and the election?

7    A.  Again, it was just very curious to see how the subject

8    matter of election fraud and stolen election was just all

9    over, you know, seeing it on TV.  And when I wasn't seeing

10   it on TV it would be across social media, even people in

11   public talking about it.

12   Q.  So the people you are talking to on social media, who

13   are they?  Is it a combination of people you know and don't

14   know?  Who are these people you are having these messages

15   with?

16   A.  It's a mix.  Some people I know, and some people I

17   don't.

18   Q.  Okay.  One of the people that the government mentioned

19   speaking with was Jake Rose.

20              Do you know that person?

21   A.  Yes.

22   Q.  Okay.  And how do you know that person?

23   A.  Jacob Rose is an old friend of mine.  We both became

24   friends because we have a same liking for photography.

25   Q.  Do you guys have different political views?

1    A.  Yes.

2    Q.  Is it fair to say that you guys like to tease each other

3    and poke at each other because of your different political

4    views?

5    A.  Yes.

6    Q.  And do you do that on Instagram as well?

7    A.  Yes.

8    Q.  Do you always mean, literally, what you say on

9    Instagram?

10   A.  No.

11   Q.  So there is another subject that the government was

12   talking about, this issue with Aztlán.

13         Do you remember that?

14   A.  Yes.

15   Q.  What is Aztlán?

16   A.  Interpretations of Aztlán vary from person to person.

17   Two of the common ones are that Aztlán is stolen land --

18   Mexican stolen land that the U.S. government took from them;

19   and another interpretation that's common is that Aztlán is

20   the mythical home place of the Aztecs.

21   Q.  And so what does Aztlán mean to you?

22   A.  Aztlán, to me, is more representative, like, a brown

23   unity -- brown, Latino empowerment.  It's just more of,

24   like, a positive model.  That's what that definition of

25   Aztlán serves to me.

1    Q.  So do you believe that the southwestern lands of the

2    United States should literally be returned to the Aztecs or

3    some other indigenous people?

4    A.  No.

5    Q.  Okay.  When you went to the Capitol on January 6th and

6    you posed with that photo --

7          MR. ORTEGA:  Why don't we bring it up, Government

8    Exhibit 819; and let's call out:  I'm reclaiming Aztlán.

9    BY MR. ORTEGA:

10   Q.  We're having some technical difficulties.  I'm just

11   going to read it to you.

12          I'm reclaiming Aztlán because I love America.

13   Querer es poder.

14          So when you're citing to Aztlán there, are you

15   talking about taking some sort of literal action with regard

16   to that concept?

17   A.  No.

18          MR. ORTEGA:  Okay.  We'll come back to this photo

19   in a little while.

20          We can take that off.

21   BY MR. ORTEGA:

22   Q.  So before we get into the details of what happened on

23   January 6th, you understood, when you went to January 6 --

24   to Washington, D.C., on January 6th, that that was the day

25   Joe Biden officially became the President, right?

1    A.  Yes.

2    Q.  Okay.  And so there are some Instagram messages where

3    you're talking about revolution.  And do you mean by that

4    that you literally wanted to come from San Diego to D.C. to

5    foment revolution, to stop Joe Biden from becoming the

6    President?

7    A.  Not at all.

8    Q.  Okay.  Did you have any intent to go to Washington, D.C.

9    to interfere with the electoral count?

10   A.  Not at all.

11   Q.  Okay.  So let's talk about when you get there.

12          Can you describe the scene around the area where

13   the Capitol is when you arrive in Washington, D.C.?

14   A.  I got there early in the morning.  I forget what time

15   exactly; but, right away, there was just people walking

16   everywhere with shirts and flags and banners.  Almost every

17   street that I walked on it was hard to not find people

18   dressed like that.

19   Q.  Were you wearing any pro-Trump paraphernalia?

20   A.  No.

21   Q.  Why not?

22   A.  I just don't usually wear stuff like that.

23   Q.  You were wearing what the government described as a

24   press badge; is that correct?

25   A.  I was wearing a press patch.

1    Q.   Patch?

2    A.   Patch.

3    Q.   And why were you wearing that?

4    A.   The press patch helps distinguish me from the rest.  It

5    shows that I am there as media.

6    Q.   Okay.  And is the press patch the same thing as a press

7    badge?

8    A.   No.

9              MR. ORTEGA:  Okay.  Let's pull up Defense

10   Exhibit 6006 -- excuse me, 6006.1.  I am not sure if it's in

11   evidence.

12   BY MR. ORTEGA:

13   Q.   Is this a copy -- photographic copy of your press pass

14   issued by the San Diego Police Department?

15   A.   Yes.

16             MR. ORTEGA:  Okay.  Your Honor, if it's not in

17   evidence, can I move Defense Exhibit 6006.1 into evidence?

18             THE COURT:  It is not in evidence.

19             The government's position?

20             MR. COOK:  No objection, Your Honor.

21             THE COURT:  No objection.  It will be admitted.

22             MR. ORTEGA:  And if we can publish?

23             THE COURT:  Yes, you may publish it.

24             (Defense Exhibit 6006.1 admitted, and published.)

25             MR. ORTEGA:  If we can zoom into the actual press

1    pass.

2    BY MR. ORTEGA:

3    Q.  So, Mr. Herrera, first of all, I just want to ask you,

4    do you have a tattoo on your head?

5    A.  Yes, I have a tattoo on my hairline.

6    Q.  Okay.  What does it say?

7    A.  It reads:  Decolonized.

8    Q.  Decolonized?

9    A.  Yes, past tense.

10   Q.  Okay.  And what is that a reference to?

11   A.  That -- for me, it was just a piece -- a tattoo to get

12   that shows that I -- like, I am a free thinker; that I think

13   for myself.

14   Q.  Okay.  And so this press pass, did you display it on

15   your body when you were in Washington, D.C. on January 6th?

16   A.  I did not.

17   Q.  Okay.  Why not?

18   A.  In the past, I used to display it; I used to carry the

19   press pass on a lanyard.  But, in my case, the lanyard would

20   always get caught on something, like a doorway or a post --

21   or anything, really; and there were multiple times when the

22   lanyard just tore off.  So since that kept happening, I just

23   decided to keep the press pass in my wallet.

24   Q.  Did you have it in your wallet on January 6, in

25   Washington, D.C.?

1    A.  I did.

2    Q.  Okay.  And so when you are at the Capitol grounds and

3    you see the crowd, what do you start doing?

4    A.  When I approached the Capitol grounds, I was taken aback

5    because there were already many thousands of people present

6    at the Capitol grounds, like, right outside.  It was just

7    a -- other than that, I don't know how to describe it.  I

8    was just amazed at how large the demonstration actually was.

9    Q.  Was that what you were expecting when you traveled to

10   Washington, D.C. to cover the demonstrations?

11   A.  I was expecting a large event, but nothing to that

12   scale.  That's not something that I -- I never imagined it

13   would be that large.

14   Q.  So you were surprised by the magnitude of it?

15   A.  Yes.

16   Q.  Did you start taking photographs?

17   A.  Yes.

18   Q.  Throughout the day, did you take photographs both inside

19   and outside of the Capitol?

20   A.  Yes.

21   Q.  Okay.  Did you use this camera or did you use other

22   devices as well to take photos and videos?

23   A.  I used this camera, and I also used the phone I had at

24   the time.

25   Q.  Why would you use your phone if you have a professional

1   camera at the ready?

2   A.   The camera is more ideal in most any situation except

3   when there's a very tightly packed place where people are

4   shoulder to shoulder.  It's much more challenging to bring

5   the camera up to my face or above my head if I'm already

6   limited in my mobility.  The phone is much smaller and

7   compact, so it's easy for me to just bring it up to my face

8   or hoist it up over my head.

9   Q.   Okay.  I would like to go through some of the photos you

10  took that day because -- well, after you go to a protest, do

11  you go through a process to select what photos you are going

12  to submit to outlets for possible publication?

13  A.   Yes.

14  Q.   What does that look like?

15  A.   Once I get back home to my computer, I download all of

16  the images off of the memory card.  It can be from a few

17  dozen to -- up to hundreds sometimes; and I review every

18  single one, try to find the best exposed and the most

19  interesting photos.  And once I gather -- or separate those

20  from the largest -- from the whole entire batch, I edit

21  those.

22  Q.   Okay.  You edit them, you say?

23  A.   Yes.

24          THE COURT:  Mr. Herrera, can we just go back to --

25  what time did you arrive in Washington, D.C. on January 6th?

1   If you were in Atlanta at four o'clock in the morning, what

2   time did you get here?

3          THE WITNESS:  I don't remember the time that I

4   arrived.  I just -- I took a red-eye flight; and I just know

5   it was still morning by the time I got here.

6          THE COURT:  And when you got here you headed right

7   down to Capitol Hill?

8          THE WITNESS:  No, not right away.

9          THE COURT:  What did you do first?

10          THE WITNESS:  I was walking around the streets,

11   just to see what I could find.  There were people

12   everywhere, so I was trying to find interesting pictures to

13   take.

14          THE COURT:  Okay.

15   BY MR. ORTEGA:

16   Q.  Okay.  So, Mr. Herrera, I am going to ask to have --

17   well, you took pictures and videos, correct?

18   A.  Correct.

19   Q.  Okay.  And is it fair to say that, when you are taking

20   these pictures, you are trying to capture something that's

21   newsworthy or something that's maybe going to fetch a

22   publication offer, correct?

23   A.  That is correct.

24          MR. ORTEGA:  Okay.  So let's actually start with a

25   video, Defense Exhibit 6053.  If you can just open it but

 1    not play it so that Mr. Herrera can see it.

 2    BY MR. ORTEGA:

 3    Q.  Do you recognize this video?

 4    A.  I do.

 5    Q.  Did you take this video?

 6    A.  Yes.

 7            MR. ORTEGA:  Okay.  Your Honor, I move Defense

 8    Exhibit 6053 into evidence.

 9            MR. COOK:  No objection.

10            THE COURT:  Hearing no objection, it's admitted.

11            MR. ORTEGA:  May we publish it?

12            THE COURT:  Yes.

13            (Defense Exhibit 6053 admitted, and published.)

14    BY MR. ORTEGA:

15    Q.  So before we play it, I just want to ask you:  Is this

16    one of the videos that you selected once you were pulling

17    through your work to propose submitting to media outlets?

18    A.  Yes.

19            MR. ORTEGA:  Okay.  If we can play it.

20            (Defense Exhibit 6053 was published.)

21    BY MR. ORTEGA:

22    Q.  Why did you pick this video?

23    A.  I thought that moment was -- stood out and -- a lot to

24    me because there were the protests down there with thousands

25    and thousands of people fighting with police, tear gas, and

1    a bunch of other things.

2             And that was an interesting moment because that

3    was when the protesters and the police sort of had this,

4    like, moment of peace.  Like, there was, like, humanity in

5    this moment where the police officer was allowing the

6    protester to have his face rinsed off.  I am assuming he had

7    mace or something on his face that was sprayed on him.

8             MR. ORTEGA:  Okay.  Let's bring up Defense

9    Exhibit 6052.

10   BY MR. ORTEGA:

11   Q.  Do you recognize this photo?

12   A.  Yes.

13   Q.  Did you take it?

14   A.  Yes.

15            MR. ORTEGA:  Your Honor, move Defense Exhibit 6052

16   into evidence.

17            MR. COOK:  No objection.

18            THE COURT:  Hearing no objection, 6052 is

19   admitted.

20            (Defense Exhibit 6052 admitted, and published.)

21   BY MR. ORTEGA:

22   Q.  Is this another photo that you selected after you

23   returned from January 6th for editing and submission for

24   publication?

25   A.  Yes.

1    Q.  And why did you select this photo?

2    A.  I selected this photo because it was just -- without

3    holding a camera up to my face, this was the view I had at

4    the moment, just a landscape of Washington, D.C.  You can

5    see the D.C. monument in the background.  And closer to the

6    Capitol Building you can just see how large this event

7    actually was.

8              MR. ORTEGA:  Let's bring up Defense Exhibit --

9              THE COURT:  Wait just a second.

10             On this photograph, are you above the police

11   officers we see there on the upper terrace of the Capitol

12   Building?

13             THE WITNESS:  I don't recall what the specific

14   area is; but there was, like, some -- there was -- I don't

15   know if it was scaffolding or not, but there was some --

16   they looked like steps; and it was above that area right

17   there.

18             THE COURT:  So you climbed up the scaffolding to

19   take this picture?

20             THE WITNESS:  Yes.

21             MR. ORTEGA:  Let's pull up Defense Exhibit 6051.

22   BY MR. ORTEGA:

23   Q.  Is this another picture you took?

24   A.  Yes.

25             MR. ORTEGA:  Your Honor, I move to admit Defense

1    Exhibit 6051 into evidence.

2              THE COURT:  Any objection?

3              MR. COOK:  No objection, Your Honor.

4              THE COURT:  Hearing no objection, 6051 will be

5    admitted.

6              MR. ORTEGA:  May we publish?

7              THE COURT:  And it may be published.

8              (Defense Exhibit 6051 admitted, and published.)

9    BY MR. ORTEGA:

10   Q.  Can you describe this picture, and why you selected it?

11   A.  I selected this picture because I thought it was another

12   interesting moment where, at least for a short time, a lot

13   of the aggression had died down, and a group of other

14   protesters had opened and unfolded a large American flag and

15   were just waving it.

16             MR. ORTEGA:  Thank you.

17             Now, let's bring up Defense Exhibit 6040.

18   BY MR. ORTEGA:

19   Q.  Now, before I ask you about this picture, Mr. Herrera,

20   you were present inside the Capitol on January 6th, right?

21   A.  I was inside, yes.

22   Q.  And you went in there without permission.

23   A.  Yes.

24   Q.  And it was wrong for you to go in.

25   A.  It was absolutely wrong of me to do that.

1    Q.   Do you acknowledge that you shouldn't have done that?

2    A.   Yes.   I acknowledge I should not have done that.

3    Q.   Okay.   But you still went into the Capitol anyway, even

4    though you knew that you couldn't, right?

5    A.   Yes.

6    Q.   And are you going to ask this jury to hold you

7    responsible for that conduct?

8    A.   Yes.

9    Q.   Now, when you are inside the Capitol, you continue to

10   take photographs, right?

11   A.   Correct.

12   Q.   And so defense exhibit -- which is being displayed --

13   6040, is that a photograph that you took?

14   A.   Yes.

15            MR. ORTEGA:   And, Your Honor, permission to

16   publish Defense Exhibit 6040.

17            THE COURT:   Any objection?

18            MR. COOK:   No objection.

19            THE COURT:   Hearing no objection, 6040 will be

20   admitted, and may be published.

21            (Defense Exhibit 6040 admitted, and published.)

22   BY MR. ORTEGA:

23   Q.   Now, this picture is a picture that you took inside the

24   Capitol, right?

25   A.   Yes.

1    Q.  Is it one of the pictures that you submitted to the

2    media that you labeled as:  Inside the Capitol?

3    A.  Yes.

4    Q.  Okay.  And why did you choose this picture as something

5    to submit for publication?

6    A.  I picked this picture because -- I believe I was in the

7    Crypt part of the Capitol, and there was people walking all

8    around inside.  And this man, in the foreground, came right

9    into frame as soon as I took the picture; and it was just

10   coincidence he looked straight into the camera.  And I

11   thought his reaction just -- it kind of set the tone for the

12   picture; I thought it made it very interesting.

13            MR. ORTEGA:  Now let's go to Defense Exhibit 6041.

14   BY MR. ORTEGA:

15   Q.  Is this another picture that you took inside the

16   Capitol?

17   A.  Yes.

18            MR. ORTEGA:  Your Honor, I move Defense

19   Exhibit 6041 into evidence, and publish.

20            MR. COOK:  No objection, Your Honor.

21            THE COURT:  It will be admitted, and it may be

22   published.

23            (Defense Exhibit 6041 admitted, and published.)

24   BY MR. ORTEGA:

25   Q.  And can you describe why you selected this picture for

1   submission to the media?

2   A.  I selected this picture because it shows how crowded it

3   was inside the Crypt, and you could see some of the

4   emotion -- the raw emotions.  Like the women is the perfect

5   example; she's more, like, the center focal point of the

6   image.  She's just yelling or screaming -- chanting along

7   with the crowd, while holding her Trump flag.

8             MR. ORTEGA:  Let's bring up Exhibit 6045.

9   BY MR. ORTEGA:

10  Q.  Is this a photograph that you took?

11  A.  Yes.

12            MR. ORTEGA:  Your Honor, I move Defense

13  Exhibit 6045 into evidence.

14            MR. COOK:  No objection.

15            THE COURT:  Hearing no objection, it will be

16  admitted.  It may be published.

17            (Defense Exhibit 6045 admitted, and published.)

18  BY MR. ORTEGA:

19  Q.  Is this another picture that you selected for submission

20  to -- for publication?

21  A.  Yes.

22  Q.  And could you tell us a little bit about why you

23  selected this photo?

24  A.  I selected this picture because it was a perfect example

25  of the violence that was occurring on the Capitol, inside

1    and out.  I was feet away from this moment where this

2    protester is punching the officer.  It was just an

3    interesting photo in the sense of, you know, how a split

4    second of violence erupting, and police -- and what they --

5    what the Capitol Police were having to combat that day on

6    the Capitol.

7              MR. ORTEGA:  Can we pull up Defense Exhibit 6048,

8    please.

9    BY MR. ORTEGA:

10   Q.  Did you also take this picture?

11   A.  Yes.

12   Q.  Did you --

13             MR. ORTEGA:  Your Honor, I move Defense

14   Exhibit 6048 into evidence, and ask to publish.

15             MR. COOK:  No objection, Your Honor.

16             THE COURT:  Hearing no objection, 6048 may be

17   admitted and published.

18             (Defense Exhibit 6048 admitted, and published.)

19   BY MR. ORTEGA:

20   Q.  Can you tell us why you selected this picture for

21   submission for publication as well?

22   A.  I selected this picture because -- similar to the

23   previous one where you can see that I am feet away from some

24   of the physical violence occurring at the Capitol grounds

25   that day.

1              But I picked this picture more so because you can

2       see how upset and what the Capitol Police were having to

3       deal with that day.  You can see that the officer is

4       protecting himself and his partners.  On the face shield of

5       the helmet, he has some orange substance; so I was believing

6       that maybe one of the protesters had maced him.  So it just

7       adds a lot to, like, how much the police were going through

8       at the Capitol grounds that day.

9       Q.  Well, they were also dealing with you, right?

10      A.  Yes.

11      Q.  Because you went into the Capitol Building and caused

12      some disruption, right?

13      A.  Yes.

14      Q.  Let me talk to you a little bit about that.

15              The first time you went into the Capitol Building

16      you went into the Senate parliamentarian's office, right?

17      A.  Yes.

18      Q.  Do you know what -- before this trial, when we all

19      learned about it together, did you know what the Senate

20      parliamentarian was?

21      A.  No.

22      Q.  Do you know what a parliamentarian is?

23      A.  No.

24      Q.  Okay.  So when you traveled to Washington, D.C. on

25      January 6th, you didn't know what a Senate parliamentarian

```
1    was?

2    A.  I did not.

3    Q.  Okay.  So when you went in to her office, you didn't

4    specifically target that office for entry because it was the

5    Senate parliamentarian's office, right?

6    A.  That's correct.

7    Q.  Okay.  You still went in there, though, right?

8    A.  I did.

9    Q.  And you still picked up papers that you shouldn't be

10   handling, right?

11   A.  That's correct.

12   Q.  Why did you do that?

13   A.  I can't even begin to answer that because -- it's

14   something I think about every day.  That day -- everything

15   that was even happening outside and I was seeing outside

16   was -- it was just a lot, all of the constant screaming and

17   chanting, and people shoving each other; and seeing police

18   fight with the protesters kind of carried into the Capitol

19   Building.  I just -- I walked in, and the screaming and

20   chanting just continued; people all around me.

21             And I just, for some reason, had this moment of

22   where I wasn't thinking, and I just acted unprofessionally,

23   foolishly; it's just something I regret.  I don't know what

24   led me to get to that point but, after that, I instantly saw

25   it as a horrible mistake.
```

1    Q.  Well, you kept making mistakes that day, right?

2    A.  Yes.

3    Q.  When you were leaving that room, you picked up a bottle

4    of whiskey, right?

5    A.  I did.

6    Q.  Okay.  Why did you pick up a bottle of whiskey?

7    A.  For the same reasons.  I wasn't thinking.  I was just

8    acting foolishly again.  On my way out, I saw an open bottle

9    next to the entrance of the office, and I picked it up on my

10   way out.  And, again, just being caught up in that moment of

11   just the sheer insanity that was happening that day; it

12   was -- I just took a drink.

13          Again, I don't know how to explain those actions.

14   I don't have an excuse for justifying those actions.  I

15   just -- it was very unprofessional of me and very -- again,

16   a horrible mistake that continued.

17   Q.  And when you left that room -- I don't think you see it

18   on the video that you take a drink; but you actually, in

19   fact, did take a drink, right?

20   A.  Yes.

21   Q.  Okay.  You also hoist up the bottle in what looks like,

22   you know, a display to the crowd.

23          Are you lifting up the bottle because you were

24   hanging out with friends and cheering them on about what is

25   going on?

1    A.  Not cheering them about what is going on, but I was

2    still caught up in the same mindset from when I was inside.

3    I was just -- somehow I just got to this point where I

4    separated myself from being a photojournalist and just

5    acting inappropriately.

6    Q.  Did you know that people that were inside the Senate

7    parliamentarian office in that moment right before you

8    walked out with the alcohol bottle?

9    A.  Can you repeat that?

10   Q.  So in the Senate parliamentarian's office, before you

11   walk out with the whiskey bottle -- do you know the people

12   in the building, the demonstrators?

13   A.  No.

14   Q.  Okay.  You went into the Capitol Building by yourself?

15   A.  Yes.

16   Q.  Okay.  So when you are walking out with the bottle and

17   you lift it up, are you making that gesture at anyone

18   specifically in the crowd?

19   A.  I am not making it at anyone in particular.

20   Q.  And is that because you were there by yourself?

21   A.  It was because I was there by myself.

22   Q.  Okay.  And you see how that action, in retrospect, makes

23   you look, right?

24   A.  I do.

25   Q.  So after you exit the Capitol the first time, you go

1    right back in, right?

2    A.  Yes.

3    Q.  And you knew that you did not have permission to go back

4    in, right?

5    A.  That is correct.

6    Q.  And you went in anyway?

7    A.  Yes.

8    Q.  Okay.  And so when you are walking down the hallway as

9    we saw in the videos eventually you can be seen holding up

10   what looks -- can you just tell us what it was?

11   A.  It was a marijuana cigarette.

12   Q.  And did you smoke it?

13   A.  I did.

14   Q.  Okay.  And why are you doing that inside the Capitol?

15   A.  Once again, I don't know how I reached that point where

16   I just behaved unprofessionally and foolishly.  I don't know

17   what was going on through my head.  It was just at the

18   time -- again, I don't know how to explain my actions; I

19   just know that they were wrong, and I shouldn't have done

20   it.

21   Q.  So in one of the videos you can be seen flipping off the

22   camera -- I'm sorry, I almost did the gesture myself.

23           You know, you are caught on the phone and you are

24   in the background, and you come on and you flip off the

25   camera with kind of a grin.  Do you know those guys who were

1    in that room taking the video and holding the marijuana

2    cigarette?

3    A.   No, I don't know who they are.

4    Q.   Okay.  How did you get in the mix there and start, you

5    know, bumming a hit off the joint from them?

6    A.   They just happened to be there.  And that one particular

7    man that was smoking on camera, he is the one that I got it

8    from.

9    Q.   Okay.  But did you -- was that guy your friend?

10   A.   No.  I had never seen him before.

11   Q.   Did you ever talk to him again?

12   A.   No.

13   Q.   And so after you smoked the marijuana in that room --

14   you leave that room, and where do you go?

15   A.   I continue to take pictures inside the Capitol.

16   Q.   Okay.  And the pictures you take, are they some of the

17   ones we just saw a few minutes ago?

18   A.   Yes.

19   Q.   Do you have a sense for how many pictures you took that

20   day of the demonstrations?

21   A.   Probably hundreds.  I wasn't keeping track.  I was just

22   clicking away.

23   Q.   Okay.  So you can understand why it might be a fair

24   question to ask you, Mr. Herrera, whether you actually went

25   into the Capitol Building because you wanted to stop the

1   electoral count from happening because you wanted to

2   interfere with Congress doing its job.

3           Is that what you wanted to do?

4   A.   That's not what I wanted to do at all.

5   Q.   Okay.  You have made statements on Instagram from

6   November -- all the way until after even January 6th,

7   critical of the President, critical of the election, you

8   know, even saying that there was dishonesty close in time to

9   January 6th, why isn't that evidence that you went in there

10  to stop Joe Biden from becoming President?

11  A.   Why is that not evidence?

12  Q.   Yeah.

13  A.   Because it was just online banter.  I don't mean

14  everything -- in the literal sense, I don't mean everything

15  that I post online.  Like, sometimes I just say stuff to get

16  a reaction from certain people.

17  Q.   Are you sorry for what you did in the Capitol that day?

18  A.   Absolutely.  I regret having done all of that.

19           MR. ORTEGA:  May I have just a second, Your Honor?

20           THE COURT:  Yes.

21           MR. ORTEGA:  Your Honor, I am going to a different

22  lengthy chapter.  Should I stop here or should I keep going?

23           THE COURT:  Yes.  It's been a long day.

24           Ladies and gentlemen, we're going to stop here.

25           I will ask -- we're going to have a couple -- as I

1    said, we're going to have a few legal issues that are going

2    to be coming up as we're reaching the tail end of this

3    trial.  I am going to ask you to come in at 9:30 tomorrow

4    morning.

5           Of course, get here early if you want.  Relax,

6    read your paper, have snacks, coffee, but we're not going to

7    start until 9:30 tomorrow morning because we have a number

8    of legal issues we need to take up first thing.  We'll be

9    working, but you can be relaxing.

10          Do not talk about the case among yourselves or

11   with anybody else.  Deliberations are the time -- the time

12   for your deliberations is coming closer, so just hold on to

13   those discussions until you get to your deliberations after

14   I have given you your final instructions.

15          You all are excused.  Have a very pleasant

16   evening.

17          (Whereupon, the jury was excused.)

18          THE COURT:  Mr. Herrera, you can step down.

19          MR. ORTEGA:  Your Honor, can I collect the items?

20          THE COURT:  Yes, you could.

21          And could you just tell me if the door is closed?

22          MR. ORTEGA:  It's not closed.

23          THE COURT:  All right.  I just wanted to talk a

24   little bit about the jury charge.

25          I do leave it up to counsel to confer.

```
 1              Of course, the normal way to give the final jury
 2    instructions is that I am the last person to speak to the
 3    jury and give the jury instructions after closing arguments.
 4    But I do -- if both counsel agree, I can give the jury
 5    instructions before closing arguments if counsel would like
 6    that.  But if counsel can't agree, then we go to the default
 7    where I give the final instructions after closing arguments.
 8              Sometimes when there's lots of elements and lots
 9    of charges, you know, it's sometimes helpful for closing
10    arguments -- for me to give my jury instructions before
11    them.  But do you-all have a preference or do you want to
12    have an opportunity to confer?
13              MR. COOK:  I think we would like to confer.
14              THE COURT:  An opportunity to confer.  Okay.
15              MS. SCHESNOL:  Now?
16              THE COURT:  You can do that right now, if you
17    want.  I don't know how long it will take.
18              (Whereupon, counsel confer.)
19              MR. OGATA:  Your Honor, we are fine with --
20              THE COURT:  I couldn't hear you.
21              MR. OGATA:  Giving jury instructions before
22    closings is fine with the parties, Your Honor.  Thank you.
23              THE COURT:  That's fine.  I will do that, then.
24              Okay.  So that's number one.
25              Number two, I have gone through the joint pretrial
```

1    statement, and the back and forth between the parties on

2    certain objections to things.  I have prepared my first cut

3    of what the final jury instructions should read as.  So let

4    me just tell you how this is going to go, and the way I do

5    my charging conference.

6              I have a couple of questions I want to review now,

7    and a couple of things I want to talk about now; I will send

8    those out.

9              My charging conferences, which shouldn't surprise

10   you at this point, are quite efficient -- quite efficient.

11   I hand you out a circulation draft of the jury instructions,

12   we go through it page by page to see who has objections to

13   what and what they are; and I will resolve them right then,

14   if I can.  I expect to do the charging conference starting

15   at 9 a.m. tomorrow morning.

16             Either -- probably later this evening my law clerk

17   will send to you the circulation draft so that you will be

18   able to see that tonight while you are also preparing for

19   your cross-examination and your closing arguments, but

20   that's the way the trial works.

21             The proposed jury instructions made reference to

22   an indictment.  I do not believe a jury -- a petit jury

23   needs to be confused with what a grand jury has done.  I do

24   not mention "indictment" any place in my jury instructions,

25   so you're going to see -- and I do not send the indictment

1    back with the jury.  The jury will see each charge in the

2    jury instructions, and they will each get a copy of the jury

3    instructions; so that's one of the things you will see.

4    Each charge lifted directly from the indictment is in the

5    jury instructions; I will read it to them from my jury

6    instructions.  They will have it with them in the jury room

7    for deliberations.  And there is no reason -- some of your

8    proposed charges mentioned the indictment scattered

9    throughout, and those -- no reference to indictment in my

10   jury instructions.

11          You will see from my circulation draft that there

12   will be some parts that are highlighted which is precisely

13   what I want to talk about tomorrow at the charging

14   conference that I haven't -- I want to hear more argument on

15   it.  And where one side or the other has proposed one thing

16   or another, I have made my first cut; but that doesn't mean

17   you don't have an opportunity to try and persuade me

18   otherwise tomorrow morning.  But you will see my first cut

19   from -- just based on the joint pretrial statement.

20          Okay.  So you are going to get the circulation

21   draft.  You are going to see it is going to have highlighted

22   areas; those are the parts you should focus on for

23   conversation.  And it's footnoted so you can see where I am

24   getting things from.

25          The final copy that I send back with the jury has

1     the captions that are located in the middle of the page.

2     All of the captions for each paragraph in the footnotes are

3     eliminated for the final jury instructions sent back to the

4     jury, if that makes sense.  You will see it -- you will

5     understand it better when you see the circulation draft.

6             I think that's it.

7             One other thing I usually include in my jury

8     instructions -- it is the practice in this district to

9     include a defense theory of the case, so you will have to

10    look at that.  I usually make it up, and then -- so that's

11    certainly going to be something that's highlighted.  But

12    just so you know what my current working circulation draft

13    will say -- oftentimes, it's just the defendant, name,

14    denies all charges.

15            I think here -- what I have put in for the defense

16    theory of the case, which you should focus on, is defendant

17    Erik Herrera admits, based on what I have heard, that he

18    committed the violations charged in Counts 2, 3, 4, and 5,

19    but denies the charge in Count 1.  Specifically, he denies

20    that he acted with the requisite intent corruptly to

21    obstruct, influence, and impede Congress's certification of

22    the Electoral College vote on January 6, 2021, and, instead,

23    contends that he was acting as a photojournalist.

24            So that is my proposal, but I'm making it up based

25    on what I have heard.  So I am clear -- that's certainly

273

1    highlighted because I will put in whatever you say your

2    defense theory of the case is.

3              I think that's about it.

4              So you will see that later tonight.  I will see

5    you all here at 9 o'clock in the morning to run through this

6    fairly quickly so we can all be prepared.

7              Is the government thinking it might have a

8    rebuttal case or do you have to confer tonight?

9              MR. COOK:  Highly unlikely, Your Honor.  Depends

10   on what comes out in cross-examination, but highly unlikely

11   at this point.

12             THE COURT:  Okay.

13             Okay.  Anything else anybody would like to discuss

14   tonight?

15             MR. COOK:  Your Honor, we mentioned previously

16   sending a proposed instruction for the 1512 count for mixed

17   or dual intent.

18             THE COURT:  Right.  But I haven't seen anything.

19             MR. COOK:  We provided a draft to the defense.  I

20   believe they're still reviewing it; but we will probably

21   send something to you tonight over email for a proposed

22   instruction.

23             THE COURT:  Okay.  What are you proposing?  I

24   mean, the charge is pretty clear about what you have to

25   prove in terms of the intent.

1          MR. COOK:  It would be a mixed instruction for

2     mixed or dual intent as it pertains to the 1512 count.  I

3     can read the instruction now, to the proposal, if you'd like

4     me to.

5          THE COURT:  Sure.

6          MR. COOK:  A person may act with more than --

7          THE COURT:  And are you -- I'm sorry to interrupt

8     you when you just got started.

9          Are you -- do you have a model jury instruction

10    from some circuit --

11         MR. COOK:  Well, we have some case law that we

12    have cited to you for our --

13         THE COURT:  I see.  Okay.

14         MR. COOK:  -- for our instruction.

15         THE COURT:  Well, I would like to see the case

16    law; that's, in fact, almost more important.

17         What's the case law you are citing?

18         MR. COOK:  So it would be *United States v Brown*,

19    934 F.3d 1278, 1307, Eleventh Circuit, 2019.

20         And it would be *United States v Woodward*,

21    149 F.3d, 4670, First Circuit 1998.

22         And *United States v Bryant*, 655 F.3d. 232, 245-46;

23    and that's a Third Circuit case from 2011.

24         And *United States v Coyne,* C-O-Y-N-E, and that's

25    4 F.3d. 100, 113, Second Circuit 1993.

1          THE COURT:  Well, I am not hearing the magic

2     circuit.  Oh, well.  You don't have as many criminal cases

3     as other circuits.  Okay.  Well, send it as soon as you can.

4          And what's the defense position so I can get -- I

5     can start thinking about that before tomorrow morning?

6          MR. ORTEGA:  I can just offer you my general

7     thoughts, Your Honor, on the instruction.

8          THE COURT:  I'm sorry, what?

9          MR. ORTEGA:  I can give you some preliminary

10     thoughts on the proposal, if you'd like.

11          THE COURT:  Sure.

12          MR. ORTEGA:  We don't think it's necessary because

13     the cases cited for this instruction mostly deal with

14     bribery and very specific types of actions, for example, one

15     of the cases using a Taser.  And so the instruction is, you

16     know, when an officer uses a Taser, it can have also a

17     lawful purpose in addition to an unlawful purpose, that

18     specific action.

19          Or in a bribery case, when someone conveys a meal

20     or a benefit, even though that conveyance might itself be

21     lawful, it could also be -- it could also have an unlawful

22     purpose.

23          Here, we are dealing with just kind of a general

24     issue of intent which --

25          THE COURT:  So these cases that have been cited --

1    sorry to interrupt you -- are not 1512(c) cases; they're

2    involving dual purpose in other criminal contexts?

3            MR. ORTEGA:  Yes, Your Honor.  Although, I did

4    read them very quickly.

5            THE COURT:  Okay.

6            MR. ORTEGA:  And so I think that, you know, if --

7    we would have to give that instruction in every case where a

8    defendant is denying intent because he says:  I didn't have

9    intent; I was trying to do something else.

10           So I don't think that this particular instruction

11   from these types of -- from this authority, anyway, is

12   appropriate here, so we would object to this instruction.

13           THE COURT:  All right.  Well, let me just say that

14   Count 1, for the obstruction count, essentially provides

15   three different theories to prove that count.  The

16   substantive direct instruction, aiding and abetting, and

17   attempt -- that's an awful lot of theories to get a

18   conviction on, then to add a dual purpose intent -- I don't

19   know, it seems like that's expanding -- that's expanding the

20   scope even more than is already provided by the substantive

21   aiding and abetting and attempt theories of criminal

22   culpability under that count; but that's my first

23   impression.  Send that language promptly.

24           MR. COOK:  Will do, Your Honor.

25           THE COURT:  All right.  Have a nice evening.

1          (Whereupon, the proceeding concludes, 5:15 p.m.)

2                             *  *  *  *  *

3                           **CERTIFICATE**

4

5          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

6     certify that the foregoing constitutes a true and accurate

7     transcript of my stenographic notes, and is a full, true,

8     and complete transcript of the proceedings to the best of my

9     ability.

10          This certificate shall be considered null and void

11     if the transcript is disassembled and/or photocopied in any

12     manner by any party without authorization of the signatory

13     below.

14          Dated this 12th day of September, 2022

15          /s/Elizabeth Saint-Loth, RPR, FCRR
16          Official Court Reporter

17

18

19

20

21

22

23

24

25