**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **CASE NO. 21-CR-619-BAH** |
| **v.** | : | |
| | : | |
| **ERIK HERRERA,** | : | |
| | : | |
| **Defendant.** | : | |

## ERIK HERRERA'S REPLY

## TO GOVERNMENT'S SENTENCING MEMORANDUM

Erik Herrera, through undersigned counsel, Federal Public Defender Cuauhtemoc Ortega, hereby submits his reply to the government's sentencing memorandum.

## I.    INTRODUCTION

Because Mr. Herrera already discussed the disputed sentencing guidelines issues in his initial memorandum, he will limit this reply to addressing a few other arguments the government advanced in its briefing.  Mr. Herrera appends to this reply brief additional letters of support he has received from friends and family.  He is mindful that letters of support were due with his initial sentencing memorandum per the Court's Standing Order (Docket No. 10, at 6), but includes them with this reply in case the Court is inclined to excuse the delay and review them.[1]

## II.    DISCUSSION

### A.    Unwarranted Sentencing Disparities

Ironically, while requesting an excessive 78 month sentence, the government turns the Court's attention to two other matters where the Court imposed a lower sentence on defendants with more egregious conduct. In *United States v. Anthony Williams*, 21-cr-377-BAH, the Court

---

[1] Attached as Exhibits 1-3 are letters of support from Mr. Herrera's father, mother, and sister respectively.  Exhibit 4 is a letter of support from a friend.

imposed a sentence of 60 months--or, 18 months below the government's recommendation for Mr. Herrera.  Unlike Mr. Herrera, Mr. Williams actively discussed traveling to Washington, D.C. on January 6 for the express purpose of "Storm[ing] the Swamp." *See* Government's Sentencing Memo., 21-cr-377-BAH, Docket No. 120, at 9. Additionally, as the government wrote in its sentencing position:

> On December 29, 2021, Williams again expressed his anger and his intention to go to Congress, stating, "yep, we pissed and we comin to Congress." *See* Government's Trial Exhibit 9.21. On December 30, 2020, Williams again posted his intentions, both on Facebook and Patriots.win, to go to D.C. on January 6.   On Facebook he reposted a message former President Donald Trump posted on Twitter stating, "JANUARY SIXTH, SEE YOU IN DC!"   *See* Government's Trial Exhibit 9.22. Williams followed by posting in Patriots.win that he was going to D.C. to "Storm the Swamp." *See* Government's Trial Exhibit 9.23.

*Id.*  Mr. Williams also apparently identified "evacuation" routes for protestors prior to the traveling to the Capitol on January 6, further confirming that he had a violent and disruptive intent before he arrived in Washington, D.C. *Id.* Once in Washington, D.C., on January 6, Mr. Williams bragged about physically charging against law enforcement:

> At approximately 2:16 p.m., Williams recorded a video on the Northwest stairs where he boasted that, "*We just stormed the stairs of the Capitol, pushed the cops back and were maced and pepper sprayed, and hit everybody. Fuck that, we took this fucking building.*" *See* Government's Trial Exhibit 4.1.

*Id.* Mr. Williams was amongst the first waive to enter the Capitol building, according to the government, stole water the police intended to use to wash out their eyes in case of exposure to tear gas, and then actively resisted when police tried to force him out of the building:

> Williams, however, was captured in another rioter's video and shown resisting the police
> as he locked arms with another rioter. *See* Government's Exhibit 3.0.
>
> Williams not only resisted the police, but he mocked them when they tried to force him
> out of the Rotunda, yelling to them to "social distance." *See* Government's Trial Exhibit 1.0.

*Id.* at 23.  After he left Washington, D.C., Mr. Williams bragged that he had "absolutely no remorse or fear" regarding his actions that day. *Id.* at 24. Astonishingly, though government seeks a perjury/obstruction adjustment against Mr. Herrera, who admitted significant portions of the charged conduct voluntarily while on the stand, it did not seek the same adjustment for Mr. Williams, who lied in very unambiguous ways while testifying: for example, he only admitted to having helped use bicycle racks to help other protestors access the Capitol when he was confronted with video evidence on cross examination. *Id.* at 11.  For good reason, in discussing *Williams*, the government makes no effort to explain why Mr. Herrera, whose conduct is significantly less serious than Mr. Williams, deserves a substantially higher sentence.

In *United States v. Matthew Bledsoe*, 21-cr-204-BAH, the Court sentenced the defendant to 48 months incarceration. Unlike Mr. Herrera, who admitted that he entered the Capitol building without permission, Mr. Bledsoe apparently was reluctant to accept responsibility for this conduct during his testimony, as the government wrote in their sentencing memorandum:

> the building." Tr. 7/20/22 @ 81:23-24.  Bledsoe acknowledged that several police officers were
> standing near a door in the same area, but he believed "their body language and everything was as
> if nothing was wrong," and "there was no indication that we weren't" permitted to go inside. Tr.
> 7/20/22 @ 81:25-82:7.

*See* Government's Sentencing Memo., *Bledsoe*, 21-cr-204-BAH, Docket No. 28, at 14. Unlike Mr. Herrera, Mr. Bledsoe also made statements to the other protestors as the Capitol was being breached, suggesting that he was intent on finding and confronting members of government:

> Bledsoe proudly announced his presence and purpose as he approached and crossed the threshold
> into the Capitol: "We in this bitch!  In the Capitol!  This is our house!  We pay for this shit!
> Where's those pieces of shit at?"  Ex. 2.29.  He ignored signs of forced entry as he entered and

*Id.* at 9. Mr. Bledsoe also joined a group that was yelling, "Nancy! Nancy! Nancy!"  *Id.* Again, unlike Mr. Herrera, he was wearing Trump's name and carrying a large Trump flag while engaged in this disturbing behavior.

The government says that Mr. Herrera's conduct was more serious because Mr. Bledsoe "did not actually enter any sensitive spaces," but that is not quite true.  Mr. Bledsoe was described by the government as "within eyesight of the House Chamber Main Door where other rioters were trying to gain access to the House Floor." *Id.* at 10.  "During this time, Members of the House of Representatives and staff were trapped inside the House Gallery while Bledsoe along with other mob members obstructed pathways to safety." *Id.* at 10-11. Nothing Mr. Herrera did matched this level of disruption and danger--not even close--yet the government asks the Court to sentence Mr. Herrera to thirty more months than Mr. Bledsoe.

Along these lines, the Court has sentenced defendants other than Mr. Williams and Mr. Bledsoe with starkly more serious conduct to less time than Probation and the government are requesting here. For example, in *United States v. Cody Mattice and James Phillip Mault*, 21-cr-657-BAH, the defendants conspired with each other prior to traveling to Washington, D.C., with a clear motive to cause disruption.  *See* Defendant Mattice's Statement of Offense, 21-cr-657-BAH, Docket No. 44, at 3.  Once in Washington, D.C., the defendants removed metal barricades, facilitating the crowd's breach and endangering law enforcement:

> 16.     At around 2:30 p.m., in the Capitol's West Plaza, the defendant pulled down one
> segment of the metal barricades that stood in front of a police line. The defendant quickly grabbed
> it with both hands, pulling it away from the police and onto the ground. A short time later, rioters
> overwhelmed the police line, forcing police officers to retreat through that central staircase, up to

*Id.*  Not only that, the defendants attempted to cause additional targeted and serious physical

harm to law enforcement, at one point aiding and abetting each other in discharging chemical

spray onto a police officer:

> 19.     After the defendant reached the tunnel, he grabbed onto and hung from the wooden
> frame surrounding the arch and was supported by members of the crowd. Mault followed closely
> behind, also crawling over the crowd, and grabbed and hung from the arch. After Mault was
> securely hanging from the arch, the defendant turned to his right, reached toward the outstretched
> hand of another rioter, and grabbed a small object which appeared to be a canister containing
> chemical spray. He appeared to pass the item from his right to left hand, then reached out, across
> Mault's body with his left arm extended, and sprayed chemical spray at police officers defending
> the tunnel. He held his thumb on the canister, discharging chemical spray at police officers for
> about ten seconds. Then, a short time later, he fell backwards into the crowd.

*Id.*  The defendants were each sentenced to 44 months imprisonment.  *See* 21-cr-657-BAH,

Docket Nos. 72, 74.  Mr. Mattice's and Mr. Mault's conduct is in another league entirely than

Mr. Herrera's.  Yet the government seeks a sentence that is 34 months higher--a hair away from

being doubled--for Mr. Herrera.

In *United States v. Greg Rubenacker*, 21-cr-193-BAH, the defendant was sentenced to 41

months on the most serious count after pleading guilty.  Unlike Mr. Herrera, Mr. Rubenacker

entered the Capitol and attempted to hurt law enforcement:

14.   Law enforcement officers continued to try and remove individuals from the Rotunda.  Rubenacker did not leave.  At approximately 3:08 p.m., Rubenacker swung a plastic bottle at an officer.  At approximately 3:09 p.m., Rubenacker sprayed water from his bottle across multiple law enforcement officers engaging with other individuals.   Law enforcement pepper sprayed the crowd, including Rubenacker.

*See* Defendant Rubenacker's Stipulation of Facts for Plea Purposes, 21-cr-193-BAH, Docket No. 48, at 4.  He did the foregoing after mocking them:

removing individuals from the Rotunda.  At approximately 3:06 p.m., Rubenacker, near the front of the crowd, recorded himself yelling at law enforcement officers, "You serve this country.  Are you even proud of yourself?  Are you guys even proud of yourselves?  Who are you serving?  Who are you guys serving?  Who are you guys serving?  We are the people!  Why are you not protecting us?"

*Id.*  While it is fair to consider that Mr. Mattice, Mr. Mault, and Mr. Rubenacker all pled guilty and accepted responsibility before trial, that factor alone does not justify the unjust result of Mr. Herrera being punished so much more severely than any of them for conduct that was not as serious.  A person who attempts murder could confess to it, but that does not make them more honorable or more deserving of leniency than a person who will not admit stealing a vehicle. The underlying actions must be compared to reach a just result.

**B.      Entry Into Sensitive Spaces**

Throughout its sentencing memorandum, government cites the fact that Mr. Herrera entered sensitive spaces--the Senate Parliamentarian's Office and a Senator's Hideaway Office-- arguing that this constitutes an aggravating factor. While the government has established, and Mr. Herrera has readily admitted, that he entered these spaces, the government has never established that Mr. Herrera knew the sensitive nature of those spaces relative to other spaces in

Case 1:21-cr-00619-BAH   Document 78   Filed 01/04/23   Page 7 of 10


the Capitol.  When asked at trial on direct whether he knew what the Senate Parliamentarian is,

he said no, and that fact remains unrebutted:

> Q.  Let me talk to you a little bit about that.
>
>      The first time you went into the Capitol Building
> you went into the Senate parliamentarian's office, right?
>
> A.  Yes.
>
> Q.  Do you know what -- before this trial, when we all
> learned about it together, did you know what the Senate
> parliamentarian was?
>
> A.  No.
>
> Q.  Do you know what a parliamentarian is?
>
> A.  No.

*See* Tr., 08/17/22, at 261 (attached as Exhibit 1 to Defendant's Sentencing Memorandum).  Truth

be told, it is not surprising that he does not know what the Senate Parliamentarian does--most

people outside of politics probably do not.  The government has similarly not established that

Mr. Herrera specifically knew he was in a sensitive "hideaway office." Mr. Herrera does not

contest that it was illegal and highly problematic that he was in the Capitol building and inside

individual offices.  But the government is making factual assumptions about his knowledge and

intent with regard to the *sensitivity* of these specific spaces without any basis, and it is using such

assumptions to drive up its sentencing recommendation. That is wrong.

###### C.        Deterrence and Respect for the Law

The government states that "a lengthy term of incarceration" for Mr. Herrera is necessary to advance the statutory goals of deterrence.  (Gov't Sentencing Memo., at 41).  In discussing the importance of the guidelines, it also states that "the Guidelines will be a powerful driver of consistency and fairness moving forward."  (*Id.*).  This Court, not the guidelines, can be the driver of consistency and fairness, especially in the face of radical government inconsistency in how it has selected to prosecute these cases.

Just three months before Mr. Herrera's scheduled sentencing date, for example, the government in *United States v. Jesus D. Rivera,* 21-cr-60-CKK[2], recommended a sentence of nine months imprisonment for a defendant it opted to charge only with misdemeanors, even though his conduct bears certain similarities to, or is more serious than, Mr. Herrera's actions. In *Rivera*, the defendant was convicted after a bench trial.  The government summarized Mr. Rivera's conduct as follows:

---

[2] Government's sentencing memorandum in *United States v. Jesus D. Rivera*, is attached as Exhibit 5.

As explained herein, a sentence of a nine months' incarceration, followed by 12 months of supervised release, and $500 in restitution is appropriate in this case because Rivera: (1) filmed the assault on the police at the Lower West Terrace as they attempted to hold off rioters who were trying to get to the Upper West Terrace, and continued filming the assault on police as their line gave way; (2) encouraged rioters climbing the walls to the Upper West Terrace, yelling to them that "there's an easier way up!"; (3) made a concerted effort to go to the front of the mob that was trying to breach the Senate Wing Door; (4) watched rioters breach the Parliamentarian Door; (5) entered the Capitol through a broken window adjacent to the Senate Wing Door; (6) spent 20 minutes inside the Capitol going, as he had previously stated he would, to the "middle" by entering the Crypt; (7) live-streamed the riot and urged his followers to share his broadcast, as he celebrated the riot and the destruction of property as it was on-going; and (8) in the days after the riot, not only demonstrated no remorse or contrition for his acts, but instead mocked the pain and trauma suffered by victims and celebrated his participation in the riot in public posts on his social media accounts.

See Government's Sentencing Memo., 21-cr-60-CKK, Docket No. 69, at 2.  Mr. Rivera's conduct was significantly worse, particularly because he attempted to helped rioters seek easier entry onto restricted grounds.  However, the government here seeks a sentence that is almost nine times as severe as the sentencing it recommended for Mr. Rivera, though it had the power to charge him with a felony (or to not charge Mr. Herrera with a felony).  It is stunning, then, that the government would encourage the Court to apply the guidelines for "consistency" when it has created fundamental inconsistencies by its charging decisions.

The public understands that in an event involving hundreds of people, punishment will be meted out according to defendant's individual roles and responsibilities.  Mr. Herrera's actions were more akin to those of Mr. Rivera, than to those of the more serious offenders.  Thus, even if

the Court disagrees with Mr. Herrera's guidelines calculations, it should vary downward to ensure that its sentence is fair and just notwithstanding the government's charging inconsistency.

## III.    CONCLUSION

Mr. Herrera, for the reasons stated in  his sentencing memorandum and this reply, respectfully requests that the Court sentence him to a term of imprisonment of 15 months, a sentence within the correct sentencing guidelines range, three years of supervised release, $2,000 in restitution, and a total of $170 in special assessments.

Respectfully submitted,


DATED:  January 4, 2023.          /s/  Cuauhtemoc Ortega

CUAUHTEMOC ORTEGA
Federal Public Defender
(Cal. Bar No. 257443)
(E-Mail:  Cuauhtemoc_Ortega@fd.org)

321 East 2nd Street
Los Angeles, CA 90012
Telephone:  (213) 894-2854
Facsimile:  (213) 894-0081